Francesca Morris
Harmony I. Loube
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York  10007-3189
Tel:  (212) 513-3200
Fax:  (212) 385-9010
E-mail:  francesca.morris@hklaw.com
        harmony.loube@hklaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KALAFRANA SHIPPING LTD.,<br><br>              Plaintiff,<br><br>    - against -<br><br>SEA GULL SHIPPING CO. LTD.,<br><br>              Defendant. | 08 Civ. 5299 (SAS)<br><br>**AFFIRMATION OF FRANCESCA<br>MORRIS IN SUPPORT<br>OF MOTION TO VACATE<br><u>AND REDUCE ATTACHMENT</u>** |

I, Francesca Morris, declare under penalty of perjury that the following is true and correct:

1.    I am a member of the firm of Holland & Knight LLP, attorneys for Defendant, Sea Gull Shipping Co. Ltd. ("Sea Gull" or "Defendant") and I am duly admitted to practice before the United States District Court for the Southern District of New York.

2.    I am familiar with the facts and circumstances underlying this dispute and I am submitting this affirmation in support of Sea Gull's motion to vacate, in part, and reduce the attachment obtained by Kalafrana.

3.    Attached hereto as Exhibit A is a true and correct copy of the Verified Complaint filed by Plaintiff Kalafrana Shipping Ltd. ("Kalafrana" or "Plaintiff") on or about June 10, 2008.

4.      Attached hereto as Exhibit B is a true and correct copy of the Ex-Parte Order for Process of Maritime Attachment entered by the Court on or about June 10, 2008.

5.      On July 23, 2008, I wrote to Plaintiff's counsel, Christopher H. Mansuy of Mahoney & Keane LLP.  A true and correct copy of my July 23, 2008 letter is attached hereto as Exhibit C (the "July 23rd Letter").

6.      In the July 23rd Letter I explained that, it is well established in binding precedent that a contract for the sale of a vessel is not a maritime contract and I provided citations to relevant cases.  I explained in the letter that Kalafrana does not have a maritime claim for the alleged breach of the contract for sale of a vessel.

7.      Accordingly, I requested that Kalafrana immediately reduce the attachment to reflect only its maritime claim for wrongful arrest.

8.      By letter dated July 28, 2008, Plaintiff declined to release the funds.  Attached hereto as Exhibit D is a true and correct copy of Plaintiff's July 28, 2008 letter.

9.      Attached hereto as Exhibit E is a true and correct copy of an Opinion and Order entered in the case *Stolthaven v. Rachel B*, 08-Civ-4327 (S.D.N.Y July 18, 2008).

10.     Attached hereto as Exhibit F is a true and correct copy of the Memorandum of Agreement dated May 4, 2006.

I, Francesca Morris, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct.  Executed on August 7, 2008 in New York, New York.


_____
Francesca Morris

# Exhibit A

3593

**MAHONEY & KEANE, LLP**
76 Beaver Street, 10ᵗʰ Floor
New York, New York 10005
(212) 385-1422

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
KALAFRANA SHIPPING LTD,

                                        Plaintiff,

          - against -

SEA GULL SHIPPING  CO. LTD, a/k/a Sea Gull
Shipping Co. SARL

                                        Defendant.
-----------------------------------------------------------X

08 Civ. 5299 (SAS)

**VERIFIED COMPLAINT,
PETITION
AND RULE B ATTACHMENT**

          Plaintiff KALAFRANA SHIPPING LTD by its attorneys, Mahoney & Keane, LLP., as

and for its Verified Complaint against Defendant SEA GULL SHIPPING CO. Ltd., a/k/a Sea Gull

Shipping Co. SARL alleges upon information and belief, as follows:

          1.          This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 U.S.C. § 1333.  This Honorable Court's Supplemental

Jurisdiction is also invoked pursuant to 28 U.S.C. § 1367 as set forth more fully hereinafter.

          2.          Venue is proper under 28 U.S.C. §§ 1391(d) because Defendant Sea Gull

Shipping Co. Ltd. (hereafter referred to as "defendant" or "Sea Gull") is an alien.

          3.          At and during all times hereinafter mentioned, Plaintiff Kalafrana Shipping Ltd

(hereinafter referred to as "plaintiff" or "Kalafrana") was, and still is, a corporation organized and

existing under and by virtue of the laws of the Republic of Malta with a principal place of

business located at Mercury House, 125 Old Mint Street, Valletta, VLT 12, Malta, and was and is engaged in the business of owning and/or operating vessels for profit in world wide trade.

4.      Upon information and belief, Defendant Sea Gull is a corporation or other business entity incorporated under the laws of the Lebanese Republic with an office and place of business located at Riad El Soloh Street, 1st Floor, Bizri Building, behind Jammal Bank, Saida, Lebanon. At all times hereinafter mentioned, Sea Gull was engaged, *inter alia*, in the business of owning, operating and chartering vessels.

5.      On or about May 4, 2006 plaintiff and defendant entered into an agreement whereby defendant would sell the ro-ro Motor Vessel ASSIL to defendant under certain terms and conditions including, but not limited to, the parties' agreement that all disputes would be submitted to arbitration at London under the auspices of the London Maritime Arbitrators' Association.

6.      Thereafter, defendant did not perform its obligations under the aforesaid agreement, plaintiff purchased the vessel from a third party and numerous disputes ensued between plaintiff and defendant involving the value of bunker fuel and lube oil aboard the vessel on or about June 16, 2006, the responsibility for the cost of effecting engine and other repairs necessary for the vessel to satisfy Classification Society requirements, certain bottom cleaning and class inspection costs, certain crew subsistence and repatriation expenses, certain engine serviceman fees, certain vessel agency and husbanding fees at the Port of Genoa, Italy and the allegedly wrongful arrest of the vessel by defendant at the Port of Trieste, Italy during the period April 4 through April 6, 2007.

7.      The parties' disputes were submitted to an arbitration tribunal consisting of sole arbitrator Christopher Fyans who rendered a final award on December 12, 2007, as subsequently

2

corrected as to the content of one paragraph on January 11, 2008. A copy of the award, reasons for the award and correction to the award is annexed hereto as Exhibit 1.

8.    The arbitrator awarded to plaintiff the sum of US$34,855.36 for damages incurred by plaintiff as a result of the aforesaid wrongful arrest of the vessel by defendant at Trieste.

9.    The arbitrator awarded to plaintiff the sum of US$509,350 necessarily expended to repair the vessel's engines and other equipment and systems to satisfy Classification Society requirements.

10.    The arbitrator awarded to plaintiff the aggregate sum of US$97,069.37 for various expenses incurred at the Port of Genoa.

11.    The arbitrator declared that plaintiff was entitled to set off certain of the amounts awarded to it against the sum of US$79,113.40 claimed by the defendant as the value of bunker fuel and lube oil.

12.    The arbitrator also awarded to plaintiff compound interest on certain sums at the rate of 6.4% per annum calculated to be $49,212.29 up to December 12, 2007 totaling along with the other net sums awarded as referred to in paragraphs 8 through 11 $611,373.62, which total sum earned interest at the rate of 6.0% per annum from December 28, 2007 in accordance with paragraph E of the Award (pp. 5-6) thus totaling US$627,163.36 as of May 31, 2008 and thereafter at the rate of $102.01 per day up to June 27, 2008 when the accrued interest will be compounded and daily rate recalculated based upon the new principal.

13.    The arbitrator awarded to plaintiff its reasonable costs of the arbitration, which remain unliquidated, and also assessed the arbitrator's costs against defendant as the primary obligor or as indemnitor in the event plaintiff paid the arbitrator his fee in British pounds, equivalent to US$ 12,140, which payment plaintiff made on December 19, 2007 to the arbitrator.

3

14.     Although plaintiff has fulfilled all conditions precedent and made demand upon defendant for payment, defendant has wrongfully failed to pay any portion of the Arbitration Award.

15.     Under the law of the place where the award was made, being English law, the award is final.

## AS AND FOR A FIRST CAUSE OF ACTION

16.     Plaintiff repeats and re-alleges paragraphs 1 through 8 and 12 through 15 and incorporates them herein by reference as though fully set forth at length.

17.     Plaintiff is entitled to and hereby prays for confirmation of the arbitration award in the amount of US$34,855.36 with respect to damages sustained as a result of the wrongful arrest of the vessel by defendant plus interest in the amount of US$2,355.36 through May, 31, 2008 and accruing thereafter at the rate of US$6.05 per day until June 27, 2008, and for entry of judgment thereon pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* and/or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented at 9 U.S.C. §§ 202 *et seq.*

## AS AND FOR A SECOND CAUSE OF ACTION

18.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth at length.

19.     Plaintiff is entitled to and hereby prays for confirmation of the arbitration award in the amount of US$12,472.02, being the amount of fees paid to the arbitrator by plaintiff plus interest in the amount of US$332.02 through May, 31, 2008 and accruing thereafter at the rate of US$2.03 per day until June 18, 2008, and for entry of judgment thereon pursuant to the Federal

Arbitration Act, 9 U.S.C. §§ 1 *et seq.* and/or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented at 9 U.S.C. §§ 202 *et seq.*

### AS AND FOR A THIRD CAUSE OF ACTION

20.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth at length.

21.     As a result of defendant's breach of the contract, the arbitrator awarded the plaintiff the additional sum of US$527,305.97 plus interest in the amount of US$62,646.67 as of May 31, 2008 and accruing thereafter at the rate of US$95.95 per day until June 27, 2008, and plaintiff prays for confirmation of the award in the aggregate amount of US$589,952.64 and entry of judgment thereon in accordance with the Court's Admiralty jurisdiction or jurisdiction supplemental to the claims asserted in the First and Second Causes of Action and pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented at 9 U.S.C. §§ 202 *et seq.*

### APPLICATION FOR ISSUANCE
### OF A RULE B ATTACHMENT

22.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth at length.

23.     After due investigation, the defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, defendant has, or will have during the pendency of this action, assets, comprising *inter alia,* cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of defendant, or either of them ("assets"), including

5

but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, within this District and subject to the jurisdiction of this Court including, but not limited to, UBS Bank, HSBC (USA), Bank of America, Deutsche Bank, Wachovia, Citibank, American Express Bank, J.P. Morgan Chase, Bank of New York Mellon, and/or Standard Chartered Bank, which are believed to be due and owing to the defendant.

24.    The Plaintiff seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims attaching any assets of the defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the defendant and to secure and/or satisfy the plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the defendant citing each to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That, since the defendant Sea Gull Shipping Co. Ltd. cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property in whatever form, including but not limited to cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of defendant("assets"), including but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be

6

served with a copy of the Process of Attachment issued herein, including, but not limited to, UBS Bank, HSBC (USA), Bank of America, Wachovia, Deutsche Bank, Citibank, American Express Bank, J.P. Morgan Chase, Bank of New York Mellon and/or Standard Chartered Bank, which are believed to be due and owing to the defendant Sea Gull Shipping Co. Ltd. in the amount of US$639,635.38 to satisfy and/or secure plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B to answer the matters alleged in the Complaint

C.    That this Court confirm the arbitration award(Exhibit 1) and enter judgment thereon in the total amount of US$639,635.38 plus interest and costs in favor of Kalafrana Shipping Ltd and against Sea Gull Shipping Co. Ltd. a/k/a Sea Gull Shipping Co. SARL; and

D.    That the plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated:  New York, New York
        June 3, 2008

MAHONEY & KEANE, LLP
*Attorneys for Plaintiff*

By
Christopher H. Mansuy
76 Beaver Street, 10th Floor
New York, New York 10005
(212) 385-1422
Our File:  3593

P:\3593\LEGAL\Verified complaint.DOC

7

## VERIFICATION

I, Marc Nicholas Sturzenegger, declare and state that I am the Director of Legal Services for Bayside Services SA, a Swiss company carrying on business as maritime consultants located in Nyon Switzerland, which was engaged by plaintiff Kalafrana Shipping Ltd., a Maltese corporation, to prosecute Kalafrana's claim against Sea Gull Shipping Co. Ltd arising out of Sea Gull's breach of a contract involving the sale of the M/V ASSIL in 2006 and subsequent wrongful arrest of the vessel by Sea Gull in the port of Trieste in April, 2007, which claims were submitted to an arbitration tribunal in London which rendered an award in favor of Kalafrana Shipping Ltd.  I am fully familiar with the facts of the claims asserted in this complaint by virtue of my active participation in conducting the successful arbitration on behalf of plaintiff Kalafrana Shipping Ltd.  I have reviewed the foregoing Verified Complaint.  I know of my own knowledge that the allegations are true, except as to matters stated on information and belief and as to those matters, I believe them to be true.  The reason that this Verification is not made by the plaintiff itself is that the plaintiff is a corporation.

I declare that the foregoing statements made by me are true and correct under penalty of perjury of the laws of the United States of America.

Executed:     Nyon, Switzerland
              June 3, 2008

MARC STURZENEGGER

# SAVILLE & CO.

———— NOTARIES ————

One Carey Lane
London EC2V 8AE
Telephone: +44 (0)20 7920 0000
Facsimile: +44 (0)20 7920 0088
www.savillenotaries.com
mail@savillenotaries.com

Richard Saville
Ian Campbell
Sophie Jenkins
Nicholas Thompson

 

TO ALL TO WHOM THESE PRESENTS SHALL COME, I
SOPHIE JANE JENKINS of the City of London
NOTARY PUBLIC by royal authority duly admitted and sworn
DO HEREBY CERTIFY the genuineness of the signature of
CHRISTOPHER WILLIAM FYANS subscribed at foot of each
page of the **correction to arbitration award, arbitration
award and reasons** hereunto annexed, such signature having
been in each case subscribed in my presence by the said
Christopher William Fyans, the arbitrator therein named and
described and whose personal identity I attest.

IN FAITH AND TESTIMONY WHEREOF I the said notary
have subscribed my name and set and affixed my seal of office
at London aforesaid this sixth day of February two thousand and
eight.



INT

and

INT

betv

KA

an

SI

## APOSTILLE
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1.  Country: United Kingdom of Great Britain and Northern Ireland
    Pays: Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

    This public document / Le présent acte public

2.  Has been signed by        Sophie J Jenkins
    a été signé par

3.  Acting in the capacity of     Notary Public
    agissant en qualité de

4.  Bears the seal/stamp of      The Said Notary Public
    est revêtu du sceau/timbre de

                                          Certified/Attesté
5.  at London/à Londres                   6. ..the/le   06 February 2008

7.  by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
    par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8.  Number/sous No     **H670675**

9.  Stamp:                               10. Signature:   Jack Milligan
    timbre:



                          For the Secretary of State / Pour le Secrétaire d'Etat

If this document is to be used in a country which is not party to the Hague Convention of 5 October
1961, it should be presented to the consular section of the mission representing that country. An
apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is
genuine. It does not mean that the contents of the document are correct or that the Foreign &
Commonwealth Office approves of the contents.

IN THE MATTER OF THE ARBITRATION ACT 1996

and

IN THE MATTER OF AN ARBITRATION

between

KALAFRANA SHIPPING LIMITED                          Claimants
                                                    (Buyers)

and

SEAGULL SHIPPING CO. SARL                           Respondents
                                                    (Sellers)


"ASSIL"

Memorandum of Agreement

Dated 4th May 2006


CORRECTION TO ARBITRATION AWARD DATED 14th DECEMBER 2007
PURSUANT TO SECTION 57 OF THE ARBITRATION ACT 1996


WHEREAS:-

1.  The undersigned sitting as sole Arbitrator in this reference made an Arbitration Award
    on 14th December 2007.

2.  Paragraph 'C' of the Arbitration Award stated as follows:

    "I DECLARE that the Seller is entitled to set off any of the amounts awarded to it
    under paragraphs (A) and (B) above against the Seller's claim in the sum of
    US$79,113.40 for the value of bunkers and lubricating oils on board the vessel."

3. The Arbitration Award was collected by the Buyer on 20th December 2007. On the same date the Buyer informed me that they considered there to be an error in paragraph 'C' of the Award in that the word "Seller" in the first line of the paragraph ought to be replaced with the word "Buyer" and they requested a correction to the Award accordingly. On 21st December 2007 I informed the Seller of the Buyer's application and of my intention, subject to the comments of the parties, to correct the said paragraph 'C' of the Award under the provisions of section 57(3)(a) of the Arbitration Act 1996 and I requested the Seller to respond by 28th December 2007. On 2nd January 2008 I extended the time limit for a response from the Seller to 8th January 2008. The Seller has failed to respond or otherwise comment on the Buyer's application.

4. Having considered the Buyer's application and having reviewed my Award, I HEREBY CORRECT my Award as follows in order that it reflects my true intention:

   Paragraph 'C' of my Award should read as follows:

   "I DECLARE that the Buyer is entitled to set off any of the amounts awarded to it under paragraphs (A) and (B) above against the Seller's claim in the sum of US$79,113.40 for the value of bunkers and lubricating oils on board the vessel."

5. This correction forms part of my Arbitration Award dated 14th December 2007 and I confirm that my Award remains unchanged in all other respects.

Dated this 11th day of January 2008.

Christopher Fyans                                   Witness

2

## IN THE MATTER OF THE ARBITRATION ACT 1996

and

## IN THE MATTER OF AN ARBITRATION

between

### KALAFRANA SHIPPING LIMITED

Claimants
(Buyers)

and

### SEAGULL SHIPPING CO. SARL

Respondents
(Sellers)

"ASSIL"

Memorandum of Agreement

Dated 4th May 2006

---

ARBITRATION AWARD

---

WHEREAS:-

1.  By the terms of a Memorandum of Agreement ("the MoA") concluded on the Norwegian Sale Form (1993) with amendments and additions dated 4th May 2006 between Kalafrana Shipping Ltd. ("the Buyer") and SeaGull Shipping Co. Ltd. ("the Seller"), the Buyer agreed to purchase the roll on – roll off motor cargo vessel "ASSIL" ("the vessel") from the Seller on terms more particularly set out in the Memorandum of Agreement.

2.  The Seller was the demise charterer of the vessel from the registered owners Scandinavian Shipping Invest A/S and Aquaglory Marine Limited under a Bareboat Charterparty which afforded the charterer an option to purchase the vessel.

3.  In accordance with clause 5 of the MoA the vessel was to be delivered by 1st June 2006.
    In accordance with clause 11 of the MoA the vessel was to be delivered with her Class
    maintained without Recommendations and with all her equipment and machinery in
    good working order. In accordance with additional clause 17 of the MoA the Buyer was
    afforded the right to open up the cylinders of the vessel's main engine at the port of
    delivery in order to determine its operating condition. Any repairs found to be necessary
    were to be for the Seller's account and were to be completed prior to delivery. Clause 5
    of the MoA provided for a cancelling date of 1st June 2006 and clause 14 provided the
    Buyer with a right to cancel the MoA in the event of the vessel not being ready for
    delivery by the cancelling date.

4.  The vessel was tendered for delivery to the Buyer at Genoa on about 22nd May 2006
    where the Buyer exercised its option to examine the main engine. Extensive defects were
    found. Further defects were found in the vessel's electrical generator engines and in the
    structure of the stern ramp. All of those defects resulted in Conditions of Class being
    imposed for repair prior to the vessel being allowed to depart from the delivery port.
    Further defects were found that affected the good working order of some of the vessel's
    other machinery and equipment. It was agreed between the Buyer and the Seller that the
    Buyer would procure the necessary repairs to restore the vessel's Class status prior to
    delivery on the understanding that the costs of such repairs would be deducted from the
    eventual sale price.

5.  On 26th May 2006 the parties agreed to extend the cancelling date to 8th June 2006. On
    9th June 2006 the registered owners of the vessel gave notice withdrawing the vessel
    from the demise charter with Seller thus removing the Seller's purchase option under that
    charter. On 11th June 2006 the vessel had not been delivered to the Buyer and it exercised
    its right to cancel the MoA on that date. On the same date the Buyer concluded an
    agreement to purchase the vessel directly from the registered owners at the same price
    under terms which provided for the retention of US$300,000 against the purchase price
    to be used for the reimbursement of the Buyer as and when the costs for the repairs to
    restore the vessel's Class became known. The vessel was delivered to the Buyer on or
    about 16th June 2006.

2

6.  Repairs to the main engine and to the stern ramp were completed to the satisfaction of Class on the 4th August 2006. The repairs to the auxiliary generators were not then complete but the vessel was allowed to sail from Genoa with a portable diesel generator installed on deck under a revised Condition of Class. Further repairs were carried out in December 2006 and in January 2007 leading to the final deletion of the Condition of Class on 4th February 2007.

7.  By an agreement between the Buyer and the Seller the quantity of bunkers and unused lubricating oils on board the vessel was valued at US$79,113.40. Those bunkers and lubricating oils were transferred to the Buyer under the terms of its agreement with the registered owners of the vessel wherein it was acknowledged that such bunkers and unused lubricating oils were not the property of the registered owners. The Seller accordingly claimed the sum of US$79,113.40 from the Buyer. The Buyer resisted such claim on the grounds of set off against sums allegedly due from the Seller as a result of its breach of the terms of the MoA in not delivering the vessel. In pursuit of its claim the Seller arrested the vessel at Trieste on 4th April 2007. Upon the Buyer providing the requisite guarantee, the vessel was released from arrest on 6th April 2007.

8.  By an Arbitration Award dated 5th March 2007 the Buyer was awarded the full amount of the retention under the agreement with the registered owners of the vessel.

9.  The Buyer alleges a breach by the Seller in failing to deliver the vessel as required by clauses 5 and 14 of the MoA in the condition required by clauses 11 and 17 of the MoA. The Buyer claims as damages the costs it incurred to place itself in the position it would have occupied if the Seller had fulfilled its obligations equivalent to (i) the costs it incurred both prior to and following the cancellation of the MoA, to bring the vessel fully into Class and/or to put the vessel's machinery and equipment into good working order and/or to repair damage to the main engine in the total equivalent amount of US$809,350 less US$300,000 awarded as under recital 8 above; (ii) costs and expenses for other liabilities incurred prior to or following the cancellation of the MoA either as agreed with the Seller or as incurred for its account in the total equivalent amount of US$97,069.37.

3



10. The Buyer also seeks a declaration that it is entitled to set off any amounts awarded to it against the sum of US$79,113.40 claimed by the Seller for the value of bunkers and unused lubricating oils.

11. The Buyer further alleges that the arrest of the vessel by the Seller was unlawful and seeks damages in the sum of US$34,855.36.

12. The Buyer also seeks interest on any amounts found to be due to it, and its costs.

13. Clause 16(a) of the MoA provided for any dispute arising out of the Agreement to be referred to arbitration in London in accordance with English Law and in accordance with the Terms of the London Maritime Arbitration Association (LMAA), before a sole arbitrator to be mutually appointed, failing which to be appointed by the President of the LMAA. No such mutual appointment was achieved and on the 3rd October 2006 the undersigned Christopher Fyans of D1, Horsted Keynes Business Park, Horsted Keynes, West Sussex RH17 7BA was appointed by the President of the LMAA.

14. Because of possible limitations as to the authority of the Seller's legal representative in Italy to receive notice of arbitration on behalf of the Seller, notice was given directly to the Seller in Lebanon on 7th May 2007 and the foregoing appointment was relinquished on the 6th June 2007. Following a further failure by the Seller to nominate or to agree on the appointment of an arbitrator, the undersigned was again appointed by the President of the LMAA on 7th June 2007.

15. Written claim submissions were prepared by legal advisors acting for the Buyer and were served on 12th July 2007. Extensions of time for the service of defence submissions were sought by the Seller's legal advisors and were granted. On 9th October 2007 the Seller's legal advisors confirmed that they had received no authorisation to make any submission on its behalf and no such defence submissions were forthcoming from the Seller despite a peremptory order for such service made on 12th October 2007. On 29th October 2007 a notice was served on the Seller advising of the undersigned's intention to proceed to an award in the absence of any defence submissions in accordance with the provisions of section 41 (4) of the Arbitration Act 1996. No response was received to that notice. Further written submissions from the Buyer were sought by the undersigned and

4



obtained during November 2007. A written submission concerning its claim for the value of bunkers was served by the Seller on 29th November 2007 and it was responded to by the Buyer.

16. A reasoned award was requested by the Buyer and accordingly reasons for this award are attached hereto and form part of this award.

17. The seat of this arbitration is England.


NOW I the undersigned Christopher Fyans, having taken upon myself the burden of the reference and having carefully read the submissions as presented by the Buyer's legal advisor and by the Seller's legal advisor, and having read the documentary evidence put before me do **HEREBY MAKE ISSUE AND PUBLISH** this my **ARBITRATION AWARD** as follows:

A. **I FIND AND HOLD** that the Buyer's claim for damages against the Seller for breach of the MoA in failing to deliver the vessel in accordance with clauses 5 and 14 and in the condition required by clauses 11 and 17 succeeds in the equivalent amount of US$509,350.

B. **I FIND AND HOLD** that the Buyer's claim for expenses incurred as a result of the Seller's breach of the MoA succeeds in the equivalent amount of US$97,069.37.

C. **I DECLARE** that the Seller is entitled to set off any of the amounts awarded to it under paragraphs (A) and (B) above against the Seller's claim in the sum of US$79,113.40 for the value of bunkers and lubricating oils on board the vessel.

D. **I FIND AND HOLD** that the Buyer's claim for damages for wrongful arrest of the vessel by the Seller succeeds in the equivalent amount of US$34,855.36.

E. **I ORDER AND DIRECT** that Seller shall forthwith pay to the Buyer the aggregate sum of US$562,161.33 in full and final settlement of its claims under the MoA together with interest on the sum of US$486,419.37 calculated from 31st August 2006 until the date of

5

this award at the rate of 6.4% per annum or pro rata compounded with three monthly rests and together with interest on the sum of US$120,000 calculated from 28th February 2007 until the date of this award at the rate of 6.4% per annum or pro rata compounded with three monthly rests and together with interest on the sum of US$34,855.36 calculated from 30th April 2007 until the date of this award at the rate of 6.4% per annum or pro rata compounded with three monthly rests. In the event that payment to the Buyer is not made as aforesaid within fourteen (14) days of the date of this award interest thereafter shall be paid on the total sum so calculated to the date of this award or such part of it as remains unpaid until the date of payment to the Buyer at the rate of 6% per annum or pro rata compounded with three monthly rests.

F. **I ORDER AND DIRECT** that Seller shall bear its own and shall pay the Buyer's reasonable costs of the arbitration such costs if not agreed to be assessed by me under section 63(3) of the Arbitration Act 1996 on the basis set out in section 63(5) of that Act together with interest thereon calculated from the date of this award until the date of payment at the rate of 6% per annum compounded with three monthly rests. The Seller shall also pay the costs of this award provided that if in the first instance the Buyer shall have paid any part of such costs, it shall be entitled to immediate reimbursement by the Seller of any such sum together with interest thereon calculated from the date of payment by the Buyer until the date of reimbursement at the rate of 6% per annum compounded with three monthly rests.

This award is final as to the matters determined herein, but **I RESERVE** my jurisdiction to deal with any assessment of the costs of the arbitration as may be necessary, and the power to make such further award in the reference as may be appropriate to complete the resolution of disputes referred to me.

Dated this 14th day of December 2007.

.............................................          .............................................
Christopher Fyans                                        Witness

6

mv "ASSIL"

Memorandum of Agreement dated 4th May 2006

## REASONS FOR THE TRIBUNAL'S ARBITRATION AWARD

1. I am concerned in this case with the attempted purchase of the mv "ASSIL" by Kalafrana Shipping Ltd. of Malta (whom I shall refer to as "the Buyer") from her demise charterer Sea Gull Shipping SARL of Lebanon (whom I shall refer to as "the Seller"). The sale was subject to a Memorandum of Agreement ("MoA") drawn up on an amended Norwegian Sale Form (1993) dated 4th May 2006. I have referred to it as an "attempted" purchase because the Buyer exercised its right to cancel the contract when the Seller became unable to deliver the vessel, and the sale did not go ahead as between the parties to that MoA. The Buyer nevertheless acquired the vessel from the registered owners under an agreement dated 11th June 2006, drawn up on the day that the earlier MoA was cancelled. I shall have to return to go into some of the detail about how the eventual sale came about, but it is sufficient for the moment to briefly set out the background.

2. The ASSIL was a roll on – roll off cargo vessel of 7,691mt deadweight capacity built at Stockholm in 1981. The vessel's main engine, which featured prominently in this dispute, was an S.E.M.T. Pielstick type 12PC2-3V 400 machine having twelve cylinders and developing a rated power of 4,720 kW at 520 rpm. The vessel was Classed with Lloyds Register of Shipping, having the notation "+100A1 Roll On/Roll Off Cargo Ship +LMC UMS Ice Class 1a at 6.20 metres". The vessel was also fitted with three diesel generators of Scania-Nabis manufacture each having a rated output of 290 kVA. Cargo access was provided at the stern of the vessel by an hydraulically operated MacGregor vehicle ramp having a width of 13 metres.

3. When the Buyer became interested in purchasing the vessel she was being operated by the Seller under a demise charter from the registered owners. By reason of a purchase option held under that charter, about which I was not fully informed, the Seller entered into a Memorandum of Agreement with the Buyers dated 4th May 2006 to sell the vessel for US$3,300,000. That Memorandum of Agreement provided for a cancelling

1



date of the 1st June 2006, and it contained the customary "Class maintained" provisions, if perhaps put a little more stringently than is usual, and including a requirement for all machinery and equipment to be in good working order. More importantly however there were, in an additional clause, detailed provisions permitting the Buyer to open up and examine the main engine quite extensively at the port of delivery, and for defects and damages thus found that affected Class to be repaired by the Seller prior to delivery. The relevant clauses were clauses 11 and 17 as follows:

> "11. Condition on Delivery
>
> The vessel shall be delivered charter free, free of cargo with holds and cargo spaces swept and clean, free of used or waste oils or remnants either in drums or other containers.
>
> The vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, but subject to the terms and conditions of this Agreement she shall be delivered and taken over as she was at the time of inspection, fair wear and tear excepted.
>
> However, the vessel shall be delivered with her Class maintained without condition/recommendation, free of recommendations or defects which if known would at any time result in class recommendations being imposed and, free of average damage affecting the Vessel's class, with all continuous survey cycles up to date at the time of delivery, without any outstandings or extensions, and with all her classification certificates and national certificates as well as other certificates the vessel had at the time    of    inspection,    valid    and    unextended    without condition/recommendation by Class or the relevant authorities and valid for at least six months at the time of delivery.
>
> ... ...
>
> ... ...
>
> The vessel shall be delivered with all her machinery and equipment in good working order. Prior to delivery the Sellers shall demonstrate the vessel's machinery and equipment to be working to the Buyers' representatives on board.
>
> See additional clause no. 17."

2

> "17. The Buyers shall be allowed, at the port of delivery and prior to
> delivery, to examine in the presence of a classification surveyor one (1)
> cylinder for each main engine (if more than one) by means of
> 'endoscope' and to take off one (1) piston at the Buyers' discretion. For
> the cylinder drawn, the Buyers shall have the right to see the bearings
> including main bearings. Crankshaft deflections may be taken. If
> anything is found to be broken/damaged/defective/un-operational in
> respect of the opened cylinder, the Buyers shall have the option to open
> up another cylinder to satisfy themselves that the same is in order. If it is
> not found to be in order, then the same procedures shall apply as for the
> first cylinder and the Buyers shall have the right to open up further
> cylinders until they find a unit that is in order. If the Buyers find three (3)
> cylinders to be broken/damaged/defective/un-operational they shall be
> allowed to open up all cylinders of the main engine(s). All damage etc.
> as found shall be repaired and made good by the Sellers at their time,
> risk and expense prior to delivery. The class surveyor shall be the sole
> arbiter as to whether damage etc. is present."

4.  The vessel was tendered for delivery at Genoa on about 22nd May 2006 and the Buyer
    commenced opening up the main engine in accordance with the rights available to it
    under clause 17. Very extensive defects were found initially, and in the event the
    entire main engine was opened up and found to be defective. It seemed likely that
    poor lubrication over a significant period of time was a contributory factor to the
    conditions found; the lubricating oil, the sump tank and the pipes to the bearings were
    found to be heavily laden with sludge. The lubricating oil was dumped.

5.  Two of the routine classification items relating to the main engine were found to be
    overdue by at least two months and a further approximately 18 items were found to be
    due for routine survey in October 2006, within 6 months of the scheduled delivery
    date and thus outside the requirements of clause 11 of the MoA.

6.  Auxiliary systems connected with the main engine and other items of machinery and
    equipment were also found to be in poor condition and not in good working order. A

3



consultant engineer from the main engine manufacturer, SEMT Pielstick, was contracted to attend and his eventual report included the following remarks:

> "*As each system was dismantled, we found situations bordering on the critical and this was without seeking to achieve normal running operations but merely with a view to minimal marine operating standards. Our recommendations eventually resulted in the complete overhaul, not just of the main engine itself, but also its main auxiliary systems.*"

7. The vessel's three diesel generator engines were also examined at Genoa and were found to be incapable of sustaining a nominal electrical load. The main fault was identified as being deficiencies in the cooling systems, although very much more extensive defects, including to its crankshaft, were found to be affecting the No. 1 engine which had to be taken ashore.

8. The roll-on roll-off ramp at the vessel's stern was examined at Genoa and was found to be suffering from corrosion and cracks in its structure.

9. On 26th May 2006 the Buyer requested the Seller to organise the attendance of a Class surveyor to examine the defective parts of the vessel and her equipment, being unable to do so themselves as merely prospective buyers of the vessel. Furthermore, because the Sellers found themselves in difficulties over payment for the repairs necessary to deliver the vessel in Class and in good working order, a deal was struck whereby the Buyer would procure the necessary repairs and overhauls on behalf of the Seller, with a view to restoring the vessel's Class and condition prior to delivery under the MoA. The Class surveyor would not however attend the vessel except on the instructions of the Sellers, and such instructions were not forthcoming until some two weeks later so that the relevant survey did not take place until 8th June. The result of that survey was that three Conditions of Class were imposed on the vessel as follows:

4



*"Condition of Class Machinery now imposed. ME crankpin and main bearings found damaged. To be specially examined and dealt with as necessary before ship's departure."*

*"Auxiliary generators no. 1, 2 and 3 unable to reach and sustain nominal load due to overheating. To specially examined and dealt with as necessary before ship's departure."*

*"Condition of Class Hull now imposed. Aft end stern ramp in way of flaps found bended and cracked. To be specially examined and dealt with before ship's departure.*

10. Insofar as the main engine was concerned, the Class surveyor was content that the requirement *"...To be specially examined and dealt with ..."* could be satisfied by following the recommendations of the Pielstick service engineer in attendance. A report from the Buyer's superintendent engineer on 8th June included the following remark:

*"Main engine bearings found defective, however since the Pielstick repr. is on site, all works as to be carried out as per his recommendation."*

11. In the meantime the Buyer continued with the work on the vessel, and a revised cancelling date under the MoA of 8th June had been agreed. On 9th June the registered owners of the vessel withdrew it from the demise charter with the Seller, thereby removing its option to purchase the vessel from the registered owners. The Seller was thereby rendered unable to complete the sale of the vessel to the Buyer under the MoA, in any condition. By a notice dated 11th June 2006 the Buyer terminated the MoA, reserving all its rights to claim for losses and expenses incurred.

12. The registered owners of the vessel proposed a sale directly to the Buyer at the same price, and an agreement was concluded dated 11th June 2006 for the sale of the vessel on *"as is where is"* terms. In recognition of the fact that the vessel was in a damaged

condition with outstanding Conditions of Class, the agreement allowed for a retention from the sale price of US$300,000 to be used as a maximum sum to reimburse the Buyer for the costs of restoring the vessel fully into Class. The sale under that agreement was completed on about 16th June 2006.

13. Repairs to the vessel continued to be undertaken by the Buyer and by 4th August 2006 the Conditions of Class in respect of the main engine and the stern ramp had been removed. However, repairs to the three diesel generator engines were more difficult due to their obsolescence, and it was found that they could not be completed without the supply and fabrication of replacement parts. One of the units had been removed ashore for repair leaving the other two on board, neither of which were in a condition to supply sufficient electrical power. In order to allow the vessel to trade therefore, a portable diesel generator of sufficient capacity to satisfy the whole of the vessel's electrical power requirements was hired and placed aboard the vessel. Accordingly a new Condition of Class was imposed relating specifically to the diesel generators that remained under repair. The vessel was thus able to depart from Genoa on the 4th August 2006.

14. The main engine however failed to operate satisfactorily and the vessel was unable to maintain a service speed greater than about 10 knots. The vessel was docked again at Tuzla in Turkey between 10th January and 4th February 2007, where works continued to rectify the problems with the electrical generator engines, and further work was carried out on the main engine turbochargers and air coolers in an effort to improve the performance of the engine. On completion of this docking the vessel's service speed was found to have improved to about 15 knots.

15. The No. 1 generator engine was returned on board the vessel on about 1st November 2006 and was reinstalled in early December 2006 at Ajman in the Persian Gulf. The Nos. 2 and 3 electrical generators could not however be made to operate satisfactorily at that time and a further Condition of Class was imposed for their overhaul within February 2007. That work was done at Tuzla in January 2007, and the Condition of Class was finally deleted on about 4th February 2007. The rented generator set was returned to the lessor on 4th January 2007.

6



16. Other repairs carried out by the Buyer to items of machinery and equipment found not to be in *"good working order"* included work on the provision rooms refrigerating system, the air conditioning systems, the air compressors, the fuel separators, the boiler pumps, the sea chests, the elevator, the main engine exhaust manifold insulation, and the main engine oil and water coolers.

17. There were other expenses associated with the vessel's stay at Genoa prior to and following the cancellation of the MoA, and the whole of the repair costs and expenses were quantified by the Buyer in the sum of US$809,350. That was subject to a recovery of US$300,000 made by the Buyer against the registered owners of the vessel under the terms of that sale agreement, leaving a balance of US$509,350 which the Buyer seeks to recover from the Seller.

18. As with any ship sale, there were bunkers and lubricating oils remaining on board the vessel and the value of these was agreed between the Buyer and the Seller to be US$79,113.40. The Seller's efforts to obtain reimbursement following the cancellation of the MoA were resisted by the Buyer because of the much greater sum allegedly owed to it by the Seller, and the eventual outcome was an arrest of the vessel at Trieste on 4th April 2007. The Buyer was obliged to furnish security for the release of the vessel and it now seeks to recover also from the Seller the costs associated with that arrest, which it alleges was unlawful.

19. The Buyer gave notice of termination of the MoA to the Seller by letter dated 11th June 2006 addressed to its legal representatives in Italy. I have not been provided with any formal acceptance of that notice, but it is perfectly clear from other documents put before me that it was so accepted. In fact the Seller took the view in some of the correspondence that all of the Buyer's rights under the MoA had been terminated along with the contract. The Seller chose not to offer any defence submissions. The Buyer's right to damages was not therefore challenged.

20. The Buyer's claim is put on the basis that the Seller was in repudiatory breach of its obligations under the MoA due to its inability to perform those obligations following the withdrawal of the vessel from the demise charter and the resulting removal of the Seller's purchase option for the vessel. That repudiatory breach entitled the Buyer to

terminate the contract, which it did, and in so doing the Buyer reserved its right to claim for losses arising. The Buyer submits that it is entitled to the right to be placed in the position that it would have occupied had the Seller properly performed its obligations under the MoA and had delivered the vessel in the condition required by clauses 11 and 17 of the MoA. I was referred to "Chitty On Contracts" 29th Ed. Para. 24-047 quoting the words of Lord Diplock in *Photo Production Ltd. v. Securicor Transport Ltd.* [1980] AC 827:

> *"(a) there is substituted by implication of law for the primary obligations of the party in default which remain unperformed a secondary obligation to pay money compensation to the other party for the loss sustained by him in consequence of their non-performance in the future and (b) the unperformed primary obligations of that other party are discharged"*

21. Put another way, the Buyer submits that if the Seller's obligations had been fulfilled, the vessel would have been delivered in Class and in good working order, and the Buyer is thus entitled to claim as damages the costs of placing itself in that position. With regard to the measure of damages I was referred in particular to "Sale of Ships: The Norwegian Sale Form" para 17-06 wherein the provisions of sections 51(2) and (3) of the Sale of Goods Act 1979 are quoted:

> *"(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract.*
> *(3) Where there is an available market for the goods in question the measure of damages is prima facie to be ascertained by the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or (if no time was fixed) at the time of refusal to deliver."*

22. The general remedy would therefore be for the Buyer to obtain a replacement for that which was not delivered to it on the market, and to claim for any losses suffered as a result of having to do with respect to any difference between the purchase price under

8



the MoA and the market price. In this case, the Buyer submits that because of the circumstances, in which the acquisition of the vessel was able to be continued at the same price from its registered owners, rather than from the Seller, there is no need to consider the market for a substitute vessel, fully in Class and in good working order. Instead, the Buyer undertook to continue the work of restoring this vessel's Class and good working condition, having paid the purchase price to the registered owners. The Buyer submits that the measure of loss is therefore quantified by the costs of undertaking that work so that it obtains the vessel contracted for under the MoA, namely a vessel fully in Class and in *"good working order"*. Such actions were by way of mitigation of the losses suffered by the Buyer as a result of the Seller's repudiatory breach of the MoA.

23. There is nothing in those submissions that could be said to contradict the general law relating to damages or to restrict the compensation to which the Buyer is entitled under such principles, subject to its duty to mitigate any such losses. There have been no arguments before me concerning mitigation, and I do not foresee in the circumstances that there could be any successful argument on that front.

24. The Buyer also referred to the wording of clause 14 of the MoA which provides the Buyer with an express right to compensation in respect of loss and all expenses, provided that the breach for which such compensation is claimed results from the Seller's negligence. The Buyer's submission on the facts of this case is that the failure to deliver the vessel in accordance with the terms of the MoA resulted unequivocally from the Seller's negligent maintenance of the vessel and/or its negligent handling of the arrangements necessary to ensure that the vessel was in the condition required by the MoA prior to delivery. I have to say that such a view seems to me to be self evident on the facts. The quantification of loss and expense is that required to put the vessel into the condition required by clauses 11 and 17 of the MoA which is the same as the quantification of damages under the general law.

25. The task that is left to me therefore is to assess the costs incurred by the Buyer, which costs are alleged to have been incurred for the purpose of restoring the vessel's Class and rendering the machinery and equipment in *"good working order"*, so as to put the vessel into the condition demanded by the MoA. In undertaking that task, and in the

9



absence of any defence submissions, I have called upon my relevant experience in the field of ship repair.

26. Before embarking upon an assessment of the costs of repair however, it is appropriate to comment on the nature of the Conditions of Class, or Recommendations as they are also known, that were imposed at Genoa. Each one identifies the principle area of damage or defect as reported to the surveyor and as sighted by him during his first inspection on about 8th June 2006. The phrase *"To be specially examined and dealt with as necessary ..."* is a common enough phrase in use by all Classification surveyors in cases either where there is insufficient time or opportunity for a complete inspection such as for instance in respect of a defect that can be left for later rectification on a vessel that is trading, or where the defects are clearly extensive and further opening up of the item in question is required. Its purpose is to signify that first inspection has revealed that there is likely to be more to the defect identified than meets the eye. It is also used in cases like this one where a vessel is already under repair and it is necessary to identify the Classification Recommendations at an early stage. In this case the Conditions of Class were drafted in typically expansive terms for a vessel which was, on the evidence, in quite poor condition. I can well understand that the work necessary to restore the vessel's Class in such circumstances was not capable of precise definition at the time that the Condition of Class was imposed.

27. In this case however, the vessel was not only required to be delivered under the MoA fully in Class, but with *"all her machinery and equipment in good working order"*. The achievement of that status might therefore be considered to involve works that go beyond what might reasonably be considered as the minimum necessary to remove Conditions of Class, so as to simply restore the vessel's Class, without Recommendation. Aged machinery can of course be in good working order without the need necessarily to restore it to its "as new" condition. The assessment of works required is therefore somewhat subjective. Nevertheless the terms of the MoA mean that it is not necessary to examine the precise nature of the works done in relation to the wording of the Conditions of Class imposed, provided that such works can be reasonably said to have been necessary to restore the particular item to *"good working order"*.

10



**Main Engine Repairs**

28. Inspection of the main engine commenced on the 22nd May 2006 in accordance with the terms of the MoA which permitted the Buyer to open up all twelve cylinders if damages were found and continued to be found as the examination progressed. The evidence is that when about half of the engine had been opened up and found damaged, the Claimants took advice from the engine manufacturers, Pielstick. The recommendation of their service engineer on the 30th May was that the entire engine should be opened up for overhaul, since it had become apparent that the condition of the bearings that had been examined had arisen principally because of inadequate lubrication over a long period of time. It was therefore reasonably assumed that the entire engine would have been affected. As a natural consequence of opening up all of the cylinders and the extent of dismantling necessary to gain access to the main bearings, other parts of the engine were opened out and were thus found to be in need of repair and overhaul.

29. By the time that the Classification surveyor attended for inspection on the 8th June 2006, it is apparent that most of the necessary dismantling work had been undertaken and the bearings, as being the most important item of damage found, were made available for his examination. The ensuing Condition of Class focussed on the damage to the bearings, but it is clear that the surveyor was not limiting his Recommendation to simple replacement of the damaged bearings. It is axiomatic that bearings that are damaged to the extent that is evident in this case, represent an important indicator to the probability of defects elsewhere in the engine, and he therefore reserved his right, correctly in my view to further inspection. However, the Pielstick service engineer was already in attendance when the Class surveyor attended, and the contemporary evidence is that he deferred to the recommendations of the engine manufacturer. The report from the Buyer's managers, Norbulk, said this:

> "The Class surveyor inspected the bearings and informed us that the engine was to be examined and all works to be carried out as necessary as per the Pielstick engineer's recommendation before departure of the vessel."

11



30. There is nothing unusual or surprising about that since it is unlikely that the Classification Society would apply any lesser standards of tolerance than the manufacturer. The engine was clearly in a sorry state and the Class surveyor's reaction from his initial inspection, to require repairs to the manufacturer's recommendation, was likely to be the most efficient way forward. The alternative would have been for him to examine each part and approve the specific repairs in each case, necessitating repeated visits to the vessel.

31. The evidence of what was done shows that the repairs were largely necessitated because of components being worn beyond the manufacturer's limits for operation. The Pielstick service engineer was unequivocal about what was required. He said in his report:

> "After an inspection of the condition of the oil circulating system, liners, cylinders and connecting rod bearings, in the presence of the customer, major defects were observed as shown in the photographs that are reproduced later in this report. In view of their condition and with the sole object of putting the engine, which was very close to suffering a major breakdown of the crankshaft, back into a safe operating condition, we asked the owners to undertake a complete examination of the engine and, in particular, the main engine bearings. As each system was dismantled, we found situations bordering on the critical and this was without seeking to achieve normal running operations but merely with a view to minimal marine operating standards. Our recommendations eventually resulted in the complete overhaul, not just of the main engine itself, but also its main auxiliary systems."

32. The photographs and technical data included with the service engineer's report show that he was not exaggerating in his description of the engine and it seems to me to be highly unlikely that any unnecessary work of any significance was undertaken. One of the more graphic descriptions of what had to be done is that of the cleaning out of the lubricating oil system, which required 10 days continuous flushing. It seems to me that the technical data attached to the Pielstick report, setting out the condition of the

12



dismantled parts prior to repair, fully justifies the repairs that were carried out and the parts that had to be replaced at Genoa.

33. The eventual costs of repairs to the main engine at Genoa are claimed as invoiced to the Buyer by the respective suppliers, in the total sum of US$383,424.96 inclusive of the costs of all spare parts, and of the costs of attendance for the Pielstick service engineer. In the absence of any defence to the claim, those costs are not challenged. However, having fully reviewed the reports put before me by the Buyer, I am satisfied that such costs would not be considered to be unreasonable as costs for restoring the main engine to Class requirements, and the descriptions given in the repair accounts do not suggest that they include any superfluous items.

34. Other works were carried out on the main engine at Genoa that were said not to be immediately necessary for the restoration of the vessel's Class, but were regarded by the Buyer as being necessary to place the machinery in *"good working order"*. Those works involved repairs to the lagging on the main engine exhaust system, and to the pipework serving the main engine cooling system. The total sum in respect of those items was EURO 14,930. I see no reason why they should not be allowed under the category of placing the machinery and equipment in *"good working order"*.

35. After departure from Genoa, the vessel is said to have been barely able to maintain a service speed of 10 knots. Included in the reports from the Buyer's managers, Norbulk, are the full particulars of the vessel. Those particulars reveal that the design speed should be 14 knots. If the vessel was able to attain a speed of only 10 knots it is reasonable to suppose that the propulsion machinery was not in *"good working order"*, despite that fact that it had been restored to Class at Genoa. The vessel's underwater parts had been cleaned at Genoa for the purposes of an in-water inspection, and there could not therefore be said to have been any significant effect of hull fouling on the speed. The main engine is likely therefore to have been operating inefficiently, which is not of itself a matter for Class.

36. The Buyer submits that the advice of the Pielstick service engineer was that the efficiency of main engine turbochargers was likely to have been at the heart of the problem. I am not provided with any report to that effect, save to say that the attending superintendent at Tuzla, where the vessel was sent for further work in January 2007,

13

reported that the turbocharger nozzle rings had been found to be worn but within Class limits at Genoa, and had not therefore been replaced in order to keep costs down. The cost of the further work done on the turbochargers at Tuzla, including replacement of the nozzle rings, is claimed as being necessary to restore them to good working order. I have seen nothing in the superintendent's report to contradict that. The sum claimed is US$9,750.

37. In addition to the turbochargers, the main engine air coolers were subjected to further work at Tuzla as a means of improving the working condition of the main engine. These had been overhauled at Genoa and therefore it is only additional work that is claimed in the sum of US$400.

38. I note from the documents that other maintenance and overhaul work was carried out at Tuzla for the Buyer's convenience. The cost of such works has not been claimed.

39. Accordingly I am satisfied that the reasonable total cost for restoring the vessel's main engine to Class, and for placing it otherwise in *"good working order"*, as set out in the Buyer's helpful spreadsheet analyses, was US$400,674.96.

### Generator Engines Repairs

40. The three auxiliary diesel generator engines were reported on the 26th May 2006 to be suffering from overheating, principally because of failures in their cooling water pumps and poor performance of the water coolers. Further investigation however revealed that the diesel engines were also suffering from problems not dissimilar to those found in the main engine with regard principally to a lack of lubrication, and the effects of that. The simple manifestation of these problems was that none of the three auxiliary generators was able to develop sufficient electrical power for the vessel's needs.

41. The No. 1 diesel engine was found to be suffering the worst damage and it was taken ashore to permit, amongst other things, repairs to its crankshaft. It was however discovered that these particular engines were obsolete and that replacement parts were

14



not easily available, if at all. Because of the need therefore to fabricate parts for overhaul, the Buyer considered complete replacement of the auxiliary generating sets. The costs of replacement were however estimated to be EURO 150,000 per set including installation, making a total likely repair cost of EURO 450,000 (equivalent to about US$580,000). That option was therefore rejected in favour of repairs to the existing machines, even though such repairs were likely to be protracted.

42. In order to allow the vessel to trade, once the main engine and stern ramp repairs had been completed, and to satisfy Classification requirements for electrical power on the vessel, a portable diesel generator had to be hired and installed on board to provide the full electrical load requirement for the vessel. A revised Condition of Class was imposed on 4th August to reflect the unusable condition of the generator engines remaining on board and the provision of alternative electrical power in the following terms:

> *"Auxiliary Generator no. 1 now disembarked and generators no. 2 and no. 3 unable to sustain nominal load to be specially examined and dealt with as necessary by 09.06. Temporarily a suitable power pack provided on board. Meanwhile UMS notation suspended."*

43. The No. 1 diesel generator engine was returned aboard the vessel on about 1st November 2006 but was not refitted until early December 2006. There remained some work to do on the Nos. 2 and 3 engines to satisfy the Condition of Class, and that was done at Tuzla in January 2007. The Condition of Class was then deleted on about 4th February 2007. In the meantime the rented generator set had been returned to the lessor on about 4th January 2007.

44. The total cost of the repairs to the three diesel generator engines was US$153,129.13. I have examined the details of the repairs as set out in the various accounts and I am satisfied that such total cost is not unreasonable. It compares with the estimated cost of about US$580,000 for replacing the units. The total costs for the installation, hire over a four month period and return of the portable generating set amounted to US$60,662.46.

15



45. It was not until the completion of these repairs on 4th February 2007 therefore that the vessel's Class can be said to have been fully restored within the meaning of the terms of the MoA.

**The Stern Ramp**

46. The vessel's stern ramp was subject to an immediate Condition of Class at Genoa when it was examined by the attending surveyor. The problem was that it was simply corroded both externally where it was immediately visible, and internally where it resulted in a significant loss of strength.

47. The evidence is that the initial inspection of the stern ramp on the 1st June revealed two areas where cracks could clearly be seen on the end of the ramp together with corrosion, and there is graphic evidence of it in the photographs provided. These defects were seen in the end panel of the ramp behind the hinged flaps and in order to conduct the repair, the hinged flaps had to be removed and the corroded structure cut away. As is often the case with corroded steel structures, the progress of the work revealed more extensive corrosion and deformation resulting from it. The ramp was clearly in very poor condition. The Class Recommendation required the ramp to be restored to efficient use, it being an essential part of the lifting gear designed to convey cargo on and off the vessel and therefore having safety implications. The ramp also forms the closure on the vessel's transom, in the form of a weathertight hatch cover. Structural repairs therefore require great care so as not to introduce distortion and to maintain alignment. It was not therefore possible to skimp the repairs. Evidence from the report by the Buyer's managers, Norbulk, shows that the Classification surveyor was in attendance after the initial examination, and that the required further repairs when proper examination of the structure revealed the extent of corrosion. That seemed to me to be entirely expected.

48. The eventual costs of repair are set out in the account of the shipyard at Genoa, General Naval Control srl. The cost of the steelwork repair was EURO 47,500 and there was an amount of EURO 5,460 in ancillary services, making a total of EURO 52,960.

16



49. The evidence is that the Class surveyor attended the repairs and it is unlikely therefore that the Buyer went further than they needed to in restoring the ramp to a condition that allowed the Condition of Class to be deleted. As I have said, repairs to an item such as the ramp require particular care and cannot be assessed on the basis of any simple formula for general steelwork repairs. I would not consider the rates that have been charged to be out of the ordinary for European shipyards. I therefore find no good reason to assess the costs of these repairs at any figure less than that claimed.

## Other Repairs

50. The Buyer carried out some other repairs to machinery and equipment that were not subject to Conditions of Class but were said to require such repairs to satisfy the requirement of the MoA that all machinery and equipment be in *"good working order"* at delivery. All such repairs were carried out at Genoa, and evidence of defects in the various systems attended to is contained in the Norbulk report for the Buyer's managers. The following are the pertinent details for the repairs claimed.

51. One of the compressors for the provision room refrigerating systems had been found to be out of service at the Buyer's initial inspection of the vessel. It had to be replaced. Because of other faults in the machinery and control systems, and on the doors and seals of the spaces, the correct temperatures could not be maintained until such matters had been rectified. The cost of such repairs was EURO 20,911.

52. When tested at Genoa, one of the compressors for the accommodation air conditioning system failed, and it was found to be beyond repair. It had to be replaced along with other works to the control systems to get the air conditioning working satisfactorily at a cost of EURO 23,090.

53. The engine control room air conditioning unit had been repaired at some time using a length of domestic garden hose. It had to be repaired in a permanent manner to ensure satisfactory operation.

17



54. When test starting the refurbished main engine at Genoa, the starting air compressors were found not to be working satisfactorily. A number of spare parts were required to be fitted to allow them to operate satisfactorily and to ensure sufficient starting air pressure at all times – no more than a basic requirement of operation. The cost of such repairs was EURO 2,067.50.

55. When test running the main engine at Genoa, one of the fresh water cooling pumps would not operate properly due to its electric motor coupling being broken. It had to be repaired to safeguard the cooling system for the main engine. The cost appears from the Buyer's spreadsheet analysis to have been EURO 889.50.

56. The refrigerating plant for the $CO_2$ fire fighting system was found to be incapable of maintaining the storage tank at the required temperature due to coolant leaks. The leakages had to be repaired. This is an unusual system, depending as it does on storing CO2 at reduced temperature in liquid form. It clearly cannot be in *"good working order"* without the proper storage facility.

57. One of the fuel oil separators was found to be out of service when the vessel arrived at Genoa. It had to be repaired, and the remaining units were found to be in need of servicing to ensure satisfactory operation and the maintenance of a adequate fuel supply to the main engine. The cost of such repairs was EURO 12,008.21.

58. The auxiliary boiler system was found not to be working properly because the circulating pumps were worn out. The impellers and shafts had to be refurbished. The auxiliary boiler serves as the heating source for the main engine fuel and water systems and it needs to be in good working order for the wellbeing of the machinery. The cost of such repairs was EURO 1,621.50.

59. At Genoa, the sea chest in the engine room was leaking resulting in significant water accumulation in the bilges. It was found to be corroded and had to be repaired. A leaking sea chest is self evidently not in *"good working order"*.

60. The cargo elevator was found to be leaking hydraulic oil. The leaks had to be repaired to ensure reliability and to avoid possible cargo damage from the leaking oil at a cost of EURO 1,459.41.

18

61. The lagging on the main engine exhaust gas manifold needed some repair. Although this is said not to be an element of the work done to restore the vessel's Class, it is included under the category of main engine repairs in the shipyard account, and I would have thought that it probably would be a matter for Class. The cost of such repairs was EURO 3,500.00.

62. The coolers for the main engine lubricating oil and jacket fresh water were inefficient and required some repairs. These items are again included under the category of main engine repairs in the shipyard account, but I would have thought that they probably would be a matter for Class. The cost of such repairs was EURO 11,430.00.

63. The items at paragraphs 52, 55 and 58 above appear to have been included in an overall sum of EURO 4,235.00 which is claimed for miscellaneous works under this category

64. I have found nothing in the evidence relating to these items of repair that would lead to any conclusion other than that they would have been necessary to place the relevant machinery and equipment in *"good working order"* at the time of delivery under the MoA. The costs of carrying out the repairs and overhauls must therefore fall on the Seller in accordance with the terms of the MoA.

19

**Expenses Incurred by the Buyer**

65. The Buyer claims in addition to the physical repairs to the vessel, a number of items of expense incurred at Genoa that it submits were properly the obligation of the Seller under the MoA. Several of the items are said to have been accepted as such by the Seller when notified at the time by the Buyer. The pertinent details are as follows.

66. Under clause 6 of the MoA the Buyer has the right, in lieu of drydocking, to conduct an in-water examination of the vessel's hull by divers. The usual provisions, with some amendments, applied in relation to the costs of such inspection and the costs of repairing any damages found. But the Seller had the clear obligation to make the vessel available for the inspection at its expense. Clause 6 provides, insofar as is relevant, as follows:

> "b) (i) The vessel is to be delivered without drydocking. However the Buyers shall have the right at their expense to arrange for an underwater inspection by a diver approved by the Classification Society prior to and at the port of delivery of the vessel at a suitable place acceptable to the appointed divers.
>
> ...
>
> The Sellers shall at their cost make the vessel available for such inspection. The extent of the inspection and the conditions under which it is performed shall be to the satisfaction of the Classification Society. If the conditions at the port of delivery are unsuitable for such inspection and should the vessel require moving the Sellers shall move the vessel at their risk and expense and shall make the vessel available at a suitable alternative place near to the delivery port."

67. When the diver went down on 23rd May 2006, there was found to be too much marine growth on the bottom areas to allow a reasonable inspection. The Class surveyor therefore demanded that the bottom be cleaned, and the Buyer had to organise underwater scrubbing of the hull so that the inspection allowed under the MoA could take place. There were accordingly wasted costs related to the first attempt to make an

20



inspection, and the cleaning costs, amounting in total to EURO 6,312.80. As no damages were found, the cost of the second inspection fell on the Buyer.

68. The liability of the Seller for those costs was notified to it by the Buyer on 31st May 2006. There is no evidence before me that the Seller accepted or acknowledged such liability, but the position seems to be quite clear under the terms of the MoA, and an inspection cannot reasonably be accomplished if the bottom cannot be seen properly because of marine growth. I consider those costs therefore to be properly the Seller's responsibility.

69. The repairs that became necessary to place the vessel in a deliverable condition under the terms of the MoA, together with the overdue, and becoming due, Classification surveys, required the attendance of Classification surveyors. Clauses 11 and 17 of the MoA make it quite clear that the costs of such attendances would fall for the account of the Seller. No other interpretation can be placed upon the requirement for the vessel to be delivered in Class with the relevant certificates valid and unextended for a period of six months. The evidence is that the Seller accepted on 3rd June 2006 its obligation to pay for the Class surveyors in relation to the main engine repairs, and that the details of the costs of other attendances were notified to the Seller on 5th July 2006. Although I have again seen no specific acceptance or acknowledgement of such costs by the Seller, the position seems to me to be quite clear under the terms of the MoA, and I consider those costs to be the Seller's responsibility. The total costs for such surveys amounted to EURO 7,957.66.

70. In relation to the very extensive damages found in the main engine, the Buyer utilised the services of a manufacturer's service engineer. The claim under this category is for his attendances for the periods 24th May – 6th June and 7th June – 28th June 2006 at a total cost of EURO 27,673.00. The evidence is that the invoices for such attendances were sent to the Seller on about 30th June 2006 and that, following a specific query about the nature of the attendances, which was answered, no further comment was made by the Seller. Nor was any comment made when the Seller responded to the Buyer's request on 19th July 2006 for details of any outstanding matters in relation to the repair accounts. Whether or not that constitutes an acceptance by the Buyer of its liability, it seems to me that the entirely reasonable option of engaging a specialist

21



service engineer in the circumstances of this case must be regarded as part and parcel of the costs of restoring the vessel's machinery to Class. I consider all those costs therefore to be the Seller's responsibility.

71. The Buyer's crew members were unable to board the vessel for a period of nine days due to a refusal by the Seller's crew to disembark from the vessel. The Buyer's crew had therefore to be accommodated at an hotel in Genoa from 6th to 15th June 2006 at a total cost of EURO 4,757.00. The evidence is that the Seller accepted its liability for such costs on 5th July 2006.

72. The Buyer claims the Agency costs and disbursements at Genoa from the time of arrival of the vessel on 22nd May 2006 up until the Buyer took delivery of the vessel from the registered Owners on 16th June 2006 in the total amount of EURO 17,010.64.. The evidence is that such costs were accepted by the Seller on 2nd July 2006 as being its liability, with the exception of some costs associated with shifting the vessel to a repair berth after underwater cleaning, and a fine imposed by the port authority on Seller's crew members found swimming in the harbour. As regards the former, the costs of moving the vessel to a repair berth would seem to me to be so closely related to the Buyer's rights under clauses 6, 11 and 17 of the MoA as to be indistinguishable from the costs of repairs necessary to place the vessel in a deliverable condition. The evidence in respect of the latter is that it was wholly a matter in which the Seller's Master was involved, including his authorisation to the local Agents to settle the fine. Under those circumstances it is difficult to conclude that it was not a matter for the Seller.

73. A part of the vessel's radio station equipment, the DSC controller, had been taken ashore for repair in Lebanon prior to the vessel's arrival at Genoa. It was then found to be irretrievable because of armed conflict in Lebanon at that time, and a replacement was purchased by the Buyer at a cost of EURO 1,935.70. There is no evidence of an acceptance by the Seller for this cost, but it would seem to me to fall clearly within the requirement under clause 11 of the MoA to deliver the vessel *"...with everything belonging to her ......as she was at the time of inspection ..."*. It seems to me to have been entirely reasonable for the Buyer to replace this item.

22



74. One the remaining members of the Seller's crew of Syrian nationality could not be repatriated from Genoa because of his lack of travel documents. Costs were therefore incurred as he was retained on board until the vessel, under the Buyer's control, called at Alexandria from where the crew member was successfully repatriated. It seems to me to be axiomatic that a buyer should not be saddled with any expenses relating to a seller's crew when a vessel has been transferred under an MoA. The expenses in this case, amounting to US$775 seem to me to have been reasonably incurred by the Buyer and should be the Seller's responsibility.

75. There were a number of spare parts for the vessel that had been ordered by the Seller prior to the delivery of the vessel. Those orders were cancelled and the Buyer seeks the equivalent value of such parts under clause 7 of the MoA. That clause provides expressly for the transfer to the Buyer of spare parts on order along with everything else belonging to the vessel. The sum involved was confirmed between the Seller and the Buyer on 26th May 2006 as being EURO 9,000.

23

**Summary of Repair Costs**

76. The total costs for repairs and overhauls claimed by the Buyer can be summarised as follows:

| Stern Ramp | €52,960.00 | US$68,318.40 |
|---|---|---|
| Main Engine Repairs | €112,779.02 US$10,150.00 | US$155,634.94 |
| Main Engine Spare Parts | €146,954.49 | US$189,571.29 |
| Main Engine Lubricating Oil | | US$7,100.00 |
| Pielstick Service Engineer | €37,495.14 | US$48,368.73 |
| Auxiliary Diesel Generators (inc. spares) | €67,336.34 £7,582.00 US$51,632.00 | US$153,129.13 |
| Portable Generator | €47,025.58 | US$60,662.46 |
| Wet Berth Charge | €16,900.00 | US$21,801.00 |
| Other Machinery & Equipment Repairs | €81,212.12 | US$104,763.65 |
| Expenses at Genoa | €74,646.80 US$775 | US$97,069.37 |
| TOTAL | | US$809,349.60 |

77. With regard to the total of expenses incurred at Genoa, itemised above under paragraphs 65 – 74, I note that the Buyer's submission includes a summary figure of EURO 96,832.92 whereas the figures given for the individual expenditure in fact total EURO 74,646.80 and US$775 as noted above.

78. The total cost of repairs is subject to the recovery of US$300,000 against the registered owners of the vessel. The claim in this arbitration for damages for the failure to deliver the vessel under the MoA therefore amounts to an equivalent US$509,350 and the claim for expenses incurred on behalf of the Seller at Genoa is EURO 74,646.80 and US$775, equivalent to a total of US$97,069.37. Both of these claims succeed in my view.

24

79. The claims are all put in terms of US Dollars even though the bulk of the expenditure was in Euros. The currency of the contract was of course US Dollars and I see no reason not to accede to the claim being put in that way.

**The Seller's Claim for the value of Bunkers**

80. The amount due to the Seller for bunkers and lubricating oils remaining on board the vessel and taken over by the Buyer was agreed as being US$79,113.40. The Buyer however, claims entitlement to a right of set off against the much larger sums due from the Seller as set out above. Those sums are claimed as damages for the Seller's breach of contract in failing to deliver the vessel under the terms of the MoA, and I can see no reason why the Buyer should not be so entitled.

81. Despite having expressly agreed, as mentioned variously above, that a number of items of expense incurred by the Buyer at Genoa were for the account of the Seller, the Seller refused the Buyer's offers of security for the value of the bunkers and arrested the vessel at Trieste on 4th April 2007. The Buyer was obliged to furnish a guarantee in terms acceptable to the Seller to obtain the release of the vessel, and that was accomplished by 6th April 2007. The Buyer alleges that the arrest was unlawful and claims as damages the costs it incurred in releasing the vessel from arrest.

82. The Buyer's submissions on this issue deal firstly with my jurisdiction in respect of the claim for wrongful arrest, which would otherwise sound in tort. They say firstly that the arbitration clause in the MoA is sufficiently wide to encompass the arrest of the vessel since it arose as a direct consequence of the various claims made under the MoA by the Buyer, and the Seller's counterclaim for the value of the bunkers. I am referred to the case of *Astro Vencedor Compania Naviera S.A. v. Mabanaft G.m.b.H [1971] 1 Lloyd's Rep. 502 (CA)* which seems to me to be precisely in point. I refer especially to the following passage from the judgement of Lord Denning, M. R.:

> *"The arrest of the ship was the direct consequence of the charterers' claim for damages against the shipowners. The charterers arrested the ship so as to enforce their claim. Their claim – that the shipowners had wrongfully stopped discharging the oil – was certainly a claim which arose out of the contract during the execution of it. It was plainly within the arbitration clause. It had necessarily to be decided by the arbitrator. The arrest was simply the follow-up to that claim. It was so closely*

26

> *connected with it that the rightness or wrongness of the arrest is also within the scope of the arbitration."*

83. In this case the arbitration clause in the MoA provided for *"...any dispute arising out of this agreement ... "* to be referred to arbitration. It seems plain to me that the various claims raised by the Buyer, and the matter of payment for the bunkers remaining on board the vessel, unquestionably arise out of the MoA and that therefore the adjudication of the claim for wrongful arrest in respect of the claim for bunkers falls squarely within the arbitration clause in the MoA.

84. As to the arrest being wrongful, I am referred to passages from *Admiralty Jurisdiction and Practice (3ʳᵈ Ed. 2003), paras. 4.29 – 4.33* for the principle that losses for wrongful arrest may be recovered from the arresting party only in cases where the arresting party is guilty of *mala fides* or *crassa neglentia.* The Buyer makes a number of submissions in that respect. Firstly that the claim for the value of the bunkers was mostly, if not completely wiped out by the sums admitted by the Seller as being due under the MoA to the Buyer. Secondly, that the Seller's refusal to accept a bank guarantee as offered by the Buyer and instead insisting upon a guarantee from an Italian bank, and in a grossly inflated amount, was unreasonable. Thirdly that an attempt by the Seller to make the Buyer submit to the jurisdiction of the Italian Courts, as a precondition of its acceptance of the guarantee, was a breach of the arbitration clause in the MoA.

85. I have set out in the foregoing paragraphs the nature of the evidence relating to precisely what was agreed between the Seller and the Buyer in relation to the costs being incurred at Genoa. It is not in my view complete. It seems to me however, that there was no dispute about the vessel requiring repairs to enable her to be delivered in Class, and I have decided that the costs claimed by the Buyer are not unreasonable. When taken together with other expenditure that was being incurred unequivocally on behalf of the Sellers at Genoa, the Buyer's submission seems to me to be inarguable.

27

86. I have seen no suggestion that the bank guarantee offered by the Buyer was in any way defective. If it was not, there would be no good reason for the Seller's insistence on a guarantee from an Italian bank. In that respect the Buyer obtained an advice from an Italian Law Firm, Studio Legale Berlingieri, in the following terms:

> *"In my view if Sea Gull lawyers have refused a bank guarantee of Credit Suisse without a valid reason and they now try to arrest the vessel in order to obtain an Italian bank guarantee, then the arrest would not be justified and they should be responsible for damages."*

87. Thus it seems to me that the Buyer's submission in this respect must be accepted.

88. The arbitration clause in the MoA is quite plain. It means that the parties have agreed that *any* dispute arising out of the MoA should be referred to arbitration. As I have said, payment for bunkers remaining on board quite definitely arises out of the MoA and there is nothing before me to suggest that the position of the Seller in that respect should be altered to that of a bunker supplier. Accordingly I accept the Buyer's submission.

89. The Buyer's claim for damages for unlawful arrest must therefore succeed. The amount claimed consists largely of the charges of Studio Legale Berlingieri and Bayside Services in dealing with the circumstances of the arrest, together with the relevant bank charges associated with the provision of a guarantee. The total is US$34,855.36 and it does not seem to me to be unreasonable.

90. In a late submission on behalf of the Seller, it is in fact expressly admitted that their claim for the value of the bunkers arises from clause 7 of the MoA. In the buyer's response to that submission it is argued that the Seller also recognises my jurisdiction to deal with the claim. I can determine no other meaning from the Seller's submission and it accordingly lends weight to the Buyers substantive submission that the arrest of the vessel by the Seller in pursuit of its claim for bunkers, was a breach of clause 16 of the MoA.

**Interest**

91. The Buyer also claims interest on any amounts found to be due to it. There are no submissions on either the rate or the period for which interest should run, and it is therefore left to my discretion. The majority of the costs were incurred whilst the vessel was at Genoa. She departed from there, albeit with a Condition of Class still outstanding and with some work yet to do to bring the machinery and equipment into *"good working order"*, on 4th August 2006. The Condition of Class was finally removed in early February 2007. The claim for damages for wrongful arrest arose in April 2007.

92. The dates of all invoices are provided in the Buyer's helpful schedules, and whilst it would of course be possible to award interest on a strict basis using those dates, it seems to me that a less pedantic approach is more appropriate. The bulk of the expenditure for repairs occurred at Genoa leaving, by my calculation, some US$118,989 which was expended in early 2007. A fair recompense by way of interest as far as the repair costs are concerned would therefore be to award interest on US$486,419.37 from 31st August 2006 and on US$120,000 from 28th February 2007. As far as the damages claim for wrongful arrest is concerned, interest should also be awarded on US$34,855.36 from 30th April 2007.

93. The rate of interest to be awarded should I think be taken as being the average LIBOR rate for period plus 1%. That means a common rate of 6.4% for each of the above periods. If that is on the low side it will serve to compensate for the fact that some of the expenditure was in fact spread over the period rather than being incurred on the dates mentioned above. I award compound interest in each case.

**Costs**

94. The Buyer also claims its costs of the arbitration. In the absence of any submissions on the point, I can do no other than to follow the general rule and award the Buyer its costs.

Exhibit B

3593                                                        $CHEINDLIN$

**MAHONEY & KEANE, LLP**
76 Beaver Street, 10th Floor
New York, New York 10005
(212) 385-1422

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
KALAFRANA SHIPPING LTD,

                              Plaintiff,

              - against -

SEA GULL SHIPPING CO., LTD, a/k/a Sea Gull
Shipping Co. SARL,

                              Defendant.
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 06-10-08

08 Civ. 09645

***EXPARTE* ORDER
FOR PROCESS OF
MARITIME ATTACHMENT**

WHEREAS on June    , 2008, Plaintiff KALAFRANA SHIPPING LTD filed a Verified Complaint herein against Defendant SEA GULL SHIPPING CO. LTD., a/k/a Sea Gull Shipping Co. SARL for damages in the amount of $639,635.38 and prayed for the issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, and

WHEREAS the Process of Maritime Attachment and Garnishment would command the United States Marshal or other designated process server attach any and all of Defendant's property within the District of this Court; and

WHEREAS the Court has reviewed the Verified Complaint and the Supporting Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist, it is hereby

ORDERED that Process of Maritime Attachment and Garnishment shall issue against all tangible or intangible property belonging to, claimed by or being held for Defendant SEA GULL

SHIPPING CO. LTD., a/k/a Sea Gull Shipping Co. SARL, by any garnishees within this District, including but not limited to American Express Bank, Bank of America, Bank of New York Mellon, Citibank, HSBC Bank USA NA, J.P. Morgan Chase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank and UBS, in the amount of $639,635.38 pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, and it is further

ORDERED that any person claiming an interest in the property attached or garnished pursuant to said order shall, upon application to this Court, be entitled to a prompt hearing at which Plaintiff shall be required to show cause why the attachment and garnishment should not be vacated or other relief granted, and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court, and it is further

ORDERED that following initial service by the United Stated Marshal or other designated process served upon such garnishee, that supplemental or subsequent service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or e-mail to each garnishee and that such garnishee personally served shall furnish to Plaintiff's counsel, the U.S. Marshal or designated process server a facsimile number or e-mail address to which supplemental and/or subsequent services may be made and other verifiable electronic means, including e-mail, if transmitted from within the District, shall be deemed to have been made within the district; and it is further

ORDERED that service on any garnishee as described above is deemed effective continuous services throughout the day from the time of each service through the opening of the garnishee's business the next business day, and it is further

2

ORDERED that, pursuant to Federal Rule of Civil Procedure (5(b)(2)(D), each garnishee may consent to accept service by any other means, and it is further

ORDERED that a copy of this Order be attached to and served with said Process of Maritime Attachment and Garnishment.

NOW, on reading and filing the Affidavit of Christopher H. Mansuy sworn to on June 5, 2008, and good cause having been shown, it is hereby

FURTHER ORDERED, that Christopher H. Mansuy, Edward A. Keane, Cornelius A. Mahoney, Garth S. Wolfson, Jorge A. Rodriguez, Marie Cush, or any other partner, associate, paralegal or other agent of MAHONEY & KEANE, LLP be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Attachment and Garnishment and the Verified Complaint, together with any interrogatories, upon garnishee(s) American Express Bank, Bank of America, Bank of New York Mellon, Citibank, HSBC Bank USA NA, J.P. Morgan Chase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank and UBS, together with any other garnishee(s) who (based upon information developed subsequent hereto by Plaintiff) may hold assets of, for, or on behalf of Defendant, SEA GULL SHIPPING CO. LTD.

Dated: New York, New York
        June 10, 2008

U. S/ D. J.

P:\3593\LEGAL\Ex Parte Order for Process.DOC

3

# Exhibit C

# Holland & Knight

Tel 212 513 3200
Fax 212 385 9010

Holland & Knight LLP
195 Broadway
New York, NY 10007-3189
www.hklaw.com

**TO:**

| Christopher H. Mansuy Esq. | Mahoney & Keane, LLP | (212) 385-1605 |
|---|---|---|
| NAME | COMPANY/FIRM | FAX NUMBER |
| New York | NY | (212) 385-1422 |
| CITY | STATE | (TELEPHONE NUMBER) |

**FROM:**

| Francesca Morris, Esq. | (212) 513-3431 | |
|---|---|---|
| NAME | TELEPHONE | TOTAL PAGES (Including Cover Sheet) |

**FOR THE RECORD:**

DATE: July 23, 2008    URGENCY: ☐ SUPER RUSH    ☐ RUSH ☐ REGULAR

FAXED BY:    FILE #: 117802.00001    CLIENT NAME:

CONFIRMED: ☐ YES ☐ NO    NAME:    TIME:

If you did not receive all of the pages or find that they are illegible, please call **212 513 3200**

**CONFIDENTIALITY NOTICE:** This facsimile, along with any documents, files, or attachments, may contain information that is confidential, privileged, or otherwise exempt from disclosure. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, printing, distribution or use of any information contained in or attached to this facsimile is **strictly prohibited**. If you have received this facsimile in error, please immediately notify us by facsimile or by telephone collect at the numbers stated above, and destroy the original facsimile and its attachments without reading, printing, or saving in any manner. Your cooperation is appreciated. Thank you.

# 5496782_v1

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland • San Francisco
Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

# Holland+Knight

Tel  212 513 3200
Fax  212 385 9010

Holland & Knight LLP
195 Broadway, 24th Floor
New York, NY 10007-3189
www.hklaw.com

Francesca Morris
212 513 3431
francesca.morris@hklaw.com

July 23, 2008

<u>VIA FAX AND REGULAR MAIL</u>

Christopher H. Mansuy, Esq.
Mahoney & Keane, LLP
76 Beaver Street, 10th Floor
New York, New York  10005

    Re: <u>Kalafrana Shiping Ltd. v. Sea Gull Shipping</u>
      *Index No. 08 Civ. 5299 (SAS)*

Dear Mr. Mansuy:

   We have been retained by Sea Gull Shipping Co. Ltd. ("Sea Gull") in connection with the attachment of its assets by your client Kalafrana Shipping, Ltd. ("Kalafrana") to secure Kalafrana's claims against Sea Gull as described in the complaint that Kalafrana filed in the local federal court.

   According to the complaint, the claim is based on an alleged breach of a contract for sale of a vessel.  (Complaint ¶¶ 5, 6).  It is well established that a contract for the sale of a vessel is not a maritime contract.  *The Ada*, 250 Fed. 194, 196 (2d Cir. 1918); *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 675 F. Supp. 146, 150 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 388 (2d Cir. 1989); *Economu v. Bates*, 222 F. Supp. 988 (S.D.N.Y. 1963).  Therefore, Kalafrana does not have a maritime claim for the alleged breach of the contract for sale of a vessel.

   We request that Kalafrana immediately reduce the attachment to reflect only its maritime claim for wrongful arrest.  Sea Gull does not concede that arrest of the vessel was wrongful.  In that regard, please be advised that Sea Gull Shipping has a counter-claim for bunkers against Kalafrana in the amount of $79,113.40 and will seek counter-security for this amount.

   Attached for your information is a recent decision by Judge Patterson who granted attorneys' fees to a defendant in a Rule B attachment action.  According to Judge Patterson, the attorneys' fees award was justified because the plaintiff should have released the attachment when it was advised of facts that demonstrated there was no maritime claim against the defendant.

Christopher H. Mansuy, Esq.
July 23, 2008
Page 2

    In accordance with the individual rules of Judge Scheindlin, we will write to the Court to request that the August 1, 2008, preliminary conference include a pre-motion conference for Sea Gull's motion for counter–security and that, if necessary, Sea Gull will make a motion to reduce the attachment. We hope to hear from you by Monday, July 28, 2008 that the motion to reduce the attachment will not be necessary. If Kalafrana refuses to reduce the attachment we will seek attorneys' fees in the motion.

    We look forward to hearing from you.

                            Very truly yours,

                            Francesca Morris

                            Francesca Morris

FM:cpm


# 5496180_v1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/18/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
STOLTHAVEN HOUSTON, INC.,

                              Plaintiff,                    08 Civ. 4327 (RPP)

          - against -                                       **OPINION & ORDER**

RACHEL B, its engines, tackle, apparel, etc., *in rem*,
and HILTVEIT ASSOCIATES, INC. and
ZAREPTA CHEMICAL KS, *in personam*,

                              Defendants.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Defendant Zarepta Chemical KS ("Zarepta") moves to vacate this Court's Ex

Parte Order for Process of Maritime Attachment dated May 7, 2008, pursuant to

Supplemental Rule E(4)(f) to the Federal Rules of Civil Procedure. For the reasons given

below, Zarepta's motion to vacate the maritime attachment (Doc. No. 4) is granted, and

attorneys' fees are awarded to Zarepta.


**BACKGROUND**

Plaintiff Stolthaven Houston, Inc. ("Plaintiff") is an affiliate company of Stolt

Nielsen USA Inc. ("Stolt Nielsen"), a marine terminal and transportation group. On May

7, 2008, Plaintiff brought a maritime action against the Rachel B ("the Vessel"), *in rem*,

and against Hiltveit Associates, Inc. ("Hiltveit") and Zarepta, *in personam*, and sought to

attach the assets of Zarepta as security in respect to its claim for unpaid marine services.

In naming the parties, the complaint stated that the "M/T Rachel B was and now is a

merchant tank vessel owned, operated, and managed by Hiltveit Associates, Inc. and/or

Zarepta Chemical KS." (Compl. ¶ 4.) It identified Hiltveit as a New York corporation

with a principal place of business in Hauppauge, New York, and as the manager of the

M/T Rachel B. (Id. ¶ 6.) It identified Zarepta as a foreign corporation with a principal

place of business in Oslo, Norway, and as the registered owner of the M/T Rachel B.

(Id.)

  The complaint alleged that beginning on March 4, 2008, Plaintiff provided

terminal services to the Vessel in the Port of Houston. (Compl. ¶ 7.) While berthed at

Plaintiff's dock, the Vessel was detained by the United States Coast Guard to undergo

repairs for various safety deficiencies, during which time Plaintiff was prevented from

serving its next vessel. (Id. ¶ 7; see also Carr Decl. ¶ 3.) The Vessel did not vacate the

berth until approximately 2200 hours on March 7, 2008. (Compl. ¶ 7.) Plaintiff attached

to the complaint a copy of its Marine Tariff (2007), pursuant to which the failure to

vacate Plaintiff's dock results in an additional $5,000.00 per hour charge. (Id., Ex. A at

3.) Plaintiff also attached a copy of its email exchange with the president of Hiltveit

dated March 5-6, 2008, in which Plaintiff advised Hiltveit to vacate the berth or else

incur layberth charges of an additional $5,000.00 per hour pursuant to the Marine Tariff.

(Id., Ex. B at 2 of 3.) According to the invoice Plaintiff sent to Hiltveit, the Vessel did

not vacate the berth until at least 53 hours later. (Id., Ex. C.) The complaint alleged that

Plaintiff "made demand for payment upon Defendants," but none of the amounts due

have been paid. (Id. ¶ 11.)

  In support of its application for a maritime attachment, Plaintiff alleged that

Zarepta could not be found within this district and requested attachment of any assets of

Zarepta found within this district. (Id. ¶ 13.) Based on the complaint and the attached

exhibits, this Court issued an ex parte Order for Process of Maritime Attachment of Zarepta's assets in the amount of $318,310.17, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure.

Following the attachment of Zarepta's assets, Zarepta's counsel sent a letter to Plaintiff's counsel dated June 5, 2008, explaining that Zarepta had entered into a bareboat charter for the Vessel dated May 25, 2004. (Honan Aff. ¶ 4, Ex. D.)  The bareboat charterer was Norfolk L.P. ("Norfolk"), through Norfolk's general partner, Hiltveit.  (Id.) Zarepta's counsel advised Plaintiff that it therefore had no *in personam* claim against Zarepta and requested that Plaintiff release the attached funds.  (Id., Ex. D.)  By email dated June 9, 2008, Plaintiff declined to release the attached funds.  (Id., Ex. E.)

On June 12, 2008, Zarepta sought an order to show cause as to why the maritime attachment order should not be vacated.  In support of its motion, Zarepta included a declaration of Morten E. Werring, Chairman of Zarepta, and attached a copy of the "bareboat charter" for the Vessel dated May 25, 2004 and signed by Zarepta and Hiltveit on behalf of Norfolk, the charterer.  Pursuant to the bareboat charter party, the initial period for the charter was eight years, starting from the delivery date.  (Id., Ex. A (Bareboat Charter) Rider ¶ 34(b)(i).)  The Werring declaration stated that the Vessel was delivered to Norfolk, a limited partnership organized under the laws of the Republic of the Marshall Islands, on May 28, 2004.  (Werring Decl. ¶¶ 3, 4.)

The bareboat charter between Zarepta and Norfolk/Hiltveit is comprised of a "BARECON 89" Standard Bareboat Charter (the "Barecon 89"), which is a form bareboat charter printed by the authority of The Baltic and International Maritime

Council (BIMCO), as well as a rider providing twenty-four additional clauses. (See

Werring Decl., Ex. A.)  Certain clauses in the Barecon 89 were visibly modified and

agreed to as such by the parties.[1]  Clause 9(a) of the Barecon 89 provides, "The Vessel

shall during the Charter period be in the full possession and at the absolute disposal for

all purposes of the Charterers and under their complete control in every respect." (Id.,

Ex. A, Barecon 89 ¶ 9(a).)  Clause 9(b), which remains unmodified in its entirety,

provides as follows:

> (b) The Charterers shall at their own expense and by their own
> procurement man, victual, navigate, operate, supply, fuel and repair the
> Vessel whenever required during the Charter period and they shall pay all
> charges and expenses of every kind and nature whatsoever incidental to
> their use and operation of the Vessel under this Charter, including any
> foreign general municipality and/or state taxes.

(Id., ¶ 9(b).)

The additional clauses in the rider generally replace or supplement clauses in the

Barecon 89.  Additional Clause 47 governs "Undertakings" of the charterers, a subject

not covered by the Barecon 89. (Id., Ex. A, Rider ¶ 47.)  Pursuant to this clause, Norfolk

agreed to

> (d) enter into a technical management agreement with Hiltveit Associates,
> Inc. (the 'Managers'), which shall be approved by the Owners [i.e.,
> Zarepta], and not, without the prior written consent of the Owners (such
> consent not to be unreasonably withheld), dismiss the Manager, alter the
> Management Agreement or appoint a new manager for the Vessel; . . . .

(Id. ¶ 47(d).)  Also in Additional Clause 47, Norfolk agreed not to change its business in

any material respect without the prior written consent of Zarepta, and agreed to maintain

---

[1] The bottom of each page of the "BARECON 89" Standard Bareboat Charter reads as follows: "This
document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or
deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text
of this document which is not clearly visible, the text of the original BIMCO approved document shall
apply. . . ." (See Werring Decl., Ex. A.)

a pledged amount of $4 million deposited in a bank account in favor of the mortgagee and Zarepta, $500,000 of which Norfolk could use, subject to the consent of the mortgagee and Zarepta, for operation of the Vessel. (Id. ¶ 47(g),(h).)

In opposition to Zarepta's motion to vacate the attachment, Plaintiff submitted the declaration of Daniel Carr, assistant general counsel of Stolt Nielsen, and the email communications between Mr. Carr, on behalf of Plaintiff, and Hiltveit regarding the layberth charges.[2] By email dated March 7, 2008, Mr. Carr transmitted a letter to Hiltveit advising that Plaintiff intended to assess layberth charges in excess of $300,000 pursuant to Plaintiff's Marine Tariff. (Carr Decl., Ex B.) Hiltveit responded by email the same day, advising Mr. Carr that the Vessel had been released by the Coast Guard and "that on behalf of owners of Rachel B we did do everything possible to complete the necessary corrective measures." (Id.) By email dated March 10, 2008, Mr. Carr transmitted to Hiltveit Plaintiff's invoice for layberth charges totaling $269,754.38. (Id.) Hiltveit responded by email on March 14, 2008, requesting that "Stolt reassess its position" in light of the fact that "[t]he vessel interests did all within their power to promptly correct the deficiencies found by the Coast Guard so that the vessel could leave the berth . . . ." (Id.)

On June 16, 2008, the Court held a Rule E(4)(f) hearing on Zarepta's motion to vacate the attachment. Following the hearing, Zarepta's counsel provided the Court with a copy of the General Management Agreement, dated May 27, 2004, by which Norfolk

---

[2] The Carr declaration also discusses and attaches exhibits pertaining to a subsequent detention of the Rachel B in late April, early May 2008, by the United Kingdom's Marine and Coast Guard Agency (the "MCA"), while the Rachel B was calling at Falmouth. (Carr Decl. ¶¶ 8-9, Ex. D.) Carr states that reports of the incident in the trade press indicated that the MCA had direct discussions with Zarepta and made no mention of a bareboat charter. (Id. ¶ 9.) He asserts that this information was made known to him prior to filing the Rule B attachment proceedings. (Id.) While this evidence is relevant to what Plaintiff knew at the time of filing the complaint and obtaining the maritime attachment, it is not reliable evidence for this Court's determination of whether Plaintiff can sustain a prima facie admiralty case.

appointed Hiltveit as general managing agent of the Vessel, and a copy of the Agreement

for Ship Management (or Technical Management Agreement), dated May 27, 2004, by

which Hiltveit appointed Carl Olsens Tankrederi A/S as technical managers.

## DISCUSSION

A district court should issue the special remedy of a maritime attachment where a

plaintiff, in addition to meeting the filing and service requirements of Supplemental

Rules B and E to the Federal Rules of Civil Procedure, can show the following:

> 1) it has a valid prima facie admiralty claim against the defendant; 2) the
> defendant cannot be found within the district; 3) the defendant's property
> may be found within the district; and 4) there is no statutory or maritime
> law bar to the attachment.

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 435 (2d Cir. 2006).

To avoid abuse of this maritime remedy, Supplemental Rule E(4)(f) provides any person

claiming an interest in the attached property with "a prompt hearing at which the plaintiff

shall be required to show why . . . attachment should not be vacated or other relief

granted consistent with these rules." Fed. R. Civ. P. Supp. R. E(4)(f).  At the conclusion

of a Rule E(4)(f) hearing, "a district court must vacate an attachment if the plaintiff fails

to sustain its burden of showing that he has satisfied the requirements of Rules B and E."

Aqua Stoli, 460 F.3d at 445.

Importantly, "Rule E(4)(f) clearly places the burden on the plaintiff to show that

an attachment was properly ordered and complied with in the requirements of Rules B

and E." Id. at 445 n.5.  In determining whether or not the plaintiff has sustained its

burden, the majority of courts interpreting Aqua Stoli in this district apply a prima facie

pleading standard.  Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm.,

6

511 F. Supp. 2d 399, 403 (S.D.N.Y. 2007) ("The majority of courts in this district have understood Aqua Stoli to require the application of the prima facie standard when considering the adequacy of a claim in a maritime vacatur motion."); OGI Oceangate Trans. Co. v. RP Logistics Pvt. Ltd., No. 06 Civ. 9441, 2007 WL 1834711, at *4 (S.D.N.Y. June 26, 2007). A plaintiff is "not required to provide evidence showing that it has a claim against defendant to carry its burden under Supplemental Rule E(4)(f)," and its complaint may suffice. Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 95870, at *16-17 (S.D.N.Y. Aug. 15, 2006). But a plaintiff must state a "valid prima facie admiralty claim" to support a Rule B attachment. Sonito Shipping Co. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007).

Zarepta challenges Plaintiff's Rule B attachment primarily on the grounds that Plaintiff fails to sustain its burden of showing a valid prima facie admiralty claim against Zarepta in view of the bareboat charter, evidence of which was not presented to the Court with the complaint at the time the attachment was issued. Zarepta asserts that by entering into the bareboat charter with Norfolk/Hiltveit, Zarepta explicitly shifted full responsibility to the charterer for any costs and expenses, including the layberth charges incurred by Hiltveit in March 2008. In response, Plaintiff argues that the so-called bareboat charter does not, in fact, relieve Zarepta of *in personam* liability because it expressly retains Zarepta's control of the Vessel and is therefore not a true bareboat or "demise" charter.

There is no dispute between the parties that a true bareboat charter shifts responsibility for any costs incurred from the owner of the ship to the charterer. (Pl.'s Mem. Law Opp'n at 6; Def.'s Mem. Law Supp. Mot. to Vacate at 6.) See Sampson

7

Madeja v. Olympic Packers, LLC, 310 F.3d 628, 638 (9th Cir. 2002) (holding that only
the bareboat charterer is liable *in personam* for seamen's wage claims in view of the valid
bareboat charter agreement). Both parties further agree that the unamended Barecon 89
is a valid bareboat charter. (6/16/08 Tr. at 30-31.) A dispute exists, however, as to the
law governing the Court's construction of the charter in this case. Zarepta argues that the
charter should be construed in accordance with Norwegian law, such as the parties agreed
in Additional Clause ¶ 56 of the charter agreement. (Werring Decl., Ex. A, Rider ¶ 56.)
Plaintiff objects to the application of Norwegian law on the grounds that Zarepta gave
improper notice of foreign law under Rule 44.1 of the Federal Rules of Civil Procedure
by citing foreign law on a reply submission. Zarepta's notice of foreign law was indeed
untimely. Plaintiff, however, has not been prejudiced by the untimely notice, as it was
granted the opportunity fully to address the issue in sur-reply. Regardless, the result
under Norwegian and U.S. law is the same in this case.

Under Norwegian law, the charter made between Zarepta and Norfolk/Hiltveit is
certainly a bareboat charter. The Court accepts the unequivocal opinion of Knut Erik
Westad, a Norwegian lawyer with many years of maritime law experience, in his
declaration on behalf of Zarepta. (Def.'s Reply Mem. Supp. Mot. Vacate, Westad Decl. ¶
6 (stating "there is, in my opinion, no doubt that under Norwegian law, the Bareboat
Charter is in fact a bareboat charter").) Gaute Gjelsten, a Norwegian lawyer who
submitted a declaration on behalf of Plaintiff, does not contradict Mr. Westad's opinion
that the bareboat charter is a true bareboat charter. Mr. Gjelsten's declaration merely
states, "The characterisation of a charter party depends on an assessment of the contract

8

as a whole where the parties' intentions are given significant weight." (Pl.'s Sur-Reply

Mem. Law Opp'n, Gjelsten Decl. ¶ 11.)

Under United States law, there is an important distinction between a bareboat

charter and a time charter. In characterizing a bareboat or demise charter, the Supreme

Court has stated,

> To create a demise the owner of the vessel must completely and
> exclusively relinquish "possession, command, and navigation" thereof to
> the demisee . . . . It is therefore tantamount to, though just short of, an
> outright transfer of ownership. However, anything short of such complete
> transfer is a time or voyage charter party or not a charter party at all.

Guzman v. Pichirilo, 369 U.S. 698, 699 (1962); see also Citrus Mktg. Bd. of Israel v. J.

Lauritzen A/S, 943 F.2d 220, 221 n.2 (2d Cir. 1991) (stating "a demise, or 'bareboat

charter,' is the 'transfer of full possession and control of the vessel for the period covered

by the contract'" (citation omitted)). Because the owner of the vessel "giv[es] up to the

charterers the full possession and control of the ship, it is usually an integral feature of

the arrangement that the responsibility for the maintenance and operation and all costs

and expenses relating thereto shall be borne by the charterers." Mark Davis, Bareboat

Charters 54 (2d ed. 2005). While the transfer of responsibility to the charterer for any

costs and expenses can be a tell tale sign of a bareboat charter, "the question whether the

possession and control is transferred to the charterer must be determined by the intention

of the parties as expressed by the wording of the contract as a whole." Zabriskie v. City

of New York, 160 F. 235, 237 (S.D.N.Y. 1908).

Based on the evidence of the intention of the parties and the wording of the

charter as a whole, the Court concludes that the Zarepta-Norfolk/Hiltveit charter is a true

bareboat charter. To begin, Barecon 89 Clause 9 provides the charterer, Norfolk, with

"full possession" and "complete control in every respect" of the Vessel. (Werring Decl., Ex. A, Barecon 89 ¶ 9(a).) In keeping with that broad transfer of control, the charterer also assumes full responsibility for the navigation, operation, supply, fuel, and repair of the Vessel and for all costs associated therewith. (Id., Barecon 89 ¶ 9(b).) As Plaintiff concedes by accepting the unamended Barecon 89 as a true bareboat charter, a registered owner properly may retain some modicum of oversight of the vessel in a bareboat charter party, since a bareboat charter is, after all, a lease and not a complete transfer of title. Here, the Barecon 89 retains Zarepta's right to inspect the Vessel and its log books (Clause 7), to be kept abreast of the Vessel's hire (Clause 5), and to approve the insurance purchased by the charterer and the insured repairs to the Vessel (Clause 12).

Plaintiff argues, however, that "several Additional Clauses demonstrate that Zarepta retained significant technical management over the vessel as well as financial control over the operational activities of the vessel, which retention is incompatible with the creation of a bareboat charter." (Pl.'s Mem. Law Opp'n at 9.) This assertion is unsupported. While Additional Clause 47(d) provides that Zarepta shall approve Norfolk's technical management agreement with Hiltveit and that Norfolk will not dismiss the manager without Zarepta's consent (which could not be unreasonably withheld), it does not, as Plaintiff suggests, "retain for Zarepta significant technical management over the vessel." There is no evidence that Zarepta is involved to any degree in the managers' performance of their duties under the agreements or in the management of the Vessel. The charterer, not Zarepta, appointed the general managers, who appointed the technical managers. (See Def.'s Supplemental Submission dated

10

6/17/08, Attachments 1, 2.)  Retaining the ability to ensure that a competent manager is appointed does not constitute retention of significant control or management.

Nor does Additional Clause 47(h) retain for Zarepta financial control over the operational activities of the Vessel.  By requiring the charterer to put up security, specifically $4 million in an account controlled by Zarepta and the mortgagee, Additional Clause 47(h) only serves to replace the requirement of a bank guaranty in Clause 22 of the Barecon 89, which the parties struck.  A clause establishing financial security of performance is normal in a bareboat charter.  See Davis, supra, at 5.  Plaintiff argues, however, that Additional Clause 47(h) is significantly different than Clause 22 of the Barecon 89 because it allows the charterer to spend up to $500,000 for the operation of the Vessel subject to the consent of Zarepta.  The requirement of Zarepta's consent before the charterer deducts from the security in the Vessel, alone, does not preclude the charter from being a bareboat charter in view of agreement as a whole.  Nor does the requirement of Zarepta's prior written consent before making material changes to the charterer's business render the charter anything less than a bonafide bareboat charter.  Such modest assurances do not constitute the retention of control.

Moreover, the evidence indicates that the parties intended to enter into a bareboat charter.  The general management agreement between Norfolk and Hiltveit refers to Norfolk's agreement with Zarepta as "an agreement to bareboat charter" the Vessel and to Norfolk as "the Owner."  (Def.'s Supplemental Submission dated 6/17/08, Attachment 2 at 2).  The technical management agreement refers to Norfolk as "Bare Boat Charterers" (id., Attachment 1 at 1), and to Hiltveit as the agent of the "Bare Boat Charterers" (id.).  Naturally, the terms bareboat charterer and owner are used

11

interchangeably, as "[i]t has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as owner, generally called owner *pro hac vice*." Reed v. Steamship Yaka, 373 U.S. 410, 412 (1963) (footnote omitted). Based on the foregoing, it is reasonable to interpret that Hiltveit was referring to Norfolk when it told Plaintiff that it did everything possible "on behalf of owners of Rachel B" to complete the necessary corrective measures. (Carr Decl., Ex B.) Hiltveit appeared to use the word "owners" interchangeably with the "vessel interests." (Id.)

In view of these facts and the language of the charter agreement as a whole, the Court concludes that the charter agreement between Zarepta and Norfolk/Hiltveit is a true bareboat charter agreement. Plaintiff cannot sustain a valid prima facie case against Zarepta, *in personam*, as owner of the Vessel, to recover the layberth charges incurred by Hiltveit. Nor does Plaintiff appear to have an *in personam* claim against Zarepta based on privity of contract. Nothing in the record supports an allegation that Zarepta was party to the wharfage agreement between Plaintiff and Hiltveit. Although Plaintiff alleged in its complaint that it "made demand for payment upon Defendants" (Compl. ¶ 11), the email communications from Mr. Carr are directed to Hiltveit only, and not to Zarepta. (See Carr Decl., Ex. B.)

Since Plaintiff fails to sustain a valid prima facie case against Zarepta, the attachment of Zarepta's assets in the amount of $318,310.17 must be vacated. Additionally, Zarepta is entitled to an award of attorneys' fees in view of Plaintiff's refusal to release the attached funds after being advised by Zarepta's counsel of the bareboat charter's existence.

## CONCLUSION

For the foregoing reasons, Defendant Zarepta's motion to vacate the Court's

Order for Process of Maritime Attachment dated May 7, 2008 (Doc. No. 4) is hereby

granted, and attorneys' fees are awarded to Zarepta.

IT IS SO ORDERED.

Dated: New York, New York
     July 18, 2008

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Order sent to:**

*Attorneys for Plaintiff*
Freehill, Hogan & Mahar, LLP
Attn: Don Philip Murnane, Jr
80 Pine Street
New York, NY 10005
(212) 425-1900
Fax: (212) 425-1901

*Attorneys for Defendant*
Holland & Knight LLP
Attn: William J. Honan
195 Broadway
New York, NY 10007
(212)-513-3516
Fax: (212)-385-9010

13

Confirmation Report — Memory Send

Page          : 001
Date & Time: Jul-23-08   09:26pm
Line 1        : +
Line 2        : +
Machine ID : HOLLAND AND KNIGHT

Job number          :   265

Date                :   Jul-23 09:22pm

To                  : ☎73431#117802#1#912123851605#

Number of pages     :   016

Start time          :   Jul-23 09:22pm

End time            :   Jul-23 09:26pm

Pages sent          :   016

Status              :   OK

Job number  :  265          *** SEND SUCCESSFUL ***

# Holland··Knight

Tel  212 513 3200
Fax  212 385 9010

Holland & Knight LLP
195 Broadway
New York, NY 10007-3189
www.hklaw.com

| TO: | | |
|---|---|---|
| Christopher H. Mansuy Esq. | Mahoney & Keane, LLP | (212) 385-1605 |
| NAME | COMPANY/FIRM | FAX NUMBER |
| New York | NY | (212) 385-1422 |
| CITY | STATE | (TELEPHONE NUMBER) |

| FROM: | | |
|---|---|---|
| Francesca Morris, Esq. | (212) 513-3431 | |
| NAME | TELEPHONE | TOTAL PAGES (Including Cover Sheet) |

| FOR THE RECORD: | | |
|---|---|---|
| DATE: July 23, 2008 | URGENCY: ☐ SUPER RUSH | ☐ RUSH ☐ REGULAR |
| FAXED BY: | FILE #: 117802.00001 | CLIENT NAME: |
| CONFIRMED: ☐ YES ☐ NO | NAME: | TIME: |

If you did not receive all of the pages or find that they are illegible, please call 212 513 3200

CONFIDENTIALITY NOTICE: This facsimile, along with any documents, files, or attachments, may contain information that is confidential, privileged, or otherwise exempt from disclosure. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, printing, distribution or use of any information contained in or attached to this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by facsimile or by telephone collect at the numbers stated above, and destroy the original facsimile and its attachments without reading, printing, or saving in any manner. Your cooperation is appreciated. Thank you.

# 5496782_v1

Atlanta · Bethesda · Boston · Chicago · Fort Lauderdale · Jacksonville · Los Angeles
Miami · New York · Northern Virginia · Orlando · Portland · San Francisco
Tallahassee · Tampa · Washington, D.C. · West Palm Beach
Beijing · Caracas* · Helsinki* · Mexico City · Tel Aviv* · Tokyo · *Representative Office

# Exhibit D

Edward A. Keane*
Cornelius A. Mahoney•
Christopher H. Mansuy••
Garth S. Wolfson•

Jorge A. Rodriguez••

Of Counsel
Stephen J. Murray.

*Also admitted in NJ
+Also admitted in CT
• Also admitted in PA

# MAHONEY & KEANE, LLP

*Attorneys at Law*
*11 Hanover Square - 10th Floor*
*New York, New York 10005*
*Telephone (212) 385-1422*
*Facsimile (212) 385-1605*
*cmansuy@mahoneykeane.com*

Connecticut Office

14 Pilgrim Lane
Weston, CT 06883
Tel: (203) 222-1019
Fax: (203)222-0252

July 28, 2005

VIA FAX 212 385-9010

Holland Knight  LLP
195 Broadway, 24th Floor
New York, NY 10007-3189

Attention:  Francesca Morris, Esq.

> Re:  USDC/SDNY 08 CV 5299 (SAS)
> KALAFRANA SHIPPING LTD. v. SEA
> GULL SHIPPING CO., LTD, a/k/a
> SEA GULL SHIPPING CO. SARL.,
> File No. 70/3593/C/08/6

Dear Ms. Morris:

We refer to your telefax dated July 23, 2008
requesting that KALAFRANA release sums in excess of $34,855.36
plus interest and costs. The basis for your request is the
contention that breach of a contract of sale of a vessel is
not an admiralty and maritime claim. We note the cases you
have cited. However, we draw your attention to the 2004
decision by the United States Supreme Court, *Norfolk Southern
Railway v. Kirby*, 543 U.S.14 and the more recent decision by

the 2nd Circuit Court of Appeals in *Folksamerica Reinsurance
Co. v. Clean Water of New York, Inc.*, 2005 AMC 1747.  As the
2nd Circuit Court of Appeals noted, the *Kirby* decision has
established new guidelines for evaluating the admiralty
character of contracts.  The kernel of the analysis is
"conceptual" as opposed to "spatial."  Since the subject
matter of a contract for the sale of a vessel is a vessel, it
would seem that nothing could be more maritime except the sea
itself.

            With regard to the value of the bunkers, please
note that the arbitrator awarded KALAFRANA a setoff of that
amount against amounts due it from SEA GULL.  We respectfully
submit that the award extinguishes the counter-claim.

            We note that SEA GULL does not concede that the
arrest was wrongful. But we assume you concede that the issue
was for the arbitral tribunal.

            Finally, we note that your letter does not mention
any intention by SEA GULL to pay the amounts awarded against
it and in favor of KALAFRANA by the tribunal.  Is it the
intention of SEA GULL to hide behind every conceivable
physical and legal barrier to avoid paying its just debts?
Or does SEA GULL wish to discuss solutions to what we view as
a straightforward debt?

                                    Very truly yours,

                                    MAHONEY & KEANE, LLP

                                    By:
                                    Christopher H. Mansuy

CHM/mtc

# Exhibit E

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED: 7/18/08              │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

STOLTHAVEN HOUSTON, INC.,

                        Plaintiff,                          08 Civ. 4327 (RPP)

          - against -                                       **OPINION & ORDER**

RACHEL B, its engines, tackle, apparel, etc., *in rem*,
and HILTVEIT ASSOCIATES, INC. and
ZAREPTA CHEMICAL KS, *in personam*,

                        Defendants.
--------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

   Defendant Zarepta Chemical KS ("Zarepta") moves to vacate this Court's Ex

Parte Order for Process of Maritime Attachment dated May 7, 2008, pursuant to

Supplemental Rule E(4)(f) to the Federal Rules of Civil Procedure. For the reasons given

below, Zarepta's motion to vacate the maritime attachment (Doc. No. 4) is granted, and

attorneys' fees are awarded to Zarepta.


**BACKGROUND**

   Plaintiff Stolthaven Houston, Inc. ("Plaintiff") is an affiliate company of Stolt

Nielsen USA Inc. ("Stolt Nielsen"), a marine terminal and transportation group. On May

7, 2008, Plaintiff brought a maritime action against the Rachel B ("the Vessel"), *in rem*,

and against Hiltveit Associates, Inc. ("Hiltveit") and Zarepta, *in personam*, and sought to

attach the assets of Zarepta as security in respect to its claim for unpaid marine services.

In naming the parties, the complaint stated that the "M/T Rachel B was and now is a

merchant tank vessel owned, operated, and managed by Hiltveit Associates, Inc. and/or

Zarepta Chemical KS." (Compl. ¶ 4.) It identified Hiltveit as a New York corporation

with a principal place of business in Hauppauge, New York, and as the manager of the

M/T Rachel B. (Id. ¶ 6.) It identified Zarepta as a foreign corporation with a principal

place of business in Oslo, Norway, and as the registered owner of the M/T Rachel B.

(Id.)

The complaint alleged that beginning on March 4, 2008, Plaintiff provided

terminal services to the Vessel in the Port of Houston. (Compl. ¶ 7.) While berthed at

Plaintiff's dock, the Vessel was detained by the United States Coast Guard to undergo

repairs for various safety deficiencies, during which time Plaintiff was prevented from

serving its next vessel. (Id. ¶ 7; see also Carr Decl. ¶ 3.) The Vessel did not vacate the

berth until approximately 2200 hours on March 7, 2008. (Compl. ¶ 7.) Plaintiff attached

to the complaint a copy of its Marine Tariff (2007), pursuant to which the failure to

vacate Plaintiff's dock results in an additional $5,000.00 per hour charge. (Id., Ex. A at

3.) Plaintiff also attached a copy of its email exchange with the president of Hiltveit

dated March 5-6, 2008, in which Plaintiff advised Hiltveit to vacate the berth or else

incur layberth charges of an additional $5,000.00 per hour pursuant to the Marine Tariff.

(Id., Ex. B at 2 of 3.) According to the invoice Plaintiff sent to Hiltveit, the Vessel did

not vacate the berth until at least 53 hours later. (Id., Ex. C.) The complaint alleged that

Plaintiff "made demand for payment upon Defendants," but none of the amounts due

have been paid. (Id. ¶ 11.)

In support of its application for a maritime attachment, Plaintiff alleged that

Zarepta could not be found within this district and requested attachment of any assets of

Zarepta found within this district. (Id. ¶ 13.) Based on the complaint and the attached

2

exhibits, this Court issued an ex parte Order for Process of Maritime Attachment of

Zarepta's assets in the amount of $318,310.17, pursuant to Rule B of the Supplemental

Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal

Rules of Civil Procedure.

Following the attachment of Zarepta's assets, Zarepta's counsel sent a letter to

Plaintiff's counsel dated June 5, 2008, explaining that Zarepta had entered into a bareboat

charter for the Vessel dated May 25, 2004. (Honan Aff. ¶ 4, Ex. D.) The bareboat

charterer was Norfolk L.P. ("Norfolk"), through Norfolk's general partner, Hiltveit. (Id.)

Zarepta's counsel advised Plaintiff that it therefore had no *in personam* claim against

Zarepta and requested that Plaintiff release the attached funds. (Id., Ex. D.) By email

dated June 9, 2008, Plaintiff declined to release the attached funds. (Id., Ex. E.)

On June 12, 2008, Zarepta sought an order to show cause as to why the maritime

attachment order should not be vacated. In support of its motion, Zarepta included a

declaration of Morten E. Werring, Chairman of Zarepta, and attached a copy of the

"bareboat charter" for the Vessel dated May 25, 2004 and signed by Zarepta and Hiltveit

on behalf of Norfolk, the charterer. Pursuant to the bareboat charter party, the initial

period for the charter was eight years, starting from the delivery date. (Id., Ex. A

(Bareboat Charter) Rider ¶ 34(b)(i).) The Werring declaration stated that the Vessel was

delivered to Norfolk, a limited partnership organized under the laws of the Republic of

the Marshall Islands, on May 28, 2004. (Werring Decl. ¶¶ 3, 4.)

The bareboat charter between Zarepta and Norfolk/Hiltveit is comprised of a

"BARECON 89" Standard Bareboat Charter (the "Barecon 89"), which is a form

bareboat charter printed by the authority of The Baltic and International Maritime

3

Council (BIMCO), as well as a rider providing twenty-four additional clauses. (See

Werring Decl., Ex. A.) Certain clauses in the Barecon 89 were visibly modified and

agreed to as such by the parties.[1] Clause 9(a) of the Barecon 89 provides, "The Vessel

shall during the Charter period be in the full possession and at the absolute disposal for

all purposes of the Charterers and under their complete control in every respect." (Id.,

Ex. A, Barecon 89 ¶ 9(a).) Clause 9(b), which remains unmodified in its entirety,

provides as follows:

> (b) The Charterers shall at their own expense and by their own
> procurement man, victual, navigate, operate, supply, fuel and repair the
> Vessel whenever required during the Charter period and they shall pay all
> charges and expenses of every kind and nature whatsoever incidental to
> their use and operation of the Vessel under this Charter, including any
> foreign general municipality and/or state taxes.

(Id., ¶ 9(b).)

The additional clauses in the rider generally replace or supplement clauses in the

Barecon 89. Additional Clause 47 governs "Undertakings" of the charterers, a subject

not covered by the Barecon 89. (Id., Ex. A, Rider ¶ 47.) Pursuant to this clause, Norfolk

agreed to

> (d) enter into a technical management agreement with Hiltveit Associates,
> Inc. (the 'Managers'), which shall be approved by the Owners [i.e.,
> Zarepta], and not, without the prior written consent of the Owners (such
> consent not to be unreasonably withheld), dismiss the Manager, alter the
> Management Agreement or appoint a new manager for the Vessel; . . . .

(Id. ¶ 47(d).) Also in Additional Clause 47, Norfolk agreed not to change its business in

any material respect without the prior written consent of Zarepta, and agreed to maintain

---

[1] The bottom of each page of the "BARECON 89" Standard Bareboat Charter reads as follows: "This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. . . ." (See Werring Decl., Ex. A.)

a pledged amount of $4 million deposited in a bank account in favor of the mortgagee and Zarepta, $500,000 of which Norfolk could use, subject to the consent of the mortgagee and Zarepta, for operation of the Vessel.  (Id. ¶ 47(g),(h).)

In opposition to Zarepta's motion to vacate the attachment, Plaintiff submitted the declaration of Daniel Carr, assistant general counsel of Stolt Nielsen, and the email communications between Mr. Carr, on behalf of Plaintiff, and Hiltveit regarding the layberth charges.[2]  By email dated March 7, 2008, Mr. Carr transmitted a letter to Hiltveit advising that Plaintiff intended to assess layberth charges in excess of $300,000 pursuant to Plaintiff's Marine Tariff. (Carr Decl., Ex B.)  Hiltveit responded by email the same day, advising Mr. Carr that the Vessel had been released by the Coast Guard and "that on behalf of owners of Rachel B we did do everything possible to complete the necessary corrective measures." (Id.)  By email dated March 10, 2008, Mr. Carr transmitted to Hiltveit Plaintiff's invoice for layberth charges totaling $269,754.38. (Id.)  Hiltveit responded by email on March 14, 2008, requesting that "Stolt reassess its position" in light of the fact that "[t]he vessel interests did all within their power to promptly correct the deficiencies found by the Coast Guard so that the vessel could leave the berth . . . ." (Id.)

On June 16, 2008, the Court held a Rule E(4)(f) hearing on Zarepta's motion to vacate the attachment. Following the hearing, Zarepta's counsel provided the Court with a copy of the General Management Agreement, dated May 27, 2004, by which Norfolk

---

[2] The Carr declaration also discusses and attaches exhibits pertaining to a subsequent detention of the Rachel B in late April, early May 2008, by the United Kingdom's Marine and Coast Guard Agency (the "MCA"), while the Rachel B was calling at Falmouth. (Carr Decl. ¶¶ 8-9, Ex. D.)  Carr states that reports of the incident in the trade press indicated that the MCA had direct discussions with Zarepta and made no mention of a bareboat charter. (Id. ¶ 9.)  He asserts that this information was made known to him prior to filing the Rule B attachment proceedings. (Id.)  While this evidence is relevant to what Plaintiff knew at the time of filing the complaint and obtaining the maritime attachment, it is not reliable evidence for this Court's determination of whether Plaintiff can sustain a prima facie admiralty case.

5

appointed Hiltveit as general managing agent of the Vessel, and a copy of the Agreement

for Ship Management (or Technical Management Agreement), dated May 27, 2004, by

which Hiltveit appointed Carl Olsens Tankrederi A/S as technical managers.


**DISCUSSION**

      A district court should issue the special remedy of a maritime attachment where a

plaintiff, in addition to meeting the filing and service requirements of Supplemental

Rules B and E to the Federal Rules of Civil Procedure, can show the following:

> 1) it has a valid prima facie admiralty claim against the defendant; 2) the
> defendant cannot be found within the district; 3) the defendant's property
> may be found within the district; and 4) there is no statutory or maritime
> law bar to the attachment.

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 435 (2d Cir. 2006).

To avoid abuse of this maritime remedy, Supplemental Rule E(4)(f) provides any person

claiming an interest in the attached property with "a prompt hearing at which the plaintiff

shall be required to show why . . . attachment should not be vacated or other relief

granted consistent with these rules." Fed. R. Civ. P. Supp. R. E(4)(f). At the conclusion

of a Rule E(4)(f) hearing, "a district court must vacate an attachment if the plaintiff fails

to sustain its burden of showing that he has satisfied the requirements of Rules B and E."

Aqua Stoli, 460 F.3d at 445.

      Importantly, "Rule E(4)(f) clearly places the burden on the plaintiff to show that

an attachment was properly ordered and complied with in the requirements of Rules B

and E." Id. at 445 n.5. In determining whether or not the plaintiff has sustained its

burden, the majority of courts interpreting Aqua Stoli in this district apply a prima facie

pleading standard. Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm.,

511 F. Supp. 2d 399, 403 (S.D.N.Y. 2007) ("The majority of courts in this district have understood Aqua Stoli to require the application of the prima facie standard when considering the adequacy of a claim in a maritime vacatur motion."); OGI Oceangate Trans. Co. v. RP Logistics Pvt. Ltd., No. 06 Civ. 9441, 2007 WL 1834711, at *4 (S.D.N.Y. June 26, 2007). A plaintiff is "not required to provide evidence showing that it has a claim against defendant to carry its burden under Supplemental Rule E(4)(f)," and its complaint may suffice. Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 95870, at *16-17 (S.D.N.Y. Aug. 15, 2006). But a plaintiff must state a "valid prima facie admiralty claim" to support a Rule B attachment. Sonito Shipping Co. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007).

Zarepta challenges Plaintiff's Rule B attachment primarily on the grounds that Plaintiff fails to sustain its burden of showing a valid prima facie admiralty claim against Zarepta in view of the bareboat charter, evidence of which was not presented to the Court with the complaint at the time the attachment was issued. Zarepta asserts that by entering into the bareboat charter with Norfolk/Hiltveit, Zarepta explicitly shifted full responsibility to the charterer for any costs and expenses, including the layberth charges incurred by Hiltveit in March 2008. In response, Plaintiff argues that the so-called bareboat charter does not, in fact, relieve Zarepta of *in personam* liability because it expressly retains Zarepta's control of the Vessel and is therefore not a true bareboat or "demise" charter.

There is no dispute between the parties that a true bareboat charter shifts responsibility for any costs incurred from the owner of the ship to the charterer. (Pl.'s Mem. Law Opp'n at 6; Def.'s Mem. Law Supp. Mot. to Vacate at 6.) See Sampson

7

<u>Madeja v. Olympic Packers, LLC</u>, 310 F.3d 628, 638 (9th Cir. 2002) (holding that only

the bareboat charterer is liable *in personam* for seamen's wage claims in view of the valid

bareboat charter agreement). Both parties further agree that the unamended Barecon 89

is a valid bareboat charter. (6/16/08 Tr. at 30-31.) A dispute exists, however, as to the

law governing the Court's construction of the charter in this case. Zarepta argues that the

charter should be construed in accordance with Norwegian law, such as the parties agreed

in Additional Clause ¶ 56 of the charter agreement. (Werring Decl., Ex. A, Rider ¶ 56.)

Plaintiff objects to the application of Norwegian law on the grounds that Zarepta gave

improper notice of foreign law under Rule 44.1 of the Federal Rules of Civil Procedure

by citing foreign law on a reply submission. Zarepta's notice of foreign law was indeed

untimely. Plaintiff, however, has not been prejudiced by the untimely notice, as it was

granted the opportunity fully to address the issue in sur-reply. Regardless, the result

under Norwegian and U.S. law is the same in this case.

Under Norwegian law, the charter made between Zarepta and Norfolk/Hiltveit is

certainly a bareboat charter. The Court accepts the unequivocal opinion of Knut Erik

Westad, a Norwegian lawyer with many years of maritime law experience, in his

declaration on behalf of Zarepta. (Def.'s Reply Mem. Supp. Mot. Vacate, Westad Decl. ¶

6 (stating "there is, in my opinion, no doubt that under Norwegian law, the Bareboat

Charter is in fact a bareboat charter").) Gaute Gjelsten, a Norwegian lawyer who

submitted a declaration on behalf of Plaintiff, does not contradict Mr. Westad's opinion

that the bareboat charter is a true bareboat charter. Mr. Gjelsten's declaration merely

states, "The characterisation of a charter party depends on an assessment of the contract

8

as a whole where the parties' intentions are given significant weight." (Pl.'s Sur-Reply

Mem. Law Opp'n, Gjelsten Decl. ¶ 11.)

Under United States law, there is an important distinction between a bareboat

charter and a time charter.  In characterizing a bareboat or demise charter, the Supreme

Court has stated,

> To create a demise the owner of the vessel must completely and
> exclusively relinquish "possession, command, and navigation" thereof to
> the demisee . . . . It is therefore tantamount to, though just short of, an
> outright transfer of ownership.  However, anything short of such complete
> transfer is a time or voyage charter party or not a charter party at all.

Guzman v. Pichirilo, 369 U.S. 698, 699 (1962); see also Citrus Mktg. Bd. of Israel v. J.

Lauritzen A/S, 943 F.2d 220, 221 n.2 (2d Cir. 1991) (stating "a demise, or 'bareboat

charter,' is the 'transfer of full possession and control of the vessel for the period covered

by the contract'" (citation omitted)).  Because the owner of the vessel "giv[es] up to the

charterers the full possession and control of the ship, it is usually an integral feature of

the arrangement that the responsibility for the maintenance and operation and all costs

and expenses relating thereto shall be borne by the charterers."  Mark Davis, Bareboat

Charters 54 (2d ed. 2005).  While the transfer of responsibility to the charterer for any

costs and expenses can be a tell tale sign of a bareboat charter, "the question whether the

possession and control is transferred to the charterer must be determined by the intention

of the parties as expressed by the wording of the contract as a whole."  Zabriskie v. City

of New York, 160 F. 235, 237 (S.D.N.Y. 1908).

Based on the evidence of the intention of the parties and the wording of the

charter as a whole, the Court concludes that the Zarepta-Norfolk/Hiltveit charter is a true

bareboat charter.  To begin, Barecon 89 Clause 9 provides the charterer, Norfolk, with

9

"full possession" and "complete control in every respect" of the Vessel. (Werring Decl., Ex. A, Barecon 89 ¶ 9(a).) In keeping with that broad transfer of control, the charterer also assumes full responsibility for the navigation, operation, supply, fuel, and repair of the Vessel and for all costs associated therewith. (Id., Barecon 89 ¶ 9(b).) As Plaintiff concedes by accepting the unamended Barecon 89 as a true bareboat charter, a registered owner properly may retain some modicum of oversight of the vessel in a bareboat charter party, since a bareboat charter is, after all, a lease and not a complete transfer of title. Here, the Barecon 89 retains Zarepta's right to inspect the Vessel and its log books (Clause 7), to be kept abreast of the Vessel's hire (Clause 5), and to approve the insurance purchased by the charterer and the insured repairs to the Vessel (Clause 12).

Plaintiff argues, however, that "several Additional Clauses demonstrate that Zarepta retained significant technical management over the vessel as well as financial control over the operational activities of the vessel, which retention is incompatible with the creation of a bareboat charter." (Pl.'s Mem. Law Opp'n at 9.) This assertion is unsupported. While Additional Clause 47(d) provides that Zarepta shall approve Norfolk's technical management agreement with Hiltveit and that Norfolk will not dismiss the manager without Zarepta's consent (which could not be unreasonably withheld), it does not, as Plaintiff suggests, "retain for Zarepta significant technical management over the vessel." There is no evidence that Zarepta is involved to any degree in the managers' performance of their duties under the agreements or in the management of the Vessel. The charterer, not Zarepta, appointed the general managers, who appointed the technical managers. (See Def.'s Supplemental Submission dated

10

6/17/08, Attachments 1, 2.) Retaining the ability to ensure that a competent manager is appointed does not constitute retention of significant control or management.

Nor does Additional Clause 47(h) retain for Zarepta financial control over the operational activities of the Vessel. By requiring the charterer to put up security, specifically $4 million in an account controlled by Zarepta and the mortgagee, Additional Clause 47(h) only serves to replace the requirement of a bank guaranty in Clause 22 of the Barecon 89, which the parties struck. A clause establishing financial security of performance is normal in a bareboat charter. See Davis, supra, at 5. Plaintiff argues, however, that Additional Clause 47(h) is significantly different than Clause 22 of the Barecon 89 because it allows the charterer to spend up to $500,000 for the operation of the Vessel subject to the consent of Zarepta. The requirement of Zarepta's consent before the charterer deducts from the security in the Vessel, alone, does not preclude the charter from being a bareboat charter in view of agreement as a whole. Nor does the requirement of Zarepta's prior written consent before making material changes to the charterer's business render the charter anything less than a bonafide bareboat charter. Such modest assurances do not constitute the retention of control.

Moreover, the evidence indicates that the parties intended to enter into a bareboat charter. The general management agreement between Norfolk and Hiltveit refers to Norfolk's agreement with Zarepta as "an agreement to bareboat charter" the Vessel and to Norfolk as "the Owner." (Def.'s Supplemental Submission dated 6/17/08, Attachment 2 at 2). The technical management agreement refers to Norfolk as "Bare Boat Charterers" (id., Attachment 1 at 1), and to Hiltveit as the agent of the "Bare Boat Charterers" (id.). Naturally, the terms bareboat charterer and owner are used

11

interchangeably, as "[i]t has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as owner, generally called owner *pro hac vice*." Reed v. Steamship Yaka, 373 U.S. 410, 412 (1963) (footnote omitted). Based on the foregoing, it is reasonable to interpret that Hiltveit was referring to Norfolk when it told Plaintiff that it did everything possible "on behalf of owners of Rachel B" to complete the necessary corrective measures. (Carr Decl., Ex B.)  Hiltveit appeared to use the word "owners" interchangeably with the "vessel interests."  (Id.)

In view of these facts and the language of the charter agreement as a whole, the Court concludes that the charter agreement between Zarepta and Norfolk/Hiltveit is a true bareboat charter agreement. Plaintiff cannot sustain a valid prima facie case against Zarepta, *in personam*, as owner of the Vessel, to recover the layberth charges incurred by Hiltveit. Nor does Plaintiff appear to have an *in personam* claim against Zarepta based on privity of contract. Nothing in the record supports an allegation that Zarepta was party to the wharfage agreement between Plaintiff and Hiltveit. Although Plaintiff alleged in its complaint that it "made demand for payment upon Defendants" (Compl. ¶ 11), the email communications from Mr. Carr are directed to Hiltveit only, and not to Zarepta. (See Carr Decl., Ex. B.)

Since Plaintiff fails to sustain a valid prima facie case against Zarepta, the attachment of Zarepta's assets in the amount of $318,310.17 must be vacated. Additionally, Zarepta is entitled to an award of attorneys' fees in view of Plaintiff's refusal to release the attached funds after being advised by Zarepta's counsel of the bareboat charter's existence.

12

**CONCLUSION**

For the foregoing reasons, Defendant Zarepta's motion to vacate the Court's

Order for Process of Maritime Attachment dated May 7, 2008 (Doc. No. 4) is hereby

granted, and attorneys' fees are awarded to Zarepta.

IT IS SO ORDERED.

Dated: New York, New York
      July /8, 2008

                                      Robert P. Patterson, Jr.
                                         U.S.D.J.

**Copies of this Order sent to:**

*Attorneys for Plaintiff*
Freehill, Hogan & Mahar, LLP
Attn: Don Philip Murnane, Jr
80 Pine Street
New York, NY 10005
(212) 425-1900
Fax: (212) 425-1901

*Attorneys for Defendant*
Holland & Knight LLP
Attn: William J. Honan
195 Broadway
New York, NY 10007
(212)-513-3516
Fax: (212)-385-9010

# Exhibit F

5

# APPENDIX 1
## TO THE HEADS OF AGREEMENT DATED 11 JUNE 2006

## MEMORANDUM OF AGREEMENT

Dated: 4th May 2006

> Norwegian Shipbrokers' Association's Memorandum of Agreement for sale and purchase of ships. Adopted by The Baltic and International Maritime Council (BIMCO) in 1956
> Code-name
> **SALEFORM 1993**
> Revised 1966, 1983 and 1986/87.

Scandinavian Shipping Invest A/S, Copenhagen, Denmark and Aquaglory Marine Limited, Limassol, Cyprus    1
hereinafter called the Sellers, have agreed to sell,
and

Kalafrana Shipping Ltd, Valletta, Malta  hereinafter called the Buyers, have agreed to buy    2

Name: M/V "ASSIL"    3

Classification Society/Class: LR +100 A1 Roll On / Roll Off Cargo Ship +LMC UMS Ice Class 1A at 6.20 metres    4

Built: 1981                    By: AB Finnboda Varf, Stockholm, Sweden    5

Flag: Maltese              Place of Registration: Valletta    6

Call Sign: 9HHX8              GrtNrt: 11,092 / 4,475    7

Register Number: 9823 (Malta)    8

Main Engine: Lindholmen Pielstick

hereinafter called the Vessel, on the following terms and conditions: as supplemented by the provisions of a Heads of
Agreement between the parties of even date.

Definitions    10

"Banking days" are days on which banks are open both in the country of the currency    11
stipulated for the Purchase Price in Clause 1 and in the place of closing stipulated in Clause 8.    12

"In writing" or "written" means a letter handed over from the Sellers to the Buyers or vice versa,    13
a registered letter, telex, telefax or other modern form of written communication.    14

"Classification Society" or "Class" means the Society referred to in line 4.    15

1.    Purchase Price US $ 3,300,000 (United States Dollars Three Million and Three Hundred Thousand).    16

2.    Deposit    17

~~As security for the correct fulfilment of this Agreement the Buyers shall pay a deposit of 10 %~~    18
~~(ten per cent) of the Purchase Price within _____ banking days from the date of this~~    19
~~Agreement. This deposit shall be placed with a first class international bank to be nominated by the Sellers and~~    20
~~approved by the Buyers~~

~~and held by them in a joint account for the Sellers and the Buyers, to be released in accordance~~    21
~~with joint written instructions of the Sellers and the Buyers. Interest, if any, to be credited to the~~    22
~~Buyers. Any fee charged for holding the said deposit shall be borne equally by the Sellers and the~~    23
~~Buyers.~~    24

3.    Payment    25

The said Purchase Price shall be paid in full free of bank charges to the account of Scandinavien Shipping Invest    26
A/S, account no. 5036 147 697, IBAN: DK 9120005036147697, SWIFT CODE: NDEADKKK maintained with
Nordea Bank Danmark A/S, Erhvervsafdeling Kobenhavn, Vesterbrogade 8, PO Box 850, DK-0900 Copenhagen
C.

on delivery of the Vessel, but not later than 3 banking days after the Vessel is in every respect    27
physically ready for delivery in accordance with the terms and conditions of this Agreement and    28
Notice of Readiness has been given in accordance with Clause 5. In order to facilitate and assist the Buyers'    29
transfer of the purchase price, the Sellers' bank shall, if so required by the Buyers or their bankers, open a
suspense account or other such account as they may consider to be appropriate for the receipt of such
purchase moneys.

4.    Inspections    30

6

a)*   The Buyers have inspected and accepted the Vessel's classification records. The Buyers   31
have also inspected the Vessel at/in *Barcelona, Spain on 24 April 2008* ~~on~~   32
and have accepted the Vessel following this inspection and the sale is outright and definite,   33
subject only to the terms and conditions of this Agreement.   34

b)*   ~~The Buyers shall have the right to inspect the Vessel's classification records and declare~~   35
~~whether same are accepted or not within~~   36

~~The Sellers shall provide for inspection of the Vessel at/in~~   37

~~The Buyers shall undertake the inspection without undue delay to the Vessel. Should the~~   38
~~Buyers cause undue delay they shall compensate the Sellers for the losses thereby incurred.~~   39
~~The Buyers shall inspect the Vessel without opening up and without cost to the Sellers.~~   40
~~During the inspection, the Vessel's deck and engine log books shall be made available for~~   41
~~examination by the Buyers. If the Vessel is accepted after such inspection, the sale shall~~   42
~~become outright and definite, subject only to the terms and conditions of this Agreement,~~   43
~~provided the Sellers receive written notice of acceptance from the Buyers within 72 hours~~   44
~~after completion of such inspection.~~   45
~~Should notice of acceptance of the Vessel's classification records and of the Vessel not be~~   46
~~received by the Sellers as aforesaid, the deposit together with interest earned shall be~~   47
~~released immediately to the Buyers, whereafter this Agreement shall be null and void.~~   48

*   *4a) and 4b) are alternatives; delete whichever is not applicable. In the absence of deletions,*   49
*alternative 4a) to apply.*   50

5.   Notices, time and place of delivery   51

a) ~~The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall~~   52
~~provide the Buyers with 14, 10,~~ , and 5 ~~days notice of the~~   53
~~estimated time of arrival at the~~
intended place of ~~drydocking/ underwater inspection/~~ delivery. When the Vessel is at the place   54
of delivery and in every respect ~~physically~~ ready for delivery in accordance with this   55
Agreement, the Sellers shall give the Buyers a written Notice of Readiness   56
for delivery, *provided that Sellers shall not tender Notice of Readiness until the Vessel and all her*
*delivery documents are ready for delivery.*

b) The Vessel shall be delivered and taken over safely afloat *within port limits* at a safe and accessible berth or   57
anchorage at/in *Genoa, Italy*   58

~~in the Sellers' option.~~   59

Expected time of delivery: 15th to 16th June 2008.   60

~~Date of cancelling (see Clauses 5 c), 6 b) (iii) and 14) June 1st 2008 in Buyers' option.~~   61

c) ~~If the Sellers anticipate that, notwithstanding the exercise of due diligence by them, the~~   62
~~Vessel will not be ready for delivery by the cancelling date, they may notify the Buyers in~~   63
~~writing stating the date when they anticipate that the Vessel will be ready for delivery and~~   64
~~propose a new cancelling date. Upon receipt of such notification the Buyers shall have the~~   65
~~option of either cancelling this Agreement in accordance with Clause 14 within 7 running~~   66
~~days of receipt of the notice or of accepting the new date as the new cancelling date. If the~~   67
~~Buyers have not declared their option within 7 running days of receipt of the Sellers'~~   68
~~notification or if the Buyers accept the new date, the date proposed in the Sellers' notification~~   69
~~shall be deemed to be the new cancelling date and shall be substituted for the cancelling~~   70
~~date stipulated in line 61.~~   71

~~If this Agreement is maintained with the new cancelling date, all other terms and conditions~~   72
~~hereof including those contained in Clauses 5 a) and 5 c) shall remain unaltered and in full~~   73
~~force and effect. Cancellation or failure to cancel shall be entirely without prejudice to any~~   74
~~claim for damages the Buyers may have under Clause 14 for the Vessel not being ready by~~   75
~~the original cancelling date.~~   76

d) Should the Vessel become an actual, constructive or compromised total loss before delivery   77
~~the deposit together with interest earned shall be released immediately to the Buyers~~   78
~~whereafter this Agreement shall be null and void.~~ *the Buyers shall be entitled to terminate this Agreement*   79
*in which event the Sellers shall indemnify the Buyers for the Repairs Costs as referred to in the Heads of*

This Contract is a computer generated copy of the SALEFORM 1993 form, printed under licence from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original document, as recommended by BIMCO, shall apply. The Norwegian Shipbrokers' Association and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.

7

*Agreement of even date.*

6.    Drydocking/Divers Inspection                                                                              80

(a)**    The Sellers shall place the Vessel in drydock at the port of delivery for inspection by the       81
Classification Society of the Vessel's underwater parts below the deepest load line, the          82
extent of the inspection being in accordance with the Classification Society's rules. If the      83
rudder, propeller, bottom or other underwater parts below the deepest load line are found         84
broken, damaged or defective so as to affect the Vessel's class, such defects shall be made       85
good at the Sellers' expense to the satisfaction of the Classification Society without            86
condition/recommendation".                                                                         87

(b)**    (i)    The Vessel is to be delivered without drydocking. However, the Buyers shall              88
have the right at their expense to arrange for an underwater inspection by a diver approved        89
by the Classification Society prior to the delivery of the Vessel. The Sellers shall at their      90
cost make the Vessel available for such inspection. The extent of the inspection and the          91
conditions under which it is performed shall be to the satisfaction of the Classification          92
Society. If the conditions at the port of delivery are unsuitable for such inspection, the         93
Sellers shall make the Vessel available at a suitable alternative place near to the delivery       94
port.                                                                                               95

(ii)    If the rudder, propeller, bottom or other underwater parts below the deepest load line       95
are found broken, damaged or defective so as to affect the Vessel's class, then unless            97
repairs can be carried out afloat to the satisfaction of the Classification Society, the Sellers  98
shall arrange for the Vessel to be drydocked at their expense for inspection by the               99
Classification Society of the Vessel's underwater parts below the deepest load line, the          100
extent of the inspection being in accordance with the Classification Society's rules. If the      101
rudder, propeller, bottom or other underwater parts below the deepest load line are found         102
broken, damaged or defective so as to affect the Vessel's class, such defects shall be made       103
good by the Sellers at their expense to the satisfaction of the Classification Society            104
without condition/recommendation". In such event the Sellers are to pay also for the cost of      105
the underwater inspection and the Classification Society's attendance.                             106

(iii)    If the Vessel is to be drydocked pursuant to Clause 6 b) (ii) and no suitable dry-         107
docking facilities are available at the port of delivery, the Sellers shall take the Vessel       108
to a port where suitable drydocking facilities are available, whether within or outside the       109
delivery range as per Clause 5. Once drydocking has taken place, the Sellers shall deliver        110
the Vessel at a port within the delivery range as per Clause 5 b) which shall, for the            111
purpose of this Clause, become the new port of delivery. In such event the cancelling date       112
provided for in Clause 5 b) shall be extended by the additional time required for the             113
drydocking and extra steaming, but limited to a maximum of 14 running days.                        114

(c)    If the Vessel is drydocked pursuant to Clause 6 a) or 6 b) above                              115

(i)    the Classification Society may require survey of the tailshaft system, the extent of        116
the survey being to the satisfaction of the Classification surveyor. If such survey is not        117
required by the Classification Society, the Buyers shall have the right to require the tailshaft   118
to be drawn and surveyed by the Classification Society, the extent of the survey being in         119
accordance with the Classification Society's rules for tailshaft survey and consistent with       120
the current stage of the Vessel's survey cycle. The Buyers shall declare whether they            121
require the tailshaft to be drawn and surveyed not later than by completion of the                122
inspection by the Classification Society. The drawing and refitting of the tailshaft shall be    123
arranged by the Sellers. Should any part of the tailshaft system be condemned or found           124
defective so as to affect the Vessel's class, those parts shall be renewed or made good at       125
the Sellers' expense to the satisfaction of the Classification Society without                    126
condition/recommendation.                                                                          127

(ii)    the expenses relating to the survey of the tailshaft system shall be borne                 128
by the Buyers unless the Classification Society requires such survey to be carried out in         129
which case the Sellers shall pay these expenses. The Sellers shall also pay the expenses          130
if the Buyers require the survey and parts of the system are condemned or found defective         131
or broken so as to affect the Vessel's class".                                                    132

(iii)    the expenses in connection with putting the Vessel in and taking her out of               133
drydock, including the drydock dues and the Classification Society's fees, shall be paid by       134

This Contract is a computer generated copy of the SALEFORM 1993 form, printed under license from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original document as recommended by BIMCO shall apply. The Norwegian Shipbrokers' Association and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.

B

the Sellers if the Classification Society issues any condition/recommendation· as a result 135
of the survey or if it requires survey of the tailshaft system. In all other cases the Buyers 136
shall pay the aforesaid expenses, dues and fees. 137

(iv) the Buyers' representative shall have the right to be present in the drydock, but 138
without interfering with the work or decisions of the Classification surveyor. 139

(v) the Buyers shall have the right to have the underwater parts of the Vessel 140
cleaned and painted at their risk and expense without interfering with the Sellers or the 141
Classification surveyor's work. If any, and without affecting the Vessels timely delivery. If, 142
however, the Buyers' work in drydock is still in progress when the Sellers have 143
completed the work which the Sellers are required to do, the additional docking time 144
needed to complete the Buyers' work shall be for the Buyers' risk and expense. In the event 145
that the Buyers' work requires such additional time, the Sellers may upon completion of the 146
Sellers' work tender Notice of Readiness for delivery whilst the Vessel is still in drydock 147
and the Buyers shall be obliged to take delivery in accordance with Clause 3, whether 148
the Vessel is in drydock or not and irrespective of Clause 5 b). 149

Notes, if any, in the surveyors report which are accepted by the Classification Society 150
without condition/recommendation are not to be taken into account. 151

5. a) and 5 b) are alternatives; delete whichever is not applicable. In the absence of deletions, 152
alternative 5 a) to apply. 153

## 7.    Spares/bunkers, etc. 154

The Sellers shall deliver the Vessel to the Buyers with everything belonging to her on board and on 155
shore. All spare parts and spare equipment including spare tail-end shaft(s) and/or spare 156
propeller(s)/propeller blade(s), if any, belonging to the Vessel at the time of inspection used or 157
unused, whether on board or not shall become the Buyers' property, but spares on order are to be 158
excluded. Forwarding charges, if any, shall be for the Buyers' account. The Sellers are not required to 159
replace spare parts including spare tail-end shaft(s) and spare propeller(s)/propeller blade(s) which 160
are taken out of spare and used as replacement prior to delivery, but the replaced items shall be the 161
property of the Buyers. The radio installation and navigational equipment shall be included in the sale 162
without extra payment if they are the property of the Sellers. Unused stores and provisions shall be 163
included in the sale and be taken over by the Buyers without extra payment. 164

The Sellers have the right to take ashore crockery, plates, cutlery, linen and other articles bearing the 165
Sellers' flag or name, provided they replace same with similar unmarked items. Library, forms, etc., used 166
exclusively for use in the Sellers' vessel(s), shall be excluded without compensation. Captain's, 167
Officers' and Crew's personal belongings including the slop chest are to be excluded from the sale, 168
as well as the following additional items (including items on hire): 169

The Buyers shall take over the remaining bunkers and unused lubricating oils in storage tanks and 170
sealed drums and pay the current net market price (excluding barging expenses), at the port and date 171
of delivery of the Vessel. 172
Payment under this Clause shall be made at the same time and place and in the same currency as 173
the Purchase Price. 174
Bunkers and lube oils ROB are not the property of the Sellers. 

## 8.    Documentation 175

The place of closing: shall be at the location of the Sellers' bank as referred to in Clause 3 unless mutually 176
agreed. 

In exchange for payment of the Purchase Price the Sellers shall furnish the Buyers with delivery 177
documents, namely: stipulated in Addendum No.1 hereto 178

a) Legal Bill of Sale in a form recordable in _____ (the country in which the Buyers are 179
to register the Vessel), warranting that the Vessel is free from all encumbrances, mortgages 180
and maritime liens or any other debts or claims whatsoever, duly notarially attested and 181
legalized by the consul of such country or other competent authority. 182

b) Current Certificate of Ownership issued by the competent authorities of the flag state of 183

This Contract is a computer generated copy of the SALEFORM 1993 form, printed under license from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original document as promulgated by BIMCO, shall apply. The Norwegian Shipbrokers' Association and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.

the Vessel.

134

c) ~~Confirmation of Class issued within 72 hours prior to delivery.~~

135

d) ~~Current Certificate issued by the competent authorities stating that the Vessel is free from registered encumbrances.~~

136
137

e) ~~Certificate of Deletion of the Vessel from the Vessel's registry, or other official evidence of deletion appropriate to the Vessel's registry at the time of delivery, or, in the event that the registry does not as a matter of practice issue such documentation immediately, a written undertaking by the Sellers to effect deletion from the Vessel's registry forthwith and furnish a Certificate or other official evidence of deletion to the Buyers promptly and latest within 4 (four) weeks after the Purchase Price has been paid and the Vessel has been delivered.~~

188
189
190
191
192
193

**As well as**

f) Any such additional documents as may reasonably be required by the competent authorities for the purpose of registering the Vessel, provided the Buyers notify the Sellers of any such documents as soon as possible after the date of this Agreement.

194
195
196

At the time of delivery the Buyers and Sellers shall sign and deliver to each other a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Sellers to the Buyers

197
198
199

At the time of delivery the Sellers shall hand to the Buyers the classification certificate(s) as well as all plans etc. which are on board the Vessel. Other certificates which are on board the Vessel shall also be handed over to the Buyers unless the Sellers are required to retain same. In which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers' possession shall be promptly forwarded to the Buyers at their expense, if the Buyers so request. The Sellers may keep the Vessel's log books but the Buyers to have the right to take copies of same.

200
201
202
203
204
205
206

**9.   Encumbrances**

207

The Sellers warrant that the Vessel at the time of delivery, is free from all charters, encumbrances, mortgages and maritime liens or any other debts whatsoever. The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made at any time against the Vessel which have been incurred prior to the time of delivery.

208
209
210
211

**10.   Taxes, etc.**

212

Any taxes, fees and expenses in connection with the purchase and registration under the Buyers' flag shall be for the Buyers' account, whereas similar charges in connection with the closing of the Sellers' register shall be for the Sellers' account.

213
214
215

**11.   Condition on delivery**

216

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, but subject to the terms and conditions of this Agreement she shall be ~~delivered and taken over as is where is at the time~~ and place of delivery, as she was at the time of inspection, ~~fair wear and tear excepted.~~

217
218
219

However, the Vessel shall be delivered with her class maintained without condition/recommendation*, free of average damage affecting the Vessel's class, and with her classification certificates and national certificates, as well as all other certificates the Vessel had at the time of inspection, valid and unextended without condition/recommendation* by Class or the relevant authorities at the time of delivery.

220
221
222
223

*   "Inspection" in this Clause 11, shall mean the Buyers' inspection according to Clause 4 a) or 4 b), if applicable, or the Buyers' inspection prior to the signing of this Agreement. If the Vessel is taken over without inspection, the date of this Agreement shall be the relevant date.

224
225
226
227

*   Notes, if any, in the surveyor's report which are accepted by the Classification Society without condition/recommendation are not to be taken into account.

228
229

**12.   Name/markings**

230

This Saleform is a computer generated copy of the SALEFORM 1993 form, printed under license from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original document shall be recognised by BIMCO which shall apply. Any original Saleform 1993 document so recognised shall prevail over this document. The original documents and the computer

www.scantopdf.eu

10

Upon delivery the Buyers undertake to change the name of the Vessel and alter funnel markings.  231

### 13. Buyers' default   232

~~Should the deposit not be paid in accordance with Clause 2, the Sellers have the right to cancel this~~  233
~~Agreement, and they shall be entitled to claim compensation for their losses and for all expenses~~  234
~~incurred together with interest.~~  235
Should the Purchase Price not be paid in accordance with Clause 3, the Sellers have the right to  236
cancel the Agreement, in which case the deposit together with interest earned shall be released to the  237
Sellers. If the deposit does not cover their loss, the Sellers shall be entitled to claim further  238
compensation for their losses and for all expenses incurred together with interest.  239

### 14. Sellers' default   240

Should the Sellers fail to give Notice of Readiness in accordance with Clause 5 a) or fail to be ready  241
to validly complete a legal transfer ~~by the date stipulated in line 61~~ the Buyers shall have  242
the option of cancelling this Agreement provided always that the Sellers shall be granted a  243
maximum of 3 banking days after Notice of Readiness has been given to make arrangements  244
for the documentation set out in Clause 8. ~~If after Notice of Readiness has been given but before~~  245
~~the Buyers have taken delivery, the Vessel ceases to be physically ready for delivery and is not~~  246
~~made physically ready again in every respect by the date stipulated in line 61 and new Notice of~~  247
~~Readiness given, the Buyers shall retain their option to cancel. In the event that the Buyers elect~~  248
~~to cancel this Agreement the deposit together with interest earned shall be released to them~~  249
~~immediately.~~
Should the Sellers fail to give Notice of Readiness ~~by the date stipulated in line 61~~ or fail to be ready  251
to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for  252
their loss and for all expenses together with interest if their failure is due to proven  253
negligence and whether or not the Buyers cancel this Agreement.  254

### 15. Buyers' representatives   255

After this Agreement has been signed by both parties ~~and the deposit has been lodged~~ the Buyers  256
have the right to _unfettered access to the Vessel and its facilities on board for its crew and contracted_  257
_workers for the purpose inter alia of safe manning and effecting the Repairs as referred to in the Heads of_
_Agreement of even date_ ~~place two representatives on board the Vessel~~ at their sole risk and expense, upon
arrival at Genoa, Italy from the date hereof ~~on or about~~  258
~~These representatives are on board for the purpose of familiarisation and in the capacity of~~  259
~~observers only, and they shall not interfere in any respect with the operation of the Vessel. The~~  260
~~Buyers' representatives shall sign the Sellers' letter of indemnity prior to their embarkation.~~ _The Buyers warrant_  261
_that P&I cover for their crew has been attached._

### 16. Arbitration   262

a)* This Agreement shall be governed by and construed in accordance with English law and  263
     any dispute arising out of this Agreement shall be referred to arbitration in London in  264
     accordance with the _London Maritime Arbitrators' Association (LMAA)_ ~~Act 1950 and 1979~~ or any  265
     statutory modification or
     re-enactment thereof for the time being in force, _before a sole arbitrator to be mutually_ ~~one arbitrator being~~266
     ~~appointed by each~~
     ~~party. On the receipt by one party of the nomination in writing of the other party's arbitrator,~~  267
     ~~that party shall appoint their own arbitrator~~ within fourteen day's _of notice of arbitration,_ failing which _to be_  268
     _appointed by the President for the time being of the LMAA_ the decision of the
     single _sole_ arbitrator appointed shall apply. ~~If two arbitrators properly appointed shall not agree~~  269
     ~~they shall appoint an umpire whose decision~~ shall be final.  270

b)* ~~This Agreement shall be governed by and construed in accordance with Title 9 of the~~  271
     ~~United States Code and the Law of the State of New York and should any dispute arise out of~~  272
     ~~this Agreement, the matter in dispute shall be referred to three persons at New York, one to~~  273
     ~~be appointed by each of the parties hereto, and the third by the two so chosen; their~~  274
     ~~decision or that of any two of them shall be final, and for purpose of enforcing any award, this~~  275
     ~~Agreement may be made a rule of the Court.~~  276
     ~~The proceedings shall be conducted in accordance with the rules of the Society of Maritime~~  277
     ~~Arbitrators, Inc. New York.~~  278

This Contract is a computer generated copy of the SALEFORM 1993 form, printed under license from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original document as recommended by BIMCO, shall apply. The Norwegian Shipbrokers' Association and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.

11

~~Any dispute arising out of this Agreement shall be referred to arbitration at~~    279
~~subject to the procedures applicable there.~~    280

~~The laws of~~ ~~shall govern this Agreement.~~    281

~~16. a), 16. b) and 16. c) are alternatives; delete whichever is not applicable. In the absence of~~    282
~~deletions, alternative 16. a) to apply.~~    283

This MOA includes Addendum no. 1 which is attached hereto and is fully incorporated herein.

Signed for and on behalf of the Sellers            Signed for and on behalf of the Buyers

This Contract is a computer generated copy of the SALEFORM 1993 form, printed under license from the Norwegian Shipbrokers' Association, using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original document, as recommended by BIMCO, shall apply. The Norwegian Shipbrokers' Association and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.