**Mahoney & Keane, LLP**
76 Beaver Street, 10th Floor
New York, New York  10005
(212) 385-1422

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

KALAFRANA SHIPPING LTD,

|                      |                           |
|----------------------|---------------------------|
| Plaintiff,           | **08 Civ.  5299  (SAS)**  |

- against -


SEA GULL SHIPPING  CO., LTD, a/k/a Sea Gull
Shipping Co. SARL,

Defendant.
-------------------------------------------------------------X




## PLAINTIFF'S MEMORANDUM IN REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR LEAVE TO AMEND




Of Counsel
Christopher H. Mansuy


MAHONEY & KEANE, LLP
76 Beaver Street, 10th Floor
New York, New York 10005
212 385-1422

## INTRODUCTION

Defendant's opposition to plaintiff's Motion for Leave to Amend is drenched with variations of the word "prejudice." This is a supercilious effort to distract attention from the fact that Sea Gull owes Kalafrana the principal net amount of $562,161.33 plus compound interest and costs awarded by the London arbitrator. Sea Gull declines to pay. The prejudice is borne by plaintiff who is out-of-pocket a substantial amount of money. It is ironic that Sea Gull, as the engineer of its own predicament, casts itself as the victim.

Plaintiff Kalafrana respectfully submits this Memorandum of Law in reply to defendant's opposition to plaintiff's motion for leave to amend.

## POINT I

### THE PROPOSED AMENDMENTS HIGHLIGHT
### THE CHARACTER OF THE DISPUTES

Sea Gull complains that it did not have sufficient time to respond to the Notice of Motion for Leave to Amend. Sea Gull's attorneys chose not to request additional time. But the simple fact is that the sum and substance of five out of six of the claims in the proposed Amended Complaint are alluded to in one way or the other in the original Complaint. The exception is the continuing legal defense costs in Italy. The six claims in the proposed Amended Complaint attempt to differentiate the nature and subject matter of the underlying disputes in order to facilitate application of the evolving jurisprudence pertaining to admiralty contracts and the nature and character of the disputes in issue that justify a Court asserting jurisdiction in

admiralty.   The proposed amendment therefore makes it easier to breakdown Sea Gull's objection to admiralty jurisdiction.

At p. 15 of its Memorandum, Sea Gull argues that it is somehow prejudiced by plaintiff's "attempt to circumvent the original Complaint's jurisdictional defects."   The proposed Amendments seek to refine the claims in the event that this Court finds that those that are due to a breach of the contract of sale of the vessel are not maritime claims notwithstanding that they reflect the cost of machinery repairs.  The Amended Complaint attempts to structure and desribe them in a way that emboldens them to the challenge offered by defendant Sea Gull.   The proposed amendments are manifestly not futile.

If the original Complaint had a jurisdictional defect it had one only with regard to those claims included in the Third Cause of Action  and refined in the proposed Fourth Cause of Action seeking the net sum of $430,236.60 awarded by the arbitrator at page 5,¶¶'s A and C, as corrected. Verified Complaint, Exh 1.  The arbitrator found that plaintiff was entitled to recover these repair costs because of Sea Gull's "breach of the MoA." Arbitration Award, p.5, ¶A.

In the Fifth Cause of Action of the proposed Amended Complaint plaintiff  isolates "costs and expenses for other liabilities incurred prior to or following the cancellation of the MOA either as agreed with the seller [Sea Gull] or as incurred for its account in the total equivalent amount of $97,069.37."   Arbitration Award, ¶9, p.3.These expenses are enumerated and explained in great length in ¶¶'s 65-75 of the Reasons for the Arbitration Award and in ¶¶'s 11-18 of the Sturzenegger Declaration executed August 20, 2008.  These claims are not the subject of or discussed in ¶20, p. 7, of the Award as stated by Sea Gull at page 3 of its Memorandum of Law. Claims described in ¶¶ 65-75 of the Arbitration Award are each separate and distinct free standing claims that require separate tasting for maritime flavor.

In paragraph 9, p.3 of the Award,  the arbitrator is careful to distinguish between the costs and expenses incurred by Kalafrana in bringing the vessel into class and/or to put the vessel's machinery and equipment in good working order and/or repair damage on the one hand and, on the other hand, those expenses incurred at Genoa by Kalafrana for Sea Gull that were contemporaneous with the performance, the breach and the ultimate repudiation of the Memorandum of Agreement by Sea Gull but which were not express breaches of specific obligations imposed by the Memorandum of Agreement.  Thus, at p. 5, ¶A of the Arbitration Award the distinction is that the expenses incurred to bring the vessel into class and make her fit for service are referred to as damages "for breach of the MoA."  In ¶B, the expenses at Genoa are described differently as incurred "as a result of the seller's breach of the MoA" in that they were derivative of the circumstances that were created by the MoA.  It should be pointed out that ¶¶'s 9 and 10 in the original Complaint clearly differentiated between these two amounts as well as ¶ 11 which enumerated defendant's claim for the value of bunkers and lube oil.

Sea Gull does not concern itself with the transactional origin of the claims covered by two separate parts of the arbitration award and two Claims in the proposed amended complaint because Sea Gull declines to follow the mandates of the Supreme Court and Second Circuit and look at the subject in dispute, not the name of the contract.  In this regard, defendant argues in Point VI of its Memorandum that the amendments are futile.  One of the cases that Sea Gull cites is *Aston Agrio-Indus. AG v. Star Grain Ltd,*, 2006 U.S.Dist. Lexis 91636, at *7.  However, in the attached decision by Judge Lynch in *Nobel Resources SA v. Sarl Ouest Import, 08 civil 3587(August 12, 2008)* (Attachment H) the dispute involved demurrage provisions in a Purchase and Sale Contract for sugar.  Judge Lynch distinguished *Aston* and followed the "looser" rule

prescribed in *Folksamerica Reinsurance Co. v. Cleanwater of New York, Inc.*, 413 F3d 307 (2d Cir. 2005). He made a determination that the disputes were maritime in nature notwithstanding the non-maritime pedigree of the commodity contract. It is Kalafrana's position that this analysis is mandated in all admiralty contract cases by the Supreme Court in *Exxon Corp. v. Central Gulf Lines, Inc.,* 500 U.S. 603, 611-12 (1991) wherein the Court looked "to the subject matter of the agency contract and determined whether the *services performed under the contract are maritime in nature*" (emphasis added). The test to determine whether an obligation is maritime in nature is "whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Atlantic Mutual Insurance Co. v. Balfour Maclaine International Ltd.*, 968 F. 2d 196, 200(2d. Cir. 1992). All of the repair and husbanding expenses incurred by plaintiff and awarded to it by the arbitrator are unmistakably maritime.


## POINT II
## COSTS ARE PROPER

On p. 17 Sea Gull argues that plaintiff cannot claim in these proceedings the cost of the Arbitration Award awarded by the arbitrator which must be assessed in a formal arbitral proceeding which has been initiated by KALAFRANA. The liability of Sea Gull has been established and only the amount needs to be made certain and these costs flow either totally or substantially from the Arbitration Award. To the extent that all or part of the Arbitration Award is within the admiralty, plaintiff is entitled to security pursuant to Rule B.

At p. 16 of defendant's Memorandum of Law, Sea Gull argues that the expenses incurred by Kalafrana in continuing to defend itself in the wrongfully initiated arrest proceedings in Italy

cannot be claimed in this proceeding. There is no question that Sea Gull agreed to submit all disputes to arbitration at London. There is no question that the claim asserted by Sea Gull in the Italian proceeding involves the value of bunkers on board the vessel in June, 2006 which have already been credited to Sea Gull by the December 14, 2007 Arbitration Award. There is no question that the arbitrator has held that the vessel arrest in Italy was wrongful. And, there is no question that Sea Gull continues to prosecute the claim wrongfully thereby force Kalafrana to continue to incur legal costs notwithstanding the credit in its favor in the Arbitration Award. The issue is not whether Kalafrana's costs in the Italian proceeding can be recovered in Italy. The fact is that Kalafrana can claim these costs in arbitration at London as a follow-up to the award already rendered relating to defendant's unlawful conduct.

Kalafrana has initiated a second arbitration against defendant in London in order to recover not only the recent legal costs of defense in Italy but also for formal assessment of the cost of arbitration at London which were awarded at p .6, ¶F but were not quantified. This claim is set forth in the Sixth Cause of Action in the proposed Amended Complaint. Contractually, it is evident that arbitration at London is the only forum vested by the parties to adjudicate those issues and this proceeding in this Court to secure these amounts is authorized by the Federal Arbitration Act and the New York Convention.

Finally, plaintiff initiated a proceeding in the High Court of Justice in London to freeze Sea Gull's accounts. Sea Gull's attorneys mischaracterize this freeze Order suggesting that it has some implication or potential for confusion of the banks in New York and that it somehow infringes on this Court's jurisdiction of attached funds. The freeze Order in London is an *in personam* Order operative against Sea Gull. Plaintiff is fully aware that this Court has certain jurisdiction which is mutually exclusive from that of any other Court, including London,

Italy and Lebanon and plaintiff makes no effort to put them in conflict. The sole cause of the need to scour the world is that Sea Gull does not pay its just debts and that is a truth that cannot be gainsaid. Sea Gull's broad brushed aspersions do not shroud that dire fact.

Plaintiff does not concede that the original Complaint had any jurisdictional infirmity. The purpose of the proposed amendment is two-fold. First, it allows plaintiff the opportunity to quantify its claim for awarded arbitration costs and its claim for on-going legal fees in Italy in the arrest proceedings and seek security therefor. Second, it allows plaintiff to demonstrate more clearly the transactional origins of the amounts owed by Sea Gull for various expenses awarded. Kalafrana does not thereby dilute its conviction that the entire amount awarded by the arbitrator is maritime in accordance with the admiralty jurisdiction analytical methodology mandated by the Supreme Court and the Second Circuit.

CONCLUSION

Defendant's Motion should be denied; but if it is granted, plaintiff should be granted leave to amend and a new Order of Attachment should be issued.

Dated: New York, New York
      September 4, 2008

Respectfully,

**MAHONEY & KEANE, LLP**
*Attorneys for Plaintiff*

By:**Christopher H. Mansuy**
  Christopher H. Mansuy
  76 Beaver Street, 10th Floor
  New York, New York  10005
  (212) 385-1422
  Our File:  3593

ATTACHMENT
H

88C9NOBA

1

88C9NOBA

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3
3   NOBLE RESOURCES SA,
4
4                  Plaintiff,
5
5         v.                              08 CV 3587 (GEL)
5
6   SARL OUEST IMPORT,
6
7                  Defendant.
7
8   ------------------------------x
8                                    New York, N.Y.
9                                    August 12, 2008
9                                    10:15 a.m.
10
10  Before:
11
11                    HON. GERARD E. LYNCH,
12
12                                        District Judge
13
13                    APPEARANCES
14
14  TISDALE LAW OFFICES, LLC
15       Attorney for Plaintiff
15  BY:  CLAURISSE OROZCO
16
16  CICHANOWICZ, CALLAN, KEANE, VENGROW & TEXTOR, LLP
17       Attorney for Defendant
17  BY:  JOSEPH F. DeMAY, JR.
18
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

88C9NOBA
1        (Case called)
2        MS. OROZCO:  Good morning, your Honor.  Claurisse
3   Orozco from Tisdale Law Offices for the plaintiff, Noble
4   Resources.
5        THE COURT:  Good morning.
6        MR. DeMAY:  Good morning.  Joseph DeMay, Jr. from
7   Cichanowicz, Callan, Keane, Vengrow & Textor for the defendant.
8        THE COURT:  Mr. DeMay, good morning.
9        Well, I think that what is technically before me is a
10  request for a hearing on a potential motion to vacate an order
11  for marine attachment.  The parties have written a number of
12  letters to the court regarding that.  It's my impression -- and
13  I think it's been confirmed by my law clerk -- that the parties
14  have fully briefed the merits of the issue and that what we're
Page 1

88C9NOBA
```
15   really here to do today is to have oral argument towards
16   deciding the motion to vacate the attachment.
17           Is that everybody's understanding, or does anybody
18   think we need more of anything?
19           MS. OROZCO:  No.  That's my understanding, your Honor.
20           MR. DeMAY:  Oral argument, your Honor.
21           THE COURT:  Very good.
22           So, I think what I'd really like to hear -- I suppose
23   starting with the defendant as the movant -- is an account from
24   each side of what they think is at issue in the arbitration in
25   this case; that is, what are the factual issues and legal
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    3

88C9NOBA
```
1    issues that the arbitrators had to decide.
2            Mr. DeMay.
3            MR. DeMAY:  Your Honor, I'll confess that I was not
4    fully briefed on the arbitral aspect of it.  Our application
5    and our retention as attorneys was directed solely toward the
6    propriety of the maritime attachment.  For that purpose, we
7    have assumed, for argument's sake only, the validity of the
8    arbitration award, and the accurate and true condition of the
9    contracts of sale that the plaintiff has already provided.
10           THE COURT:  Yes.  I'm not so much concerned with the
11   merits of the arbitration.  But, as I understood it, your
12   argument is that this is really not a maritime case.
13           MR. DeMAY:  Yes, your Honor.
14           THE COURT:  And on reading the arbitration award, it
15   seemed to me that what the arbitrators were concerned with was
16   what, as a nonadmiralty lawyer you'll forgive me for calling,
17   boaty things; assumed to be about what happened to the ship and
18   why it was late and things of that sort.
19           And I wanted to give everyone a chance to address that
20   in case I misperceived what was the -- what is the real dispute
21   between the parties because it sounded to me, in my landlubber
22   way, to be a maritime kind of dispute.
23           MR. DeMAY:  Your Honor, my understanding is that what
24   we're talking about here are essentially pricing terms.  The
25   sales contract were just that.  They were contracts for the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    4

88C9NOBA
```
1    sale of sugar.
2            Under like the contracts in Judge Preska's case, which
3    has already been provided to you, these particular contracts
4    made reference to the ship.
5            They made reference to the fact that the buyer, our
6    client, would be responsible for certain discharging costs, and
7    they provided references to the charter party by which those
8    costs would be calculated.
9            My understanding, however, is that unlike the typical
10   maritime case, our client did not assume any direct obligation
11   toward the operation or navigation of the ship.  In other
12   words, the contract for the sale of the sugar made reference to
13   the operation of the ship, made reference to things like
14   demurrage.  But I think the case law is fairly clear that
15   simply making reference to those things do not give rise to a
16   maritime obligation.  The maritime obligation arises when you
17   assume an obligation that directly relates to the operation and
18   navigation of a ship in commerce on the high seas.
19           THE COURT:  Well, I mean it seems to me that there
```
                                Page 2

88C9NOBA
```
20   are, as I've understood the case law, two different kinds of
21   ways in which a contract can give rise to admiralty
22   jurisdiction.  The one is, as you say, where the contract
23   itself is predominantly about maritime issues.  And I'd have to
24   agree with you, this looks more like, for example, the case
25   that I have that the parties cited in that it's really a
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

88C9NOBA
```
1    contract for the sale of goods that says:  Well, but by the
2    way, it's going to be going by ship.
3              But then there is a separate issue where the claim at
4    issue arises from a breach of the maritime obligations that are
5    part of the contract.  And it seemed to me that what the
6    parties were actually fighting about here was the maritime part
7    of the contract.  In other words, they were concerned about
8    what the demurrage costs were going to be based on what
9    happened at sea.
10             Am I wrong about that?
11             MR. DeMAY:  No, your Honor.  To the extent that this
12   is a demurrage claim, that's absolutely correct.  And the
13   contract does make provision for our client to reimburse the
14   seller for all demurrage costs that they incur.
15             But demurrage is primarily an obligation that's
16   incurred by the charterer, in this case the seller, to the
17   vessel owner.  Our client, the buyer, is neither the charterer
18   nor the vessel owner.
19             What they did, in effect, was to say that:  We, the
20   buyer, will indemnify or compensate you, the seller, for
21   whatever demurrage costs that you incur during the performance
22   of the charter party.
23             And think the case law is clear that unlike a
24   situation where somebody, say a guarantor, assumes the direct
25   performance and obligation to the vessel owner, where you
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

88C9NOBA
```
1    merely take or undertake to indemnify or compensate somebody
2    for a maritime obligation that they have incurred, that
3    obligation to pay, to indemnify, is not itself a maritime
4    obligation.
5              It is inevitable if you've undertaken to compensate or
6    indemnify somebody for a maritime obligation that the dispute
7    will necessarily center on the details of that maritime
8    obligation.  But, here the maritime obligation was not our
9    client's maritime obligation.  It was first and foremost the
10   seller/charterer's obligation, and our client was merely called
11   upon to indemnify, which meant that inevitably that the details
12   of the charter party of the performance would have to be
13   raised.  But that's not the same thing as saying that our
14   client undertook a maritime obligation, undertook to compensate
15   the charterer for its maritime obligations.
16             THE COURT:  I see.  So you're saying even if the
17   dispute was in substance about the facts of what occurred at
18   sea, that your obligation here was purely to pay whatever the
19   chartering party had to pay in demurrage costs?
20             MR. DeMAY:  Exactly.  The contract for sale set out
21   the way in which that compensation would be calculated.  But
22   that is essentially the case.
23             THE COURT:  Again, when you say the contract for sale
24   set out the way in which it would be calculated, what did the
```
Page 3

88C9NOBA
```
25     contract of sale say?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        7
```
       88C9NOBA
 1              Again, it seems to me that your argument works best if
 2     the contract simply says whatever the -- am I using the right
 3     terminology -- the chartering party has to pay in demurrage
 4     costs, you will reimburse, not us.  And we don't care
 5     whether -- what the rights and wrongs are of that charge.
 6     whatever he gets charged, you will pay.
 7              And in that event, you would not have a dispute about
 8     whether the charges were correct or about anything maritime at
 9     all.  It would simply be:  Here's the bill that we were
10     presented and you better pay it.
11              MR. DeMAY:  That would be the cleanest way of doing
12     it.  But in commerce, it is not unusual that the parties
13     bargained for whatever advantage they can get.  And it was
14     certainly open to the parties in this case, in our case the
15     buyer, to negotiate with the seller that, yes, it would be
16     responsible for demurrage but only within certain parameters
17     and on certain conditions.
18              So that the mere fact that they tried to cut
19     themselves a better deal than the seller/charterer might have
20     had with the vessel owner, I don't think changes the essential
21     fact that they're not assuming a maritime obligation.  They are
22     assuming a payment obligation.
23              THE COURT:  But the obligation then is very similar to
24     the payment obligation that would occur if the contract simply
25     said we're responsible for getting the ship to port and if you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        8
```
       88C9NOBA
 1     don't get there you pay demurrage, right?
 2              I mean it winds up being the same thing.  Once you
 3     incorporate the maritime issues into what has to be paid,
 4     you're essentially talking about a very maritime kind of set of
 5     issues, aren't you?
 6              MR. DeMAY:  Yes.  The issues can be maritime.  I don't
 7     think that's determinative.
 8              THE COURT:  I see.
 9              MR. DeMAY:  The question is:  Are the obligations
10     maritime?  And, of course, if, as I said before, you're talking
11     about having the buyer, having to compensate the seller, for
12     money incurred in the performance of maritime obligations,
13     unless the seller has somehow undertaken to directly assume an
14     obligation to the shipowner, I don't see that it's a maritime
15     obligation; it's simply a payment obligation that has reference
16     to maritime issues.
17              THE COURT:  I see.  And that further explains why you
18     would take the position that I really shouldn't worry very much
19     about what the arbitrators had to do?  I should just look at
20     the contract itself to decide what the nature of the obligation
21     is that the parties are disputing?
22              MR. DeMAY:  Yes, your Honor.
23              THE COURT:  Okay.  That's very helpful.  Thank you.
24              Ms. Orozco, what's your view?
25              MS. OROZCO:  Well, clearly, I disagree with Mr. DeMay.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        9
       88C9NOBA

88C9NOBA

1  I think that the dispute here is clearly a maritime dispute.
2  And I think that the case law requires us and directs us to
3  look at the nature of the dispute of this particular contract.
4  That's what the Second Circuit has directed in Folksamerica.
5          And I believe that the very dispute in this case,
6  which is admitted by both parties, is identified in the
7  arbitration award.  And I think that the arbitration award is
8  important because it outlines and indicates what the parties'
9  understandings were and what their rights and obligations were
10  under the contract.  So, I think that the arbitration is
11  important.
12          But before getting to the arbitration award, the
13  contract itself has very specific maritime provisions.  Each of
14  the six contracts are generally the same.  The only differences
15  being the date, the quantity of goods to be shipped, and the
16  vessels.
17          THE COURT:  Can you point me to where in the
18  voluminous materials I will most easily find the contracts so I
19  can follow?
20          MS. OROZCO:  They are -- to my letter dated July 8,
21  they are Exhibits 1 through 6.  They are all generally the
22  same.
23          THE COURT:  Okay.  Got it.
24          MS. OROZCO:  If you go to the fourth page of the
25  contract under discharging conditions --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

88C9NOBA

1          THE COURT:  Okay.
2          MS. OROZCO:  -- it specifically identifies and
3  specifically states that all of the discharging costs are for
4  the buyer's account, in this case the defendant.
5          So, there is no secret or no hidden agenda.  It's
6  basically any discharging costs, discharging, port expenses,
7  demurrage incurred, any other vessel-related costs that would
8  be incurred are for the buyer's account.
9          More importantly, in this particular contract -- each
10  contract identifies the vessel, as well.  So, the buyer's
11  already aware of the discharging terms, the conditions, the
12  payments they are going to incur, the vessel that is going to
13  be nominated, And I think what's very important is the very
14  last sentence says, "All of the other conditions to be in
15  accordance with the amended version of the Sugar Charter Party
16  Form 1999."
17          The arbitrators, when they were reviewing their award,
18  made a note at page 4 of the arbitration award, which is your
19  Exhibit 7, in paragraph 6.  They stated and they recognized
20  that at the oral argument hearing during the arbitration both
21  parties agreed in accordance with clause 22 of the standard
22  sugar charter party 1999, which was incorporated into each of
23  the six contracts, gross weight, rather than net weight, was
24  relevant.
25          This statement was made for the purposes of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

88C9NOBA

1  calculating the demurrage rate.  But what's, I find -- I think
2  is very important in this particular case is that the charter
3  parties were incorporated.  And to the extent that the
4  discharging conditions in the standard form were different than
5  this particular contract, this particular contract would

Page 5

88C9NOBA

6  govern.  But otherwise, all of the standard terms of the sugar
7  charter party were incorporated.
8         In addition --
9         THE COURT:  So, looking back at the contract for a
10  moment, the contract doesn't, in your view, simply say that
11  there's going to be reimbursement of costs; instead, you're
12  saying that the contract provides specifically for terms about,
13  for example, how the vessel is going to be discharged?
14         MS. OROZCO:  Yes.
15         THE COURT:  And those are provisions between these
16  parties, not involving the shipowner.  They are between these
17  parties.  And they are agreeing as to how the vessel is going
18  to be discharged and what -- when lay time is going to count
19  and when it's not going to count; and how the demurrage is
20  going to be settled; and what the water draft is at the port of
21  discharge.  These are all obligations that the buyer is
22  guaranteeing, not something that the buyer is just going to pay
23  costs that somebody else incurs?
24         MS. OROZCO:  Yes.  I believe -- my position would be,
25  your Honor, that this is not at all an indemnity provision.  If

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

88C9NOBA

1  it was an indemnity provision, I think it would say it was an
2  indemnity provision.
3         In the case of Aston Agro v. Star Grain, which the
4  defendant had cited in one of their letters, which is a case of
5  Judge Daniels, it was a sales contract, and I believe it was
6  for the sale of wheat, I don't recall off the top of my head.
7         But, in that particular case, the issue before the
8  court and what the court stated was with respect to the
9  demurrage obligations in that case, it was not clear under the
10  contract which party would pay for or incur demurrage.
11         In that case, Judge Daniels found that it may very
12  well just have been an indemnity provision.  But the demurrage
13  clause in that contract just said demurrage to be calculated in
14  accordance with the charter party.  So at the time of entering
15  into the contracts in this case, the defendant was very much
16  aware that it was obligating itself to pay demurrage.
17         In addition, the arbitration decision --
18         THE COURT:  Now, again, just to go back to this.
19         MS. OROZCO:  Yes.
20         THE COURT:  I cited a moment ago various provisions in
21  the contract that seemed to be of a maritime nature, but it's
22  not clear to me -- I suspect it's the other way -- it's not
23  clear to me that those were -- the ones I cited are the -- what
24  the dispute was about.  No one was fighting about whether there
25  was lay time on a Thursday afternoon, I take it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

88C9NOBA

1         So, what exactly -- well maybe they were.  There's a
2  lay time allowance being calculated.  There is an effective
3  demurrage -- on demurrage of rain periods during the discharge.
4         What contract provisions do those disputes fall under?
5         MS. OROZCO:  Those disputes fall under the discharge
6  conditions.  And to the extent that they are not outlined
7  within the discharging conditions of the particular contracts,
8  then the sugar charter party form would come into play.
9         And at page 2 of the arbitration award in the overview
10  paragraph, it's clearly stated that Noble, the plaintiff in

Page 6

88C9NOBA

11  this case, their claims are for demurrage which were incurred.
12  And Ouest Import, the defendant, admitted that the demurrage
13  costs were incurred.  But, the dispute was the defendant had
14  counterclaims for dead freight and for dispatch -- I'm sorry,
15  not dead freight -- dispatch and discharge port fines.
16       So, it wasn't a question of:  Do we owe demurrage or
17  not?  It was a question of how demurrage is calculated, and how
18  do we treat lay time periods, how do we treat rain delays, how
19  do we treat lack of bills of lading at the discharge port.
20  Those were the disputes.
21       Just two more important points.  If it was an
22  indemnity contract, perhaps the issue would be:  You paid the
23  charterer -- Noble, you paid the owner too much money and we
24  don't think we should indemnify you.  But, it's not.  It's a
25  dispute of how to calculate, when does lay time run.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14

88C9NOBA

1        More importantly, on page 9 at paragraph 25 and page
2   10 at paragraph 27 in the arbitration award, the defendant in
3   this case relied on charter party case law in London to support
4   its positions.  So I don't think that it's -- I think that the
5   parties were very much aware of the maritime nature of the
6   obligations with this particular dispute.
7        And I think that this case is very similar to the
8   Noble v. YTS case that I submitted to your Honor, recently
9   decided by Judge Preska.  I think that these are clearly
10  maritime obligations.
11       THE COURT:  Okay.
12       Mr. DeMay, any last words?
13       MR. DeMAY:  Yes, your Honor.
14       Number one, I disagree that this case is on all fours
15  with Judge Preska's decision.  If you look at Judge Preska's
16  decision, I think on the second page she outlines a number of
17  details that were present in those contracts that are not
18  present in these contracts.
19       Number two, I believe only four of the six contracts
20  actually named the vessel.  Two of them do not.
21       Number three, I take issue with the notion that the
22  charter party was incorporated.  What it says is that, "All of
23  the other conditions to be in accordance with the amended
24  version of the sugar charter party."  And "conditions" in that
25  sense has to refer to the caption, which is discharge
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

88C9NOBA

1   conditions.
2        So, once again, all the parties have done is to refer
3   to another document as a standard by which they determine their
4   own obligations.
5        The notion that the buyer guarantees the minimum water
6   draft, again, that's fine if the guarantee is being made
7   directly to the vessel owner, where it certainly then would be
8   a maritime obligation.  But as between two businessmen, a buyer
9   and seller of sugar, that means something else.  It simply
10  means that the buyer says:  If the water draft is not 99 feet,
11  we'll compensate you for damages suffered as a result of that.
12  And the notion that if this were intended to be an indemnity
13  provision, they would have said so.
14       This is a businessman's contract.  And I think it's
15  unreasonable to assume that businessmen would necessarily
                        Page 7

88C9NOBA
16  phrase their obligations as would an attorney.
17          THE COURT:  I understand.  I think I'm prepared to
18  rule.
19          As I said, what's before the court is effectively a
20  motion by the defendant to vacate an order for the process of
21  maritime attachment.  The underlying dispute concerns a series
22  of agreements between the plaintiff and defendant for the sale
23  of sugar.  A dispute arose between the parties regarding the
24  performance of those contracts, and following arbitration a
25  panel awarded the plaintiff $674,558 in outstanding demurrage
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    16
88C9NOBA
1   charges owed by the defendant.
2           The plaintiff then sought this order of maritime
3   attachment in an attempt to satisfy that judgment which remains
4   unsatisfied.
5           The defendant contests the existence of federal
6   admiralty jurisdiction, which is of course a prerequisite to
7   the applicability of the rules governing maritime attachments.
8           After hearing argument and reviewing the papers
9   submitted by the parties, for the following reasons the court
10  denies the defendant's motion to vacate the order for maritime
11  attachment.
12          Traditionally, the rule was that a federal court could
13  exercise admiralty jurisdiction only over "contracts, claims,
14  and services, purely maritime," in nature.  That's Rea v. The
15  Eclipse, 135 U.S. 599, 608 (1890).  However, that rule has
16  loosened considerably and today mixed contracts, those
17  containing both maritime and nonmaritime provisions, can be
18  subject to admiralty jurisdiction in two situations.  As set
19  forth by the Second Circuit in Folksamerica Reinsurance Company
20  v. Clean Water of New York, Incorporated, 413 F.3d 307, (Second
21  Circuit 2005), those situations are, first, where "the
22  principal objective of a contract is maritime commerce," and
23  second, where the claim at issue in the dispute, "arises from a
24  breach of maritime obligations that are severable from the
25  nonmaritime obligations of the contract."  And that quotation
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    17
88C9NOBA
1   is from page 315 of the opinion.
2           It's clear that the first situation does not apply
3   here.  The contracts in this case deal primarily with the sale
4   of goods.  Each is styled as a "Confirmation of Sale."  See
5   Exhibits 1 to 6 of the plaintiff's letter of July 7, 2008.
6           Each of the contracts sets forth the standard terms
7   one expects to see in a contract for a sale of goods, including
8   a buyer, a seller, a price, quantity, and quality.
9           The contracts also set forth the terms of payment.
10          The contracts do, however, specify some details about
11  shipment.  Some indicate shipment dates and others the actual
12  ships to be used.  The contracts specify that "discharging
13  costs" are to be borne by the buyer.  See, for example, Exhibit
14  1 to the plaintiff's letter of July 7, 2008.
15          But, the contracts are not themselves contracts for
16  the carriage of goods and they clearly contemplate separate
17  bills of lading to be negotiated between the seller and a third
18  party carrier.
19          Materially similar contracts were found not to have
20  maritime commerce as their principal objective in Aston
                            Page 8

88C9NOBA

21   Agro-Industrial AG v. Star Grain Limited, 2006 U.S. District
22   Court, LEXIS 91636, (Southern District of New York,
23   December 20, 2006). Star Grain considered contracts for the
24   sale of wheat that contained some details about the shipment of
25   the wheat such as, "the conditions under which the shipment and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

88C9NOBA

1   unloading of the wheat should occur," and how demurrage costs
2   were to be calculated. See pages 1 to 2 of this opinion. The
3   court held that despite these details, the contracts' "primary
4   objective was undoubtedly the sale of wheat," not "the
5   transportation of goods at sea," at page 9.
6       Similarly, in Shanghai Sinom Import and Export v.
7   Exfin (India) Mineral Ore Company, 2006 A.M.C. 2950, (Southern
8   District of New York 2006), an oral opinion, this court, that
9   is I, considered a contract for the sale of iron ore that also
10   included maritime provisions "requiring the ore to be shipped
11   by sea and specifying certain requirements regarding the
12   conditions for such shipment." 2006 A.M.C. at 2950. Noting the
13   dangers of interpreting federal maritime jurisdiction too
14   broadly, this court decided it did not have jurisdiction
15   because the contract was "essentially a land-based contract for
16   the sale of goods," at page 2954.
17       Although the contracts here clearly contemplate
18   shipping, the bulk of the contracts are devoted to defining
19   terms of sale rather than terms of transport. The fact that
20   the movement of the goods over sea is essential to the
21   performance of the contract does not by itself make a contract
22   maritime. If that were so, then any contract for the sale of
23   goods between countries on different continents would become
24   maritime law. The court does not find support for so broad an
25   interpretation of its maritime jurisdiction. For similar

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

88C9NOBA

1   reasons, that the contracts for sale of goods incidentally
2   specify some terms of transport does not make their principal
3   objective a maritime one.
4       The second basis for admiralty jurisdiction, however,
5   is where the dispute "arises from a breach of maritime
6   obligations that are severable from the nonmaritime obligations
7   of the contract." That is to say, to the extent that the
8   contracts here are mixed contracts, if the dispute concerns
9   those parts of the contracts that are maritime in nature, then
10   this court has jurisdiction. Because the dispute does concern
11   those parts of the contract that are maritime in nature, this
12   provides a basis for the court's jurisdiction.
13       The dispute here centers on the payment of demurrage
14   that resulted from delays in the discharge of ships' cargoes at
15   their destination ports. Resolution of the competing claims
16   required the arbitration panel to analyze a number of
17   obligations under the contracts. These included provisions
18   relating to the assignment of discharging costs, conditions for
19   the commencement of discharge, the calculation of demurrage
20   rates, and the parties' obligations under related bills of
21   lading, letters of credit, and a charter party. See, for
22   example, the interim final arbitration award, Exhibit 7 to the
23   plaintiff's letter of July 7, 2008 at pages 7, 17, 19, 24, 33,
24   and many other places.
25       Such obligations fall squarely within the court's

Page 9

88C9NOBA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

88C9NOBA
1  admiralty jurisdiction.  In deciding whether obligations are
2  maritime in nature, the test is, "whether the subject matter of
3  the dispute is so attenuated from the business of maritime
4  commerce that it does not implicate the concerns underlying
5  admiralty and maritime jurisdiction."  That is from Atlantic
6  Mutual Insurance Company v. Balfour Maclaine International
7  Limited, 968 F.2d 196, page 200, (Second Circuit 1992).
8       Far from being attenuated from the business of
9  maritime commerce, discharge of cargo, calculation of
10  demurrage, bills of lading, and letters of credit are subjects
11  intimately connected to the business of maritime commerce.
12  Federal adjudication of disputes over such matters serves the
13  goals of admiralty jurisdiction in providing "a neutral federal
14  forum and a uniform body of law to adjudicate rights and
15  liabilities as they relate to the trafficking of sea-faring
16  vessels," from the same place in the Atlantic Mutual case.
17  Consequently, admiralty jurisdiction is warranted over disputes
18  between the parties arising out of these obligations.
19       Reference to the contract at Exhibit 1 clearly
20  provides for a variety of obligations that the buyer in this
21  case undertook, which are not simply obligations to pay but are
22  obligations to see to certain performance, and that performance
23  relates to things like how the vessel should discharge, how lay
24  time should be treated, even what the water draft should be at
25  the port of discharge, and furthermore, the parties then
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

88C9NOBA
1  incorporate additional provisions from an underlying charter
2  party.
3       Mr. DeMay argues, as a very well made argument,
4  indeed, that these are simply conditions of payment.  But, of
5  course, all conditions between commercial parties, maritime and
6  otherwise, boil down to agreements to pay if the conditions
7  that are established are not satisfied.  And these are no
8  different in that regard from any other provision that
9  specifically requires that vessels be discharged in particular
10  ways.  All such provisions boil down to an agreement to pay
11  damages or pay costs in some way if those conditions are not
12  met.
13       The question is:  What are you paying for?  And here,
14  it seems clear, that what the buyer is agreeing to do is to pay
15  certain specifically maritime obligations are not met, or to
16  pay for particular shipping costs, to be calculated in ways
17  that, quite understandably, are referred to arbitrators with
18  expertise in admiralty matters, who then proceed to decide the
19  case by reference to various maritime commercial concepts.
20       Anyone who reads the arbitration agreement, it seems
21  to me, is forced to the conclusion that what these parties are
22  disputing in this case is nothing related to the sale of sugar
23  but is everything related to the proper conduct of the vessel
24  with respect to discharging the conduct.
25       Now, the parties have cited a number of district court
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

88C9NOBA
1  cases.  And, of course, it's worth remembering that none of
Page 10

88C9NOBA
```
 2   these cases, whoever cites them and whichever side they seem to
 3   fall on, are binding authority in this court.  Nevertheless,
 4   the court respects the value of consistency and the importance
 5   of considering those cases and specifically respects the
 6   expertise of the judges who decided them.
 7        So, I have considered those cases.  And it seems to me
 8   that the holding in Star Grain, the principal case on which the
 9   defendant relies, is not really to the contrary.  That case was
10   similar to this one insofar as the claim there was also for the
11   payment of demurrage.  However, as I read the case, the claim
12   in Star Grain arose not out of a specific obligation in the
13   contract with regard to demurrage but ultimately from a
14   standard contract term that assigned the risk of loss of goods
15   during transit to the buyer.  See page 14 of 2006 U.S. District
16   Court LEXIS 91636.
17        Because the demurrage was the result of damage to the
18   goods during transit, the dispute centered on this standard
19   nonmaritime contract term and not on parts of the contract that
20   were, "uniquely maritime," quoting from page 12 of the opinion.
21        Now, it's not entirely clear to me that the uniquely
22   maritime standard applied in Star Grain is exactly consistent
23   with the standard laid down by the Second Circuit in Atlantic
24   Mutual Insurance, which seems to me to put the burden to some
25   degree -- the presumption in the other direction saying that
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

88C9NOBA
```
 1   the provisions are not maritime if they are so attenuated from
 2   maritime commerce as opposed to that they are only to be
 3   considered maritime if they are uniquely maritime.
 4        It may be that the court in Star Grain applied a
 5   narrower rule of maritime jurisdiction than the Second Circuit
 6   law justifies.
 7        But this case is sufficiently different from Star
 8   Grain that I don't have to decide in any way whether I would
 9   decide Star Grain the same way as Judge Daniels did.  This case
10   concerns obligations that are common and instrumental features
11   of maritime contracts and not terms that are typical features
12   of contracts for the sale of goods generally.
13        Accordingly, it's hereby ordered that the defendant's
14   motion to vacate this court's April 15, 2008 ex parte order for
15   process of maritime attachment is denied.
16        Now, Ms. Orozco, one of the things I always wonder
17   about with these maritime attachment cases is when do they end?
18   What typically happens, it seems to me -- and again, I'm hardly
19   an expert in this stuff -- is that a plaintiff brings an action
20   in this court and seeks maritime attachment by way of gaining
21   security, and then doesn't really have any intention of
22   following up the case.  Here, the case is decided in some other
23   forum, usually an arbitral forum.  And in this case if I have
24   the timing right, the arbitration actually happened in the
25   first place and then this was sought in aid of execution of the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

88C9NOBA
```
 1   judgment.
 2        Is this a tempest in a teapot?  Do you have money?
 3   And if so, how much do you have?  And what happens by way of --
 4        MS. OROZCO:  Procedurally, we actually have not
 5   captured any funds yet.  But what the intention would be, would
 6   be that in the event we capture funds, we would move to confirm
```
Page 11

88C9NOBA

```
 7   the award in this court.  And once the award is confirmed,
 8   which we have no reason to believe it would not be confirmed,
 9   it's a London arbitrating, then we would move to secure any
10   security to satisfy that New York judgment.
11        THE COURT:  But how long does this go on?  I don't
12   know -- I gather from the fact that Mr. DeMay is here, that the
13   defendant exists and has ongoing business and can afford to
14   retain a lawyer to engage in this dispute.  So maybe some day
15   some money will show up in this district.
16        But, one thing that has concerned me, both from a
17   very, perhaps, pedantic concern for the court's docket, to a
18   more substantive concern about the nature of these attachments,
19   is that it's one thing to attach property that's here, even if
20   that is intangible property.  It's another thing to have a sort
21   of open-ended order that will attach something someday if it
22   should appear when there is no particular reason, other than
23   the fact that a lot of money comes through New York, to assume
24   that it's ever going to.
25        Now, I've had to deal with this issue in other cases
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

88C9NOBA

```
 1   and it seems to me the Second Circuit law is clear that these
 2   prospective attachments are valid.  It seems to me that the
 3   underlying Second Circuit cases are ones precisely in which the
 4   district court issued an order saying you could attach some
 5   money transfer when nobody actually was aware of a particular
 6   transfer being there.  So, the validity of this I take as
 7   established by circuit case law, but I don't think, as far as I
 8   know, that the circuit has addressed:  Is this open-ended
 9   forever, or at what point is it perfect for a court to say:
10   But there ain't no property to attach, and there never has
11   been, and it's unclear when, if ever, there will be, and why
12   don't we just close this up.
13        Now, this one hasn't been pending for very long and I
14   don't know that we're close to any point of whatever it might
15   be of closing it down.  But, do you have any thought or
16   suggestion as to when this just becomes ridiculous?
17        MS. OROZCO:  I do, your Honor.  Actually it's an issue
18   that we deal with.  Our general rule of thumb, if we have not
19   caught any funds after about six to eight months -- depending
20   upon what type of information we can find that confirms that
21   the defendant is still in business or that they are not in
22   business or that there are eight other attachments -- if we
23   haven't caught funds after about the six-to-eight-month period,
24   we generally recommend to our client that we dismiss without
25   prejudice.  In the future if you have information; you discover
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

88C9NOBA

```
 1   they are trading, they are liquid, we can revisit, perhaps
 2   reopening the file.  But that is our general recommendation for
 3   the same reason of it's overwhelming the courts.  It's
 4   overwhelming to us, and it's daily service -- it's throwing
 5   money -- the client spends money for daily service and they are
 6   getting nowhere.  And if the company is really not trading,
 7   there's really no point.  The attachment is there.
 8        It can be -- we've had cases where we've dismissed the
 9   attachment and then we've gotten information and refiled and
10   we've caught money within 30 days, but it's generally -- we do
11   put an end to it.  We go back to our clients and say, look,
```

Page 12

88C9NOBA

```
12      this is -- you know.
13            THE COURT:  Well, of course, that's what you do and
14      you're free to do as you like.  The question is --
15            MS. OROZCO:  As are you?
16            THE COURT:  Well, that's the question.  Am I?  Is this
17      solely a matter for my discretion, or are there any rules that
18      ought to apply here?
19            Now, at this point -- I just said the date, now I'm
20      forgetting.  It was April --
21            MS. OROZCO:  April 12 it was issued.  I believe we
22      started serving April 15.
23            THE COURT:  So, it's been four months and nothing has
24      turned up yet.  Certainly six months sounds like to me
25      relatively an outside period unless there is some evidence that
```

27

88C9NOBA

```
 1      something is likely to happen now.
 2            Again, I suppose it's possible that a party could try
 3      to simply avoid New York for a period and then if something
 4      gets vacated resume normal business practices.  I doubt that
 5      would be easy to do, but maybe it's possible.
 6            And I suppose, further, that absent the process of
 7      daily service and having an open order, you would never really
 8      have any way of knowing whether that's resumed.
 9            At any rate, it seems to me that come October this is
10      going to be vacated anyway if there is not some success in
11      attaching something.  And I don't know any way of dealing with
12      this kind of problem other than by rule of thumb of that sort.
13            Mr. DeMay, do you have a thought or -- this is a
14      different issue than what you all came here to talk about,
15      but --
16            MR. DeMAY:  Your honor, I've been on both sides of the
17      transaction.  I take it as a given that no Rule B case would be
18      allowed to remain open-ended.
19            THE COURT:  I should think not.
20            MR. DeMAY:  My understanding is that under Rule 4,
21      there's a 120-day limit for service of process.  If the
22      defendant is one on whom service of process can be made in the
23      United States, I think that 120-day rule probably would apply
24      absent good cause.  If the defendant is located overseas, my
25      understanding is the 120-day rule does not strictly apply.
```

28

88C9NOBA

```
 1      It's up to the court's discretion; may be applicable in a case
 2      where the defendant is located in a western nation where
 3      service can easily be made.
 4            But my understanding is that Rule B is essentially
 5      equitable in nature.  It's subject to the court's discretion.
 6      The court can limit the attachment; it can vacate an
 7      attachment.  So I would read into that, that the court has
 8      inherent power, after a passage of time that the court deems to
 9      be reasonable, to decide that there is no point in continuing,
10      that the case would have to be dismissed without prejudice.
11            THE COURT:  Well, that sounds about right to me.  I
12      think what I've done in the past -- and I don't know whether
13      there's ever been a particular time -- but once I started
14      seeing these things piling up on the docket, I did a little
15      project of just issuing orders saying tell me what's going on.
16      And it turned out that most of the plaintiffs had attached
```

Page 13

88C9NOBA

17  something during that period and we just didn't know about it.
18  So, they weren't totally dormant. But it seems to me that some
19  sort of time limit is appropriate.
20        And I guess it sounds as if the practice at the bar so
21  far has been not to include such a time period, an expiration
22  date in the order of attachment itself. And that makes some
23  sense. It may be that leaving this to case-by-case issues and
24  allowing the plaintiff an opportunity to explain why they
25  think, if they do, that the order should be extended after some
             SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              29
88C9NOBA

 1  period of time, is the best way to go.
 2        But at any rate, what I'm indicating is you can expect
 3  that come October either this will be vacated outright or I'll
 4  be at least asking the plaintiff for some account of is there
 5  any reason they can think of why this should go on. Of course,
 6  it's my expectation that the defendant will say no, it
 7  shouldn't. And barring some new news, this dispute is resolved
 8  now only for the next two months and it may well be that
 9  today's order is largely academic.
10        All right. Thank you very much.
11        MS. OROZCO: Thank you, your Honor.
12        MR. DeMAY: Thank you, your Honor.
13        (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300