UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
KALAFRANA SHIPPING LTD,                                 :
                                                        :
                           Plaintiff,                   :
                                                        :        OPINION AND ORDER
              - against -                               :
                                                        :        08 Civ. 5299 (SAS)
SEA GULL SHIPPING CO. LTD.,                             :
a/k/a Sea Gull Shipping Co. SARL,                       :
                                                        :
                           Defendant.                   :
------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/4/08

SHIRA A. SCHEINDLIN, U.S.D.J.:

I. INTRODUCTION

On July 10, 2008, this Court entered an ex parte order on behalf of Kalafrana Shipping Ltd. directing attachment and garnishment of up to $639,635.38 of the assets of Sea Gull Shipping Co. Sea Gull Shipping now moves to vacate and reduce that attachment on two separate grounds. *First*, it asserts that this Court does not have jurisdiction to issue an attachment for claims based on a vessel sale contract.[1] *Second*, Sea Gull asserts that the attachment was either

---

[1] *See* Memorandum of Sea Gull Shipping Co. Ltd. in Support of its Motion to Vacate and Reduce Kalafrana Shipping Ltd.'s Maritime Attachment ("Def. Mem.") at 3-9.

1

wrongful or an abuse of process.² For the reasons stated below, the request to vacate and reduce the attachment order is denied.

In addition, Kalafrana filed a cross motion seeking to amend its complaint and attach additional assets of Sea Gull Shipping. For the reasons stated below, the motion for leave to file the Amended Complaint is granted. Kalafrana must submit appropriate revised pleadings and a proposed order within seventy-two hours of the release of this Order.

## II. BACKGROUND

### A. The 2004 Memorandum of Agreement and Subsequent Arbitration

On May 4, 2006, Kalafrana and Sea Gull Shipping executed a Memorandum of Agreement ("MoA") whereby Sea Gull Shipping agreed to sell the motor cargo vessel "Assil" to Kalafrana.³ According to the MoA, necessary repairs to the vessel were to be made by Sea Gull Shipping prior to delivery.⁴ The

---

²   *See id.* at 12-15.

³   *See* Amended Verified Complaint ("Am. Verified Compl.") ¶ 5. On August 25, 2008, Kalafrana sought leave to amend its complaint. Given the Second Circuit's liberal standards for granting leave to amend, *see Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002), Kalafrana may file its Amended Complaint.

⁴   *See* Am. Verified Compl. Ex. 1 at 3.

MoA states that all disputes between the parties would be arbitrated in London under terms established by the London Maritime Arbitrators' Association.[5]

Thereafter, Kalafrana alleges that Sea Gull Shipping failed to perform some of its obligations under the MoA.[6] Disputes between the parties include responsibility for the cost of necessary vessel repairs and the alleged wrongful arrest of the vessel by Sea Gull Shipping at the Port of Trieste, Italy from April 4 through April 6, 2007.[7] The parties' disputes were submitted for arbitration in London, where the arbitrator awarded Kalafrana $611,373.62 plus interest and arbitration fees.[8]

### B. The Present Attachment

Claiming that Sea Gull Shipping had wrongfully failed to pay any portion of the abovementioned arbitration award,[9] Kalafrana filed a verified complaint demanding maritime attachment of Sea Gull Shipping's assets in this Court on June 10, 2008 pursuant to Rule B of the Supplemental Admiralty Rules

---

[5] *See id* ¶ 5.

[6] *See id.* ¶ 6.

[7] *See id.*

[8] *See id.* ¶¶ 7, 12.

[9] *See id.* ¶ 14.

for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.[10] That same day, this Court granted an ex parte order for maritime attachment and garnishment of up to $639,635.38 of Sea Gull Shipping's assets. As of August 2007, Kalafrana had attached $123,195.28.[11]

Sea Gull does not dispute the attachment of its assets based on Kalafrana's claim for wrongful arrest of a vessel.[12] It requests only that this court vacate the attachment to the extent it is based on claims under the MoA.[13]

## III. LEGAL STANDARD

### A. Vacatur Under Rule E(4)(f)

Supplemental Rules B and E of the Federal Rules of Civil Procedure govern attachment of assets in maritime actions. Rule B allows for the attachment of a defendant's assets up to the amount in dispute if the defendant is not present

---

[10] While maritime attachments are generally issued in anticipation of a judgment, attachment is "not merely a pretrial remedy . . .but is also a remedy that may be used to enforce a judgment." *Astrea United Investments, L.P. v. Onitiri*, No. 92 Civ. 0581, 1992 WL 346353, at *3 (S.D.N.Y. Nov. 18, 1992) (Mukasey, J.).

[11] *See* Def. Mem. at 2.

[12] *See id.* at 15.

[13] *See id.*

within a district.[14] Rule E entitles a party claiming interest in attached property to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated."[15]

The Second Circuit has held that in addition to meeting the service and filing requirements of Rules B and E, a plaintiff opposing vacatur of an attachment must satisfy the four requirements laid out in *Aqua Stoli Shipping, Ltd. v. Gardner Smith Proprietary Ltd.*[16] Thus, the plaintiff must show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."[17]

## IV. DISCUSSION

### A. The *Aqua Stoli* Factors

Three of the four *Aqua Stoli* factors are undisputed in this case. At least $123,195.28 of Sea Gull Shipping's assets have been found within the

---

[14] *See* Fed. R. Civ. P. Supp. R. B(1)(a).

[15] Fed. R. Civ. P. Supp. R. E(4)(f).

[16] 460 F.3d 434 (2d Cir. 2006).

[17] *Id.* at 445.

district and attached.[18] Sea Gull Shipping cannot be found within the district.[19] Nor has Sea Gull Shipping asserted a statutory or maritime law bar to the attachment.

At issue, however, is whether Kalafrana's claims based on the MoA constitute a prima facie maritime claim against Sea Gull Shipping. Any Rule B maritime attachment not supported by a prima facie admiralty claim against the defendant is void for lack of subject matter jurisdiction.[20]

**B.  Admiralty Jurisdiction over Vessel Sale Contracts**

On August 1, 2008, the parties participated in a conference before this Court, where they stipulated that Kalafrana's claims — aside from its claim for wrongful arrest of the vessel — are based solely on the MoA, a contract for the sale of a vessel.[21] Thus, the primary question for decision in this case is whether a contract for the sale of a vessel is a maritime contract and thus within federal admiralty jurisdiction.

It has long been the rule in the Second Circuit that a contract for the

---

[18]  *See* Def. Mem. at 2.

[19]  *See* Verified Compl. ¶ 27.

[20]  *See Aston Agrio-Indus. AG v. Star Grain Ltd.*, No. 06 Civ. 2805, 2006 WL 3755156, at *2 (S.D.N.Y. Dec. 20, 2006); *see generally* 28 U.S.C. § 1331(1).

[21]  *See* Def. Mem. at 3.

6

sale of a vessel is not a maritime contract.[22] Outside of the Second Circuit, many federal courts have also held that federal admiralty jurisdiction does not reach such contracts.[23] Yet Kalafrana argues that this widely accepted bright-line rule was undermined by the Supreme Court's 2004 decision in *Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd.*[24] and the Second Circuit's 2005 decision in *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*[25]

    **1.**    **The Effect of *Kirby* and *Folksamerica* on the Rule of *The Ada***

        **a.**    ***Kirby***

---

[22] *See The Ada*, 250 Fed. 194 (2d Cir. 1918); *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 675 F. Supp. 146, 150 (S.D.N.Y. 1987) ("It is elementary hornbook law that a contract for the sale of a vessel is not within the admiralty jurisdiction of the district courts.") (citation omitted), *aff'd* 875 F.2d 388 (2d Cir. 1989); *Economu v. Bates*, 222 F. Supp. 988, 991 (S.D.N.Y. 1963) (noting that "a contract for the sale of a vessel has been held to be nonmaritime") (citation omitted).

[23] *See, e.g., Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 804 (9th Cir. 2001); *Casco Marina Dev. v. M/V Forrestall*, 384 F. Supp. 2d 154, 160 (D.D.C. 2005); *Clements v. Preston*, No. 05 Civ. 0209, 2005 WL 3371084, at *6 (S.D. Ala. Dec. 12, 2005) (citing *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No. 01*, 625 F.2d 44, 47 (5th Cir. 1980); *Richard Bertram & Co. v. Yacht Wanda*, 447 F.2d 966, 967 (5th Cir. 1971); *Gaster Marine Recovery & Sales, Inc. v. M/V The Restless I*, 33 F. Supp. 2d 1333, 1334 (S.D. Fla. 1998); *Grand Banks Fishing Co. v. Styron*, 114 F. Supp. 1, 3 (D. Me. 1953)).

[24] 543 U.S. 14 (2004).

[25] 413 F.3d 307 (2d Cir. 2005).

7

*Kirby* is "a maritime case about a train wreck."[26] The case involved two bills of lading for the transportation of goods from Australia to Alabama.[27] While the goods safely reached the United States by ship, they were damaged after the train carrying them from Savannah to Huntsville derailed.[28]

In determining whether to apply state law or federal admiralty law, the Court was required to decide "whether intermodal transportation contracts for intercontinental shipping are maritime in nature."[29] The Court noted that some lower courts had held that intermodal transportation contracts are maritime only if the nonmaritime transportation is "incidental" rather than essential — and according to these courts, "long-distance land travel is not incidental."[30]

Ignoring this distinction between essential and incidental means of

---

[26] 543 U.S. at 18.

[27] *See id.*

[28] *See id.*

[29] *Id.* at 26.

[30] *Id.* (citing *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555-56 (2d Cir. 2000); *Sea-Land Serv., Inc. v. Danzig*, 211 F.3d 1373, 1378 (Fed. Cir. 2000); *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir. 1989)).

transportation,[31] the Court held that the bills of lading were maritime contracts.[32] In support of its conclusion, the Court noted that both "[t]he boundaries of admiralty jurisdiction over contracts [are] conceptual rather than spatial"[33] and that whether a contract is maritime "'depends upon . . . the nature and character of the contract,' and the true criterion is whether is has 'reference to maritime service or maritime transactions.'"[34]

### b. *Folksamerica*

*Folksamerica* arose from a negligence action filed by a man injured while cleaning the oil tank of a barge.[35] Clean Water informed its insurer of the suit, and Folksamerica, the insurer's successor in interest, claimed that "it had no

---

[31] *See id.* at 26-27 ("[I]t seems to us imprecise to describe the land carriage required by an intermodal transportation contract as 'incidental'; realistically, each leg of the journey is essential to accomplishing the contract's purpose.").

[32] *See id.* at 27.

[33] *Id.* at 23 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

[34] *Id.* at 24 (quoting *North Pacific S.S. Co. v. Hall Brothers Marine Ry. & Shipbuliding Co.*, 249 U.S. 119, 125 (1919) and citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603 (1991) ("[T]he trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime.")).

[35] 413 F.3d at 309.

9

obligation to defend or indemnify Clean Water."[36] Litigation ensued in federal court over the insurance policy at issue, which contained both a Shiprepairers Legal Liability Policy and a Commercial General Liability Policy. After the district court determined that this mixed policy was not a maritime policy giving rise to admiralty jurisdiction, the Second Circuit reversed, finding that "the primary objective of the [policy] was to establish maritime insurance."[37]

Early in its opinion, the court noted that "[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract,"[38] yet it qualified that statement by asserting "the recent pronouncement of *Kirby* calls for reconsideration of our precedent."[39] According to the *Folksamerica* court, *Kirby* stands for the proposition that when determining whether a contract is a maritime contract, one should focus "'on whether the principal objective of the contract is maritime commerce,' rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely

---

[36] *Id.*

[37] *Id.* at 310.

[38] *Id.* at 311 (citing *Kossick,* 365 U.S. at 735)).

[39] *Id.* at 314.

10

incidental' to the contract."[40] Using this framework, the court found that "[t]he two sections of the Policy together operate seamlessly to provide coverage that is primarily maritime in nature."[41]

### c. Analysis

Given their broad language, *Kirby* and *Folksamerica* support the demise of the holding in *The Ada*. As the Court noted in *Kirby*, whether a contract fall within admiralty jurisdiction depends on "the nature and character of the contract."[42] The MoA is not a contract for the securitization of payments on a leased ship, nor is it a contract regarding bonds issued to finance a ship. Similarly, it is not a shipbuilding contract "made on land, to be performed on land."[43] All of these examples lack the "genuinely salty flavor" characteristic of admiralty cases.[44] Rather, the MoA is a contract for the purchase of a launched ship that has been plying the seas for some time. As such, it has a distinctly "salty flavor," for the sole purpose of a ship is to sail.

---

[40] *Id.* at 315 (citing *Kirby*, 543 U.S. at 15).

[41] *Id.* at 323.

[42] *Kirby*, 543 U.S. at 24 (citation omitted).

[43] *Jack Neilson, Inc. v. Tug Peggy*, 428 F.2d 54, 58 n.6. (5th Cir. 1970).

[44] *Kirby*, 543 U.S. at 22 (citing *Kossick*, 365 U.S. 742).

11

Moreover, the "fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'"[45] Such commerce requires a vessel, sailors, and ship fuel, and there is simply no justification for including contracts for the latter two requirements in admiralty jurisdiction[46] while excluding contracts for the former.

While the foregoing discussion of *Kirby* and *Folksamerica* provide ample ground for this decision, it is also worth noting that *The Ada* has been the subject of substantial criticism. As Judge John Minor Wisdom has noted, "the petrified rule that ship-sale contracts are not within admiralty jurisdiction . . . 'arose as an analogy to a case which is inconsistent with the basic principles governing the admiralty jurisdiction of United States courts.'"[47] Moreover, in *Flota Maritima Browning v. The Ciudad De La Habana*,[48] the court noted that

---

[45] *Id.* at 25 (citing *Exxon*, 500 U.S. at 608).

[46] *See Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.*, 304 F. Supp. 2d 584, 587 (S.D.N.Y. 2004) ("contract for supply of marine fuel is maritime in nature") (internal quotation omitted) (citing *Exxon*, 500 U.S. at 612); *Carroll v. Protection Maritime Ins. Co., Ltd.*, 512 F.2d 4, 6 (1st Cir. 1975) ("Suit for breach of [a contract between a seaman and a vessel owner] lies in admiralty.").

[47] *Tug Peggy*, 428 F.2d at 58 (quoting Note, *Admiralty Jurisdiction and Ship-Sale Contracts*, 6 Stan. L. Rev. 540, 540 (1954)).

[48] 181 F. Supp. 301 (D. Md. 1960).

12

"[t]here are valid arguments in favor of the proposition that admiralty courts should take jurisdiction over claims arising out of contracts for the sale of a ship. . . ."[49]

> For example, admiralty courts are generally familiar with the subject matter of such contracts and with the related questions which frequently arise; admiralty procedure is usually more flexible and speedier than state court procedure in comparable cases; the admiralty rules with respect to attachment, release on stipulation, and the like, are uniform throughout the country and are well known to admiralty lawyers, whereas the attachment laws and practices of the several states are very different and are ill-adapted to cases involving vessels engaged in navigation, where seamen, cargo owners and others may have all sorts of conflicting claims and liens, which admiralty courts and the admiralty bar are accustomed to handle.[50]

In short, based on subsequent higher court decisions, the rule of *The Ada* is no longer viable. Not only has it been widely criticized by judges and scholars since its inception, but its supporting rationale has been eviscerated by the recent holdings in *Kirby* and *Folksamerica*.

Even if one reads *Kirby* and *Folksamerica* as limited to cases involving mixed contracts, there is admiralty jurisdiction over claims arising under this MoA. In executing the MoA, Kalafrana clearly had two objectives: *first*, it

---

[49] *Id.* at 309.

[50] *Id.* Judge Wisdom subsequently praised this argument as "well-expressed." *Tug Peggy*, 428 F.2d at 57 n.5.

13

sought to secure ownership of the "Assil," and *second*, it sought to ensure that Sea Gull Shipping would make any necessary repairs to the vessel. As such, the MoA was a mixed contract like the contracts at issue in *Kirby* and *Folksamerica*. Whether such contracts fall within admiralty jurisdiction depends on whether they make "reference to maritime service or maritime transactions,"[51] not on whether the non-maritime components are properly characterized as "incidental" to the contract.[52] Put differently, disputes arising under the MoA cannot be excluded from admiralty jurisdiction simply because the disputes involve, in part, the sale of a vessel. Because admiralty jurisdiction would undoubtedly exist if Kalafrana had entered into a vessel repair contract alone,[53] "there is no intuitive reason why the same repairs . . . fail to do so if undertaken pursuant to a sales agreement."[54] Therefore, this MoA was a maritime contract.

### C. Sea Gull Shipping's Other Arguments

Sea Gull Shipping also argues that the attachment initiated by Kalafrana was either wrongful or an abuse of process. In support of these

---

[51] *Kirby*, 543 U.S. at 24 (citation omitted).

[52] *Folksamerica*, 413 F.3d at 15 (citation omitted).

[53] *See Flota Maritime Browning de Cuba, Sociadad Anonima v. Snobl*, 363 F.2d 733, 736 (4th Cir. 1966).

[54] *Gaster Marine*, 33 F. Supp. 2d at 1335.

14

allegations, Sea Gull Shipping argues that in light of *The Ada*, it should have been clear to Kalafrana that its claims under the MoA were not within admiralty jurisdiction.[55] Given the foregoing conclusion that *The Ada* is no longer good law, Sea Gull Shipping's wrongful attachment and abuse of process claims are without merit.

### D.  Kalafrana's Request for Attachment of Additional Funds

Because Kalafrana's claims under the MoA are maritime claims within admiralty jurisdiction, this Court has jurisdiction to order the attachment and garnishment of the assets of Sea Gull Shipping Co. based on Kalafrana's claims. In its Amended Complaint, Kalafrana seeks the attachment of additional assets — $783,753.74 in total — based on revised interest and fee calculations.[56] Upon submission of the appropriate documentation, the Court will consider this request.

## V.  CONCLUSION

For the foregoing reasons, defendant's motion is denied. In addition, the Amended Verified Complaint may be filed. The Clerk of the Court is directed to close these motions (Docket Nos. 10 and 15). A conference is scheduled for

---

[55]  *See* Plaintiff's Memorandum of Law in Opposition to Motion to Vacate and Reduce Maritime Attachment Order and in Support of Cross Motion for Leave to Amend at 12.

[56]  *See* Am. Verified Compl. at 10.

October 28, 2008 at 4:30 PM in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:   New York, New York
         October 2, 2008

-Appearances-

**Counsel for Plaintiffs:**

Christopher H. Mansuy, Esq.
Mahoney & Keane, LLP
76 Beaver Street, 10th Floor
New York, NY 10005
(212) 385-1422


**Counsel for Defendants:**

Francesca Morris, Esq.
Harmony I. Loube, Esq.
Holland & Knight LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200